IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

SOUTHERN DIVISION


_____ )
                                )
USA,                            )
                                )
              Plaintiff,        )
                                )          Case No.
        vs.                     )     4:22-CR-00103-DN
                                )
ADRIAN JOSEPH ALVARADO,         )
                                )
              Defendant.        )
_____ )



DAY 1 OF 2 SUPPRESSION HEARING

BEFORE THE HONORABLE

JUDGE PAUL KOHLER



NOVEMBER 8, 2023




Reported by:   Tasha A. Sisneros, RPR, CRC, CRR, CSR
               United States Federal Court
               206 West Tabernacle Street
               St. George, Utah 84770
               435-773-5115
               Tasha_Sisneros@utd.uscourts.gov

**APPEARANCES**

**FOR THE PLAINTIFF:**

Angela Marie Reddish-Day
US ATTORNEY'S OFFICE
20 NORTH MAIN ST STE 208
ST. GEORGE, UTAH 84770
435-634-4265
angela.reddish-day@usdoj.gov

Joseph Hood
US ATTORNEY'S OFFICE
20 NORTH MAIN ST STE 208
ST. GEORGE, UTAH 84770
435-634-4264

**FOR THE DEFENDANT:**

Frank A. Berardi
ATTORNEY AT LAW
3378 South 275 East
Salt Lake City, Utah 84115
801-466-1266
jsable@gmail.com

I N D E X


WITNESS                                                    PAGE


NOLAN TANNER

     Direct Examination by Ms. Reddish-Day. . . .   18

     Examination by the Court . . . . . . . . . .  100

     Cross-Examination by Mr. Berardi . . . . . .  102

     Redirect Examination by Ms. Reddish-Day. . .  121




EXHIBITS                          MARKED      RECEIVED


     Government Exhibit 1           17            17

     Government Exhibit 2           17            17

     Government Exhibit 3           17            17

     Government Exhibit 3-1         17            17

     Government Exhibit 3-2         17            17

     Government Exhibit 3-3         17            17

     Government Exhibit 3-4         17            17

     Government Exhibit 3-5         17            17

     Defendant's Exhibit No. 1     119           ==

**P R O C E E D I N G S**

1

2          THE COURT:  Thank you.  Well, to those of

3   you expecting the venerable Judge Nuffer, apologies,

4   you are stuck with me; but I think we will get through

5   things here.

6          Let me note a couple of things.  I know

7   Judge Nuffer likes to in a suppression hearing sort

8   of at the end of it make findings of fact and then

9   have the parties brief based on those findings of

10  fact.  That is not my preferred method.  I think I

11  would prefer to do it in the more traditional way.

12         Order briefing after the transcript has been

13  produced, that kind of thing.  But I don't want to

14  disrupt something that Judge Nuffer has put in place.

15  So give that a little thought; we can talk about that

16  if you're not sure at this moment.

17         Otherwise, I think we will proceed in the

18  sort of traditional way here.  Let me make sure the

19  record is clear.  We are here on United States versus

20  Adrian Alvarado case.  Case 4:22-CR-103.

21         Let me have attorneys state their appearance

22  for the record, please, starting with the prosecution.

23         MS. REDDISH-DAY:  Good afternoon, Your

24  Honor, Angie Reddish-Day on behalf of the United

25  States.

1      MR. HOOD:  And Joseph Hood on behalf of the

2  United States.

3      THE COURT:  Very good, thank you.

4      MR. BERARDI:  Frank Berardi for

5  Mr. Alvarado.

6      THE COURT:  Very good.  The other thing I

7  would like to do to get things started today, I have

8  looked at the motion itself and some of the underlying

9  documents in the case.

10      I would like the parties to just give me a

11  very brief opening statement just suggesting your view

12  on the case and what the issues are likely to be as we

13  move forward today.  And at least identify if it

14  appears to you that all theories will be under the

15  exclusionary rule and the burden shifts to the United

16  States on that.

17      So, Mr. Berardi, why don't I start with you.

18  And just some very overview thoughts.

19      MR. BERARDI:  Your Honor, first, we'd ask

20  the exclusionary rule be invoked.

21      The summary of the case basically is Officer

22  Tanner appears to have a high tendency to stop

23  Hispanics, this is a pretextual stop.  His reports

24  tend to contradict the video evidence of the stop,

25  i.e. there's time discrepancies, there's discrepancies

of fact, omission of significant facts, tending to
show an intent to mislead fact finders.

The initial reason for the officer claim was
for a window tint violation.  That was then dropped,
and it was decided because the tint was legal that
Officer Tanner then went with something hanging from
the rear-view mirror, and following too close to be
the reasons he said he pulled the vehicle over.

He is heard telling the driver that having
anything hanging three to four inches from the mirror
is illegal.  Following a close -- following too close
is the second reason.  That's not cause for the
Defendant.  And he also did not give the Defendant
reasonable time to correct the problem.  The Defendant
did correct the problem, I think, in about three or
four seconds.

The report also has some major facts
omitted.  Like the fact that all the evidence -- all
the contraband in this case, all of it was packed in
these smell proof bags.  Yeah, 100 percent smell
proof, according to the companies that tested this,
this company's product.  Incorrect time stamps, etc.
That's the basis of the arguments.

THE COURT:  Okay.  Thank you.

Let me just double check with you,

Mr. Berardi, in terms of procedurally, any objection
to my plan of evidence being gathered today, tomorrow
if needed, transcript being ordered, and briefing
scheduled to follow from from that rather than --

MR. BERARDI:  No, that's fine.

THE COURT:  Okay.  Rather than Judge
Nuffer's typical plan.

Ms. Reddish-Day, just some initial thoughts
from you.

MS. REDDISH-DAY:  Your Honor, the summary of
the facts is that Officer Tanner stopped the
Defendant's vehicle and did so based on two traffic
code -- Utah Traffic Code violations.  Object hanging
in the rear-view mirror that materially obstructed the
Defendant's -- the operator's view.  The Defendant was
the sole occupant of the vehicle he was driving.

The second traffic code violation he
observed is that the Defendant was following too
closely behind another vehicle.  He initiated the
traffic stop based on those two Utah Traffic Code
violations.

Almost immediately upon contacting the
Defendant at the passenger side window of the vehicle,
in which the Defendant was the sole occupant, Officer
Tanner was struck with the overwhelming odor of

marijuana in the vehicle.  He had already called

Deputy Montgomery, advising him that he was going to

be making the traffic stop.

Deputy Montgomery arrived moments later,

after Officer Tanner made the traffic stop.  Deputy

Montgomery also indicated that he smelled the odor,

the strong odor of marijuana from the vehicle.

Probable cause resulted from that overwhelming odor of

marijuana to search the vehicle.

The vehicle was, in fact, searched.  And

there was a large quantity of marijuana, more than

24 pounds of raw marijuana.  In addition to about

19 pounds of methamphetamine, fentanyl pills, and

cocaine in that vehicle in an open cargo area in a

sport utility vehicle with that cargo area being

opened to the driver and passenger compartment of the

vehicle.

So those are the -- the factual summary of

the case.  The Defendant was subsequently interviewed

by two Federal agents that arrived more than a half

hour later to the scene.

Once the large load of drugs was located by

Officer Tanner and Deputy Montgomery, D.E.A. Agent

Marcus Jensen and Homeland Security Investigator TFO

Nick Hershey were both called out to the scene to

conduct a further investigation and interview the
defendant.

The defense counsel filed the motion to
suppress, alleging the legality -- questioning the
legality of the inception and scope of the traffic
stop with Mr. Alvarado; the legality of the detention
and/or arrest of Mr. Alvarado, and the
constitutionality of the interrogation of
Mr. Alvarado.

It appears today that he is relinquishing
his desire to litigate the legality or the
constitutionality of the interrogation of
Mr. Alvarado.  I had that discussion with defense
counsel over the phone prior to this hearing, and then
also in the courtroom today prior to Your Honor taking
the bench.

Based on the statements made in his motion
to suppress, he asked that four different witnesses be
subpoenaed by the United States.  We did so based on
the fact that we believed he was challenging the
inception of the stop, the probable cause to arrest,
and the interrogation of the defendant.

But to the extent that the defense is
abandoning that argument with regard to the
defendant's statements, we would ask that the two

Federal agents that arrived more than half an hour
after the vehicle was searched and contraband was
found, we would ask those witnesses be allowed to be
released and not have to wait around in the courtroom
all afternoon.

So I just wanted to clarify the scope of the
motion with defense counsel and with this Court. I
believe there's no other reason in a motion to
suppress to have those two Federal agents here when
that is their limited involvement in this case is
taking the Defendant's statements.

THE COURT: Thank you. That's part of my
goal, too, is to narrow the scope as much as possible.

Mr. Berardi, any objection to those Federal
officers being released?

MR. BERARDI: Yes, Your Honor. I told
Counsel I wanted them here at least at the beginning.
I have questions for at least one of them currently.
So yeah, I object to them being released. I asked for
them to be subpoenaed, and they were subpoenaed.

You know, I will let them go as soon as we
can, but I probably will start with them, or at least
Hiroshi(sic). So yeah, I object.

THE COURT: Okay. Fair enough then. I will
just ask that you please, if it becomes apparent to

you at some point that they can be released, please

let us know as soon as possible.

If that changes the order that you'd like to

do things, Ms. Reddish-Day, feel free.

MS. REDDISH-DAY: Your Honor, if I might

impose for a moment. If we could ask defense counsel

to proffer for the Court what would be the purpose of

the Federal agents testifying in this case if we

aren't going to be litigating the constitutionality of

the Defendant's statements.

Based on defense counsel's representations

to me, it appears that he wants to utilize Federal

agents that came on the scene far beyond the arrest in

order to somehow question the credibility of Officer

Tanner. And they weren't even at the scene at the

inception of the stop or the search of the vehicle so

I think that would be improper.

And just simply issue for trial, with

regard to the timing of the events subsequent to the

arrest, who interviews the Defendant subsequent to

his arrest. But I believe the defense counsel wants

to attempt to impeach Officer Tanner based on

reports of Federal officers that arrived much, much

later. So I don't believe that would be proper for

a motion to suppress hearing.

```
 1          THE COURT:  Mr. Berardi, let's start with

 2   your thoughts on the issue regarding interrogation.

 3   Has Ms. Reddish-Day correctly summarized your position

 4   on that?

 5          MR. BERARDI:  No, I don't think so.  I

 6   mean -- I think some of the arguments she made, I

 7   think I can use any of those to say that's the reason

 8   why I want that officer's testimony.  The fact --

 9          THE COURT:  Just start with telling me

10   whether or not you are challenging statements made by

11   your client as part of your motion to suppress.

12          MR. BERARDI:  Am I challenging the statement

13   made you mean by wanting to suppress the statements he

14   made?

15          THE COURT:  Yeah.

16          MR. BERARDI:  Yes, based -- yes, based on

17   the total of illegality of the stop, yeah.

18          THE COURT:  Okay.  It seems to me that

19   whatever discussions happened prior to this, I am left

20   with not being 100 percent sure that Mr. Berardi is

21   abandoning an argument to challenge statements made by

22   this Defendant under the exclusionary rule so I don't

23   think I can release him at this time.

24          I will say, Mr. Berardi, if you put

25   Ms. Reddish-Day through the paces of proving up and
```

calling witnesses for that, when it becomes clear you
are walking away from it, I'm not going to be thrilled
about that.  So keep this as narrow as possible, but I
am not going to send witnesses away that are
subpoenaed here today.

So I guess what I am trying to get at in
part is it sounds like you have had discussions with
Ms. Reddish-Day before the hearing today.

MR. BERARDI:  Yes.

THE COURT:  Has she mischaracterized in your
mind those discussions?  And if not, why are we
worried about the interrogation?

MR. BERARDI:  What's the question about the
interrogation?

THE COURT:  Okay.  Your motion, you know,
challenges evidence that seeks to exclude evidence
based on the stop, probable cause to arrest, and the
interrogation of your client; is that correct?

MR. BERARDI:  Yes.

THE COURT:  Ms. Reddish-Day is suggesting
conversations you have had with her before coming here
suggest that you are no longer pursuing to suppress
statements made by your client.

MR. BERARDI:  Well, that's not true.  I mean
that --

1          THE COURT:  That's what I am asking you to

2 clarify your position for me, please.

3          MR. BERARDI:  As far as this hearing today,

4 I don't think we were going to go into that.

5          THE COURT:  Okay, then --

6          MR. BERARDI:  To the extent of the

7 statements that my client made.  But the fact is is

8 that there was statements and things in the reports of

9 those two officers that I think are relevant to

10 today's hearing.  And I think --

11          THE COURT:  Based on what?  How are they

12 relevant?

13          MR. BERARDI:  Because they show at the time

14 that one of these reports -- allegedly in the report

15 it states when they were called to assist on this

16 stop, and where they were requested to go.

17          You know, the two officers have different --

18 one says mile marker eight, one says mile marker 16,

19 and the time I think is 22:00 hours.

20          Which at 22:00 hours, the stop has already

21 occurred, my client is in the backseat of Officer

22 Tanner's vehicle, the vehicle has been searched.  And

23 it doesn't line up.  It does line up with -- and it

24 also because the stop is already occurring, is over,

25 the fact that one or both of those officers state we

1    are going out to assist on a possible drug delivery or

2    transporting type of -- type of case.

3          And that would have been true earlier on at

4    miler marker eight because they hadn't made the stop

5    yet, and they are anticipating that it's a drug

6    trafficking charge.

7          But at 22:00, it doesn't make sense because

8    the stop has already occurred; the search has already

9    occurred.  And it is -- the times don't line up.

10         THE COURT:  Okay.  Let me just say then,

11   without hearing the facts, as they may come in today,

12   it seems premature to me to release the witnesses at

13   this time.

14         So I am going to deny that request, but I

15   will renew my request to Mr. Berardi to let them go as

16   soon as possible.

17         Anything else we need to do preliminarily

18   before, Ms. Reddish-Day, we have you call witnesses?

19         MS. REDDISH-DAY:  Your Honor, I just want to

20   make sure the Court received the Government's amended

21   exhibit and witness list.

22         THE COURT:  I have that.

23         MS. REDDISH-DAY:  And for purposes of

24   clarification, I would make a motion for admission of

25   those exhibits prior to us beginning.

1    I can certainly lay a foundation for each

2  of those, but I believe it would save some time if

3  Counsel would be willing to stipulate to the

4  admission of those exhibits.  They are simply the

5  body cam videos of both Officer Tanner and Deputy

6  Montgomery, the dash cam video of Officer Tanner,

7  and then the five clips of the dash cam video of

8  Officer Tanner are provided for the Court solely

9  because of the fact that there is some glitches in

10 the sound in the full dash cam.

11    At every minute marker in the dash cam,

12 there's a glitch in sound.  And so we provided five

13 clips that show a continuous time period from the

14 dash cam being activated to Officer Tanner

15 conducting the stop of the vehicle.  And that time

16 span is covered in those five clips, which are also

17 covered in the full dash cam, but the sound is

18 glitchy.

19    So we provided those five clips in order

20 for the Court to be able to see what is happening

21 and also hear what is happening on the dash cam.

22    THE COURT:  Okay.

23    MS. REDDISH-DAY:  If Counsel is willing to

24 stipulate to those, then we could move for admission

25 of those exhibits ahead of time.

1        THE COURT:  All right.  Mr. Berardi, any or
2    all of those eight exhibits you are willing to
3    stipulate to admissibility before we get there?
4        MR. BERARDI:  Yeah, I think we will
5    stipulate to them all.
6        THE COURT:  Okay.  Based on the agreement by
7    the parties, I will admit those exhibits.  That
8    appears to me it is Exhibits 1, 2, 3, and 3-1 through
9    3-5.  Does that sound right, Ms. Reddish-Day?
10        MS. REDDISH-DAY:  That's correct.  Thank
11   you, Your Honor.
12        THE COURT:  Okay.  They're admitted.  Thank
13   you for doing that.
14        (Government's Exhibits 1, 2, 3, 3-1 through
15         3-5 admitted into evidence.)
16        THE COURT:  Anything else we ought to do in
17   advance of witnesses?
18        MS. REDDISH-DAY:  I don't believe so, Your
19   Honor.
20        THE COURT:  Okay.  Very good.  You may
21   proceed when you are ready.
22        MS. REDDISH-DAY:  The United States calls
23   Officer Nolan Tanner.
24        THE COURT:  Officer Tanner, come on up here
25   close to the witness box.  Before you jump in there,

```
 1    if you will pause for a minute to be sworn.

 2

 3           THE CLERK:  Please raise your right hand.

 4       You do solemnly swear that the testimony you

 5    shall give in the case before the Court shall be the

 6    truth, the whole truth, and nothing but the truth so

 7    help you God?

 8           THE WITNESS:  I do.

 9           THE COURT:  Please have a seat.  Very good,

10    thank you.  I am Judge Kohler.  Have a seat there.

11    And give your attention to Ms. Reddish-Day, please.

12           Are you able to fit in the chair there with

13    all your gear?

14           THE WITNESS:  Yeah.

15           THE COURT:  Okay.

16           THE WITNESS:  I'm good.  Thank you.

17                      NOLAN TANNER

18       called as a witness herein by the Plaintiff,

19       having been first duly sworn, was examined and

20       testified as follows:

21                  DIRECT EXAMINATION

22    BY MS. REDDISH-DAY:

23       Q    Tip the mic up a little bit so we can hear

24    you.  Okay.

25           Good afternoon, Officer.  Can you please
```

1   state your name and spell it for the record.

     2        A    It is Nolan Steven Tanner, last name

     3   T-a-n-n-e-r.

     4        Q    Okay.  And can you just speak up just a

     5   little bit.

     6        A    Yeah, sorry.  Can you hear me better?

     7        Q    You can actually move the microphone a bit

     8   closer to you.  Great.  Thank you.  You almost have to

     9   be --

    10        A    Like touching it.

    11        Q    -- touching it.  Can you tell us what is

    12   your occupation?

    13        A    I am a patrol officer assigned to the K9

    14   Division for Washington City Police Department.

    15        Q    And how long have you been so employed?

    16        A    Seven years now.

    17        Q    Okay.  And can you describe briefly for the

    18   Court your training that allows you to become a police

    19   officer?

    20        A    Yep.  I completed Utah Post Academy.  Upon

    21   completion of that, the physical and written tests.  I

    22   then tested for Washington City Police Department and

    23   was hired by Washington City Police Department.

    24             And then I completed the field training

    25   program.  And then once I was completed with that,

1   then I was put on my own.

2       Q    Can you describe your duties in general as a

3   Washington City police officer?

4       A    Yes.  I respond to routine patrol calls,

5   conduct traffic enforcement, things like that.  I am

6   assigned to the K-9 Division so my job is a little bit

7   more unique now.  I respond to assist other officers

8   with narcotics investigations, any form of violent

9   fugitives or things like that, where a K9 would be

10  used as well.

11      Q    Okay.  And how long have you been a K9

12  handler for Washington City Police Department?

13      A    Approximately five years now.

14      Q    Okay.  And in order to have that assignment,

15  do you and your K9 partner undergo specific training

16  in that regard?

17      A    We do.

18      Q    Okay.  Can you describe that for the Court

19  briefly?

20      A    When we first became a team, we were -- we

21  completed a course up at the Utah Post for narcotics.

22  It is eight weeks long, 40 hours a week.

23           I have to then pass a written test.  And

24  then the K9 as well as myself have to pass a

25  practical test to be certified by Utah Post.

1    Q    Is there continuing training you have to

2    engage in to maintain your certification to be a K9

3    handler?

4    A    That's correct.  We are required four hours

5    of minimum training per discipline per week to uphold

6    your certificate through Utah Post.  And then we have

7    to complete an annual test as well and complete that.

8    Q    And as part of your ongoing training as a K9

9    handler, do you and your K9 partner engage in training

10   with regard to identifying the odor of various

11   narcotics?

12   A    We do.

13   Q    Okay.  And as a K9 handler, do you carry

14   various narcotics with you for training purposes?

15   A    We do.

16   Q    Okay.  And so in that capacity, you are

17   exposed to narcotics on more occasions than a regular

18   patrol officer may be; is that correct?

19   A    That is correct.

20   Q    Okay.  And are you also -- do you also have

21   a drug interdiction assignment?

22   A    I do.  I am a Task Force Officer for

23   Homeland Security.  And my job for them is to

24   specialize in narcotics investigations through them.

25   Q    And how long have you been a Task Force

Officer for Homeland Security?

    A    A little over two and a half years now.

    Q    Okay.  Can you describe for the Court what your duties entail specifically with regard to drug interdiction as a Task Force Officer?

    A    Yeah.  So what I -- with the assistance of Homeland Security, I am assigned to work the interstate and to conduct all forms of criminal interdiction on the interstate, but my specialty with them is narcotics.

         So I try to eliminate the travel of narcotics from point A to the delivery location, and try to intercept it before it gets there.

    Q    Is that primarily on the highway?

    A    Yes.

    Q    Like Interstate 15 specifically that runs through Washington County?

    A    That's correct.

    Q    Okay.  And do you receive specific training that allows you to be a narcotics interdiction officer with -- as TFO for Homeland Security?

    A    Yes.  I completed an annual training every year for Homeland Security.  In addition to that, I have taken several interdiction courses to further my knowledge in interdiction.

1    I also teach interdiction to other

2  agencies through Homeland Security as well.

3    Q    And can you describe for the Court, if you

4  can, what interdiction work is specifically?

5    A    It is the attempt to intervene between

6  crimes that are -- for this instance, going up I-15.

7  North or south of I-15 before they reach a location.

8    Q    Okay.  And in your interdiction training,

9  are you taught -- through your training and

10  experience, have you been taught to focus on small

11  details that might not be noticeable to the

12  non-trained law enforcement eye?

13    A    I am.

14    Q    Okay.  Can you describe for the Court some

15  of those details that you are trained to look for when

16  you are doing drug interdiction work on the freeway?

17    A    Yes.  There's a lot.  For examples, a

18  vehicle that's traveling in the number one lane and

19  switches to the number two lane to distance themselves

20  from an officer.  That's -- that could be a clue.

21    Somebody that is tailing behind a semi,

22  trying to blend in with the crowd, avoidance of the

23  officer.  So presence of the officer, they quickly

24  exit the freeway.  Upon passing the officer, avoid

25  eye contact.  But then as they are past them, they

will look in their side mirror, rearview mirror,

look back to see if the officer has noticed their

presence.  Those are all examples.  There's a lot.

Q    Okay.  So those are just some examples of

the cues that you are trained to look for that taken

individually are innocent cues, but as a trained

officer you are looking for those different cues as

you are watching vehicles travel on Interstate 15; is

that correct?

A    That's correct.

Q    Okay.  And how many traffic stops would you

estimate that you make per week?  Not just as a drug

interdiction officer, but in general as a patrol

officer?

A    I would say between ten and 20.

Q    Okay.  And I asked you a little bit about

your training with regard to a narcotics interdiction

and being a K9 handler.

Have you become familiar with the odor of

marijuana through your training and experience?

A    I have.

Q    And are you able to tell the difference

between the smell of raw marijuana versus burnt

marijuana?

A    I can, yes.

1      Q    Okay.  And how would you describe the -- if
2  you can, the odor of raw marijuana?
3      A    I have been around marijuana enough that I
4  describe it as the odor of marijuana.  But oftentimes
5  I hear people that aren't around it as often describe
6  raw marijuana as a skunk type of odor.
7      Q    And how would you distinguish that from
8  burnt marijuana smell?
9      A    Burnt marijuana is going to still have the
10 skunk odor but there's going to be a smoke odor mixed
11 in with it.
12     Q    And do you just kind of know it when you
13 smell it; is that fair to say?
14     A    Yes, that's fair to say.
15     Q    Okay.  And when you are making decisions as
16 a patrol officer, especially doing drug interdiction
17 on the freeway, are you -- what are you factoring in
18 when deciding where to make a stop on the freeway once
19 you have observed a traffic code violation?
20     A    There's a lot of different things.  The
21 major thing is safety.
22          If I activate my lights, are they going to
23 make a quick reaction and turn -- and stop right
24 there, or are they going to look for the nearest
25 exit.  I try to eliminate their thought process to

```
 1   make it as easiest for them.

 2           So when I decide where I am going to stop of

 3   a vehicle, I am thinking ahead of multiple different

 4   things that may come into play.  Is a dog going to be

 5   used, a K9 going to be used to sniff the car?  If so,

 6   we will need a larger area to sniff it.

 7           Innocent motoring public, as they are

 8   traveling up I-15 or down I-15, are they going to be

 9   able to see us in enough time to be able to react

10   and switch lanes.  Are we on a bend, is there a

11   barrier between the road and the turnoff where it

12   wouldn't be safe for us to pull over there for

13   officer safety as well as responding units.

14       Is there enough room if I need assistance, can

15   they respond.  A tow truck driver, if we end up towing

16   the vehicle, are they able to access the vehicle to

17   tow it.

18       Q    Okay.  So those are a lot of different

19   factors that you are evaluating.  It sounds like

20   safety first; right?

21       A    Safety first.

22       Q    Is there common areas on Interstate 15 that

23   you will make a traffic stop once you observe a

24   traffic code violation?

25       A    That's correct.  I primarily work between
```

1  the mile markers eight and 16.  I know that at mile

2  marker eight I'm going to have one pull off, which is

3  going to be Exit 10, if I am able to get to them in

4  time.

5           The next one's going to be 13, if they are

6  able to pull off there.  And then 16 is going to be

7  the next one.  And then north of 16 there's a large

8  shoulder that I would be able to safely conduct a

9  stop as well.

10     Q    Okay.  Just so we are clear, because I asked

11  you about different cues that you look for as a drug

12  interdiction officer.

13           You never stop somebody based just on

14  those cues that you see; correct?

15     A    That's correct.

16     Q    Okay.  You're -- as a law enforcement

17  officer, you are trained to only make a traffic stop

18  when you observe a traffic code violation or there's

19  other criminal activity afoot; is that correct?

20     A    That is correct.

21     Q    Okay.  I am going to turn your attention to

22  August 29, 2023.  I mean 2022.

23           At approximately 8:40 p.m., approximately,

24  were you on duty at that time?

25     A    I was.

1    Q    And were you engaged in drug interdiction

2  duties at that time as a Task Force Officer?

3    A    I was working for patrol, which is an

4  assignment that I have in patrol for Washington City;

5  but yes, I was.

6    Q    Okay.  And where were you located about that

7  time in the evening?

8    A    I was on Interstate 15 at mile marker eight.

9  My patrol vehicle was facing the northbound direction

10  of travel.

11    Q    Okay.  So you were parked stationary at mile

12  marker eight?

13    A    That's correct.

14    Q    Okay.  Why -- is that in Washington City or

15  is that in St. George city limits?

16    A    That falls in St. George city limits.

17    Q    Okay.  So why were you in St. George city

18  limits?

19    A    So I have a unique job.  Like I said, as a

20  K9 handler, I have a little bit more flexibility.

21  Where I sit at mile marker eight, my city starts at

22  mile marker 10.

23        As vehicles pass me, by the time I am able

24  to typically locate them and conduct a traffic stop

25  on them, it is typically in the City of Washington.

1            The City of Washington doesn't have a lot

2     of safe locations for me to sit stationary.  There's

3     one location which is mile marker 12 and a half.  It

4     is under construction currently, and it is a dirt

5     road versus an asphalt.

6            So it's a little harder for me to safely

7     proceed off the interstate.  So my agency is allowed

8     between the miles of eight and 16 as my area that I

9     work.

10         Q    Okay.  So that's allowable?

11         A    Yes.

12         Q    Okay.  And while you were at mile marker

13    eight, did you observe a vehicle that was traveling

14    northbound on Interstate 15 that drew your attention

15    to it?

16         A    I did.

17         Q    And what vehicle did you observe?

18         A    It was a black SUV.  I believe it was a Kia

19    Sorento.

20         Q    Okay.  And what is it about that vehicle

21    that drew your attention?

22         A    There was a couple things that interested

23    me.  As I was sitting at mile marker eight stationary,

24    I observed for the vehicle to quickly exit the

25    freeway.  I began to watch the vehicle exit the

freeway.

And as it passed me, I observed a construction vest that was hanging in the back window behind the driver's seat.

I also observed as the vehicle was exiting off the off-ramp for him to look through his side mirror to see if I had noticed his presence exiting the freeway.

Q    Okay.  And are those things that you viewed consistent with your training and experience that caused you concern?

A    They did pique my interest, yes.

Q    Piqued your interest, okay.

And with regard to the construction vest that you observed, what was significant about that?

A    Just from past experiences I observed large narcotics couriers to commonly have some form of a story built in.  Construction vests are popular at the time from what I was seeing.  In order for if law enforcement were to stop them, that would be their story is they were working.  So it was just something I was seeing that was trendy at the time.

Q    Okay.  And so that combined with the other behaviors that you noticed, it piqued your interest?

A    That's correct.

```
 1      Q    And the driver of that vehicle, the black
 2   SUV, exited the freeway?
 3      A    That's correct.
 4      Q    At what exit did the vehicle take?
 5      A    Mile marker eight.
 6      Q    Is that St. George Boulevard?
 7      A    That's correct.
 8      Q    And then you proceeded to follow that
 9   vehicle off the exit on to St. George Boulevard as
10   well?
11      A    That's correct.
12      Q    Okay.  And then where did the vehicle travel
13   to once it exited the freeway on to St. George
14   Boulevard?
15      A    The vehicle pulled into Maverick at 900 East
16   St. George Boulevard and began getting fuel.
17      Q    And 900 East St. George Boulevard Maverick,
18   is it fair to say that's about a block west of
19   Interstate 15?
20      A    Yeah.
21      Q    Just off Interstate 15?
22      A    It is just off Interstate 15.
23      Q    On St. George Boulevard, correct?
24      A    That's correct.
25      Q    Okay.  So it is at 900 East and intersects
```

1    with St. George Boulevard; correct?

2         A     Yes.

3         Q     Okay.

4         A     It actually might be 1,000 East, but

5    somewhere in that area right off the freeway.

6         Q     So approximately a block off the freeway,

7    just as you exit the freeway; correct?

8         A     Yes.

9         Q     Okay.  And so you observed the black SUV

10   pull into the Maverick, and then what did you do at

11   that point?

12        A     At that point, I parked away from him at a

13   close distance.  And I began to monitor the driver of

14   the vehicle.

15             There's other things I look for.  Are they

16   actually getting fuel, are they just exiting to

17   avoid me.

18             So I began to monitor the driver to see

19   what he was doing and as well to see how many

20   occupants were in the vehicle, et cetera.

21        Q     Okay.  So while you are monitoring the

22   vehicle, did you make contact with the driver of the

23   vehicle at that time at the Maverick?

24        A     I did not.

25        Q     Did you activate your lights or sirens at

```
 1   all at that time at the Maverick?

 2       A    I did not.

 3       Q    So you were just simply observing from a

 4   distance the driver and the black SUV; is that

 5   correct?

 6       A    That is correct.

 7       Q    Okay.  Did you take any enforcement action

 8   whatsoever while at the Maverick?

 9       A    I did not.

10       Q    Okay.  Did you communicate with another

11   officer while you were at the Maverick making those

12   observations of the driver and the black SUV?

13       A    Yeah.  There was another St. George city

14   officer that was just already in the area there.  As I

15   was circling the parking lot to position my vehicle, I

16   observed that he was already there prior to the

17   suspect arriving in the area as well as myself.

18            So I pulled up next to him to appear that

19   I was just having a conversation with him as I was

20   monitoring the vehicle as well.

21       Q    Okay.  And so direction wise, can you

22   explain as best you can what direction you're facing

23   in relation to this subject vehicle that you are

24   monitoring?

25       A    We are both facing southbound.  And I am
```

1  parked on the east side of him.  And so we are both

2  facing this way and our cars are pointed in the same

3  direction, and we are level with each other.

4      Q    And about how far away were you from the

5  subject vehicle?

6      A    About 20 to 25 feet.

7      Q    Okay.  And while you were at that distance

8  away, were you able to make any additional

9  observations about the driver and/or the vehicle?

10     A    I observed it was the same vehicle that I

11  had located exiting the freeway.  The same

12  construction vest, the orange one, was still in the

13  same location.

14          I also observed for several items to be

15  hanging from his rear-view mirror that I believe was

16  an obstruction from his view at that time.  And that

17  he was still the sole occupant and hadn't made

18  contact with anybody.

19     Q    Okay.  And so still at this point you didn't

20  make any contact with him; is that correct?

21     A    That is correct.

22     Q    And you did not -- you didn't initiate your

23  overhead lights or sirens at all?

24     A    No.

25     Q    And can you describe in more detail what you

observed with regard to the objects hanging from the rear-view mirror?

A    I observed just a cluster of items hanging from the rear-view mirror.  At the time I couldn't tell what they exactly were.  I could just see the size of the items that were hanging dead center of the dash and hanging downwards.  But I didn't know what they were at the time, I just knew they were objects.

Q    Okay.  And in your experience as a trained police officer, did you believe those objects were a violation of Utah Traffic Code?

A    I did.

Q    And what section would that be a violation of?

A    41-6A-1635, I believe.

Q    Okay.  And do you recall what that provision provides for?

A    Yeah.  I believe it states that a vehicle may not have any devices or material hanging from the rear-view mirror that may cause an obstruction of the operator of the vehicle.

Q    Okay.  And so based on your observations, did you believe that those objects that you saw hanging from the rear-view mirror did cause an obstruction to the driver?

1     A     I did.

2     Q     Okay.  And what did you do at that time once

3   you made that observation?

4     A     The vehicle -- so the vehicle was on private

5   property.  I am not able to conduct a simple traffic

6   infraction, traffic stop on a vehicle on private

7   property.  So I knew they needed to exit on to public

8   property.

9           At this time, he still could have removed

10  the objects prior to exiting onto public property

11  and then there wouldn't be a violation.  So he began

12  to proceed out of the parking lot in a congested

13  area.  And I observed for the items still to be

14  hanging from the rear-view mirror and for him not to

15  remove them prior to entering public property.

16          And then as he entered on to public

17  property, or public roadway, sorry, I then began to

18  try to catch up to the vehicle to conduct a traffic

19  stop on the vehicle.

20    Q     Okay.  I am going to ask you a couple more

21  questions about that.

22          But before I do, do you recall about how

23  long you were at the Maverick making observations of

24  this vehicle and the objects hanging in the rear-view

25  mirror?

```
 1       A     Rough estimate, three to five minutes; but

 2    that's an estimate.

 3       Q     Okay.  And by the time the subject vehicle

 4    left the Maverick parking lot, you had never initiated

 5    a law enforcement contact at that point; is that

 6    correct?

 7       A     That is correct.

 8       Q     Okay.  So when he left the parking lot, you

 9    followed; is that correct?

10       A     That is correct.

11       Q     Were you a distance behind him?

12       A     I was stuck in traffic trying to catch up,

13    yes.

14       Q     Okay.  And then what direction did the

15    subject vehicle travel?

16       A     He began to head back towards I-15 to go

17    northbound.

18       Q     Okay.  And so in doing so, he would have to

19    cross over the freeway to get on to the northbound

20    exit; is that correct?

21       A     Yes.  He would have to go over the overpass,

22    and then enter on to I-15 to go north.

23       Q     Okay.  And did you follow that same path of

24    travel?

25       A     I did.
```

```
 1        Q    But from a distance behind?

 2        A    Trying to catch up, yes.

 3        Q    Okay.  Was there a number of cars in between

 4   you and the subject vehicle?

 5        A    There was.

 6        Q    But you were able to still keep eyes on him

 7   as he entered the freeway; is that correct?

 8        A    Yeah.  I lost sight of him as he was

 9   entering on the freeway, I was a couple cars behind.

10             At that point, I knew that the only place

11   he could go from there would be Exit 10.  And I was

12   able to catch up to him about Exit 10 and observe

13   him not to exit the freeway.

14        Q    Okay.  So you had observed the traffic code

15   violation of the objects hanging from the rear-view

16   mirror as he left the Maverick parking lot.

17             Why did you not initiate a traffic stop at

18   that time?

19        A    I wasn't in a position where I could.  There

20   was cars between us.  He was a distance ahead of me.

21   So I just had to catch up to the vehicle.  Yeah, so

22   that's why.

23        Q    Okay.  Is it also a relatively congested

24   area crossing the overpass to get on to the freeway?

25        A    Yes.
```

1      Q    Okay.  Is that a place where you would

2   normally make a traffic stop?

3      A    It's not normal.  If I am able to catch up

4   to him in a timely manner and find a safe location off

5   the shoulder, then I would.  It is not somewhere I

6   could even recall the last time I did stop a car

7   there, if I even have.

8           Could I?  Yeah, if I was close enough to

9   him and it was safe; but I can't make that

10  assumption because at that time I wasn't in a

11  position to be able to make that stop.

12     Q    Okay.  And going back for a moment to the

13  objects hanging from the rear-view mirror, you saw

14  them from -- I believe you said 20 to 30-foot

15  distance; correct?

16     A    Yeah.

17     Q    Did they -- were they exceeding below

18  four inches below the top of the windshield --

19     A    Yes.

20     Q    -- those items?  Okay.  Were they also --

21  one second.

22          Were the objects also hanging below the

23  AS1 line of the windshield as well?

24     A    Yes.

25     Q    And can you describe where the AS1 line is?

1    A    Yes.  So the AS1 line is four inches below

2  the top of the front windshield.  The rear-view

3  mirrors on vehicles are positioned in the location

4  level with AS1 lines for a reason.  Because that is

5  what they deemed as anything below that obstructs the

6  view.

7         So that's why the rear-view mirror will be

8  level with the AS1 line so anything below that would

9  be below the AS1 line as well.

10   Q    Okay.  And so when you observed the vehicle

11  get back on to Interstate 15, then you followed;

12  correct?

13   A    That's correct.

14   Q    And then what did you do next?

15   A    At that point, I began to catch up to the

16  vehicle.  There was a semi truck in the number two

17  lane.  There was a pickup truck directly in front of

18  me in the number one lane.  And then directly in front

19  of the pickup truck was the suspect vehicle, a black

20  SUV.

21         And then directly in front of the suspect

22  vehicle was a white passenger vehicle.  And we are

23  all traveling in the number one lane of travel at

24  this time, often known as the fast lane that people

25  understand it as.  At that point, we were about mile

marker 11, 12-ish, and we are continuing northbound

on I-15.

       And I am -- yeah, I'm getting in a

position to stop the vehicle at this point.

    Q   Okay.  But at that point, at mile marker --

would you say 10, 11, 12?

    A   Uh-huh, (affirmative).

    Q   Right in there, you didn't initiate a

traffic stop at that time; correct?

    A   That's correct.

    Q   So you are at the rear of a line of vehicles

with being a white vehicle, the subject vehicle behind

it, the track behind the subject vehicle, and then

your patrol vehicle; is that correct?

    A   That's correct.

    Q   Traveling in the fast lane?

    A   Yes.  And then there's a semi on the right

of us as well.

    Q   Okay.  And so at that point, had you decided

you were going to initiate a traffic stop?

    A   I was going to initiate the traffic stop for

the front windshield violation.  But upon monitoring

it and attempting to locate a safe spot to stop the

suspect vehicle, I also observed a second violation

for following too closely.

1    Q    Okay.  Can you describe for the Court what

2  that observation was specifically that you observed as

3  you were following?

4    A    Yes.  So it was 41-6a-711, following too

5  closely, reasonable.

6         In front of the suspect vehicle is the

7  white passenger vehicle.  As they are traveling in

8  the number one lane, I am behind the pickup truck.

9  I began to position my vehicle to the left of the

10  pickup truck so I can see out the driver's side of

11  my front windshield.

12         At this point, I am crossed over into the

13  shoulder so I can see all three vehicles in front of

14  me.  I observed that the distance between the pickup

15  truck and the suspect vehicle are at a greater

16  distance than the suspect vehicle is from the white

17  passenger vehicle.  I started getting concerned that

18  he is following too closely to the white passenger

19  vehicle.

20         At that point, I start counting the two

21  seconds in my head based off the guardrail that

22  we're approaching as a fixed object.  I began one,

23  one thousand; two, one thousand.  And in that

24  timeframe I noticed between the white passenger

25  vehicle passing that fixed object and the suspect

```
 1   vehicle is less than two seconds is what I've

 2   estimated.

 3            So I determined I am going to also stop

 4   the vehicle for following too closely as well as a

 5   front windshield obstruction.

 6       Q    Okay.  And so you are talking about counting

 7   to two seconds.  Why are you doing that; is that what

 8   the code provides?

 9       A    Yes, the code provides -- 41-6a-711, states

10   that the operator of a motor vehicle may not follow at

11   a distance unreasonable or prudent based off of speed

12   of vehicles as well as a two-second time lapse should

13   proceed between the two.  And that is the code that I

14   was going off of for the vehicle.

15       Q    Okay.  So vehicles in following too

16   closely -- or vehicles need to follow at a distance

17   that's safe, correct?

18       A    Correct.

19       Q    And in order for officers like you to

20   determine, to help determine what is safe, there's

21   also a specific timeframe that's provided in the Utah

22   Code for you to follow.  And that's two seconds

23   between when one vehicle passes a fixed point to when

24   the next vehicle passes that same fixed point; is that

25   a fair assessment of that?
```

1      A     Yes.  It states a minimum of two seconds.

2      Q     Okay.  So that as a trained officer you are

3 trained to count two seconds in order to gage whether

4 or not a vehicle is following too closely?

5      A     That's correct.

6      Q     And what is your -- your general practice in

7 doing so?  Do you -- have you made a number of stops

8 for that same violation of other vehicles traveling on

9 the freeway?

10     A     I have.

11     Q     And are you considering the speed that the

12 vehicles are traveling on the freeway when making that

13 assessment?

14     A     Yes.  I am considering a lot of different

15 factors.  Speed, weather conditions, size of vehicle,

16 all those go into effect as well based off of how long

17 it would take that vehicle to stop.  And that's what I

18 am basing it off of.

19     Q     Okay.  But the counting, the counting two

20 seconds is in essence factoring in the speed of those

21 vehicles as well; correct?

22     A     Correct.

23     Q     Okay.  And so your practice is to find a

24 fixed point; is that correct?

25     A     That is correct.

1    Q    And then you begin counting?

2    A    As the vehicle in front passes it, then I

3    begin my counting to see if the suspect vehicle or the

4    vehicle I am in interest of possibly stopping crosses

5    before the two seconds was up.

6    Q    Okay.  And by counting, you -- is it your

7    practice to count one, one thousand; two, one

8    thousand?

9    A    That is.

10    Q    Okay.  And what pace do you do that count?

11    Can you provide that to Court, what's the pace that

12    you do that?

13    A    One, one thousand; two, one thousand.

14    Q    Okay.  And then if the second vehicle passes

15    that same fixed point before you reached two, one

16    thousand, then do you determine that's a violation of

17    Utah Code?

18    A    I do.

19    Q    Okay.  So then in this case, you observed

20    the subject vehicle traveling behind a white vehicle

21    and you engage in that same process; is that correct?

22    A    That's correct.

23    Q    And what did you use as your fixed point to

24    do your counting?

25    A    It is the last post on the guardrail that I

1    used.  There's a metal guardrail on the left shoulder

2    of the inside lane.  We're in the number one lane so

3    we are driving close to that guardrail.  So it is easy

4    for me to see taillights as they pass it.  So that's

5    what I am using as my fixed object.

6        Q    Okay.  And you made these observations of

7    the subject vehicle that it was -- well, first of all,

8    let me ask you:

9            For how long, if you can estimate, did you

10   observe that violation to occur?  How long do you

11   believe the subject vehicle was following too

12   closely the white vehicle in front of it?

13       A    What I observed was for at least a couple

14   miles.  When I started gauging it is between

15   approximately mile marker 12 and 14, in that area.

16   And that's when I started counting it and I do it

17   twice in my head.  And the second time is when I

18   determined okay, he is following too closely.

19       Q    So you went through the counting exercise

20   more than once?

21       A    Yes.

22       Q    Okay.  You went through that twice?

23       A    Right.

24       Q    Okay.  To ensure that you were finding --

25   you were, in fact, finding a traffic violation?

1    A    That's correct.

2    Q    But again, you had already made the decision

3  you were going to stop this vehicle at a safe

4  location, correct?

5    A    That is correct.

6    Q    Based on the obstruction in the windshield?

7    A    That is correct.

8    Q    Okay.  And had you already decided where you

9  were going to be stopping the vehicle prior to you

10  observing the following too close violation?

11    A    Yeah, I did.  My -- there's locations, like

12  I said, I have memorized that I frequently stop

13  vehicles at where I know it is a safe location.

14         Also, with based off of how travel is

15  right now, like I said, I have a semi on my right, I

16  have a vehicle in front of me that I need to get out

17  of the way before I can even activate this stop.

18  And then the suspect vehicle.

19         So I am shooting ahead of my next safe

20  location.  And that area was around between the mile

21  markers of 15 -- or 15 and a half and 16 and a half,

22  anywhere in those locations is where I was going to

23  determine the stop.

24    Q    Okay.  So is it fair to say there was some

25  delay between when you observed the first traffic code

```
 1  violation at the Maverick in St. George and where you

 2  ultimately were deciding to make the traffic stop?

 3      A    Yes.

 4      Q    And that's how many miles?

 5      A    Between where I observed Exit 8 and where he

 6  was stopped at 16 would be eight miles.

 7      Q    Okay.

 8      A    But between where I had located him at on

 9  I-15 is going to be a little north of 10.  So

10  depending on that, but it would be ten to 16 as we

11  were traveling together on I-15.

12      Q    Okay.  And is that uncommon for you to

13  follow a vehicle for that long before initiating a

14  traffic stop?

15      A    No.

16      Q    Once you have already seen a violation?

17      A    No.

18      Q    Okay.  And why is that?

19      A    Because I have to put in a lot of different

20  factors on where I am going to stop the vehicle as I

21  explained.  Safety, things like that as well.

22      Q    Okay.  So when did you initiate the traffic

23  stop, at what point?

24      A    I began calling out the traffic stop about

25  mile marker 15 to my dispatch.  I have a standard
```

```
 1   procedure, I call out the traffic stop.  Once dispatch

 2   acknowledges my traffic stop, I activated my body cam.

 3   And the third thing I am doing is activating my

 4   emergency lights and sirens.

 5          And so that all took place about mile

 6   marker 15.  The vehicle came to a stop about mile

 7   marker 16 just past the 16 off ramp.

 8      Q    Okay.  And the 16 off ramp is the Hurricane

 9   exit?

10      A    Correct.

11      Q    So you stopped the vehicle just beyond the

12   exit ramp; is that correct?

13      A    That's correct.

14      Q    Okay.  And when you first initiated, did you

15   initiate lights and siren or just lights?

16      A    Just lights.

17      Q    And did the subject vehicle proceed to the

18   shoulder of the roadway?

19      A    He did.

20      Q    Immediately?

21      A    Yeah.

22      Q    Okay.  And what did you do next?

23      A    At that point, I exited my patrol vehicle

24   and began making contact on the vehicle on the front

25   passenger side.
```

1     Q    And when you did so, was the front passenger

2   window rolled up or down?

3     A    I don't remember.  It was rolled down by the

4   time I walked up there.  I don't know if it was in the

5   process of rolling down.

6          I have a standard way of things.  When I

7   walk up on a car, I clear from back to front to make

8   sure that somebody is not in a back area of concern,

9   things like that.  So I began shining my light on

10  the cargo area of the vehicle.  And then I work up

11  to the front -- or the middle row, and then

12  ultimately to the driver area to make contact with

13  the driver.  By the time I made those assessments,

14  the window was down.

15    Q    Okay.  So let's talk about before you get to

16  the window.  Let's talk about what observations you

17  made as you were approaching the passenger side

18  window.

19         What observations did you make?

20    A    I observed in the cargo area of the vehicle

21  to have several cardboard boxes, large cardboard boxes

22  that were taped as well as backpacks and duffel bags.

23         Then as I approached the middle row of the

24  vehicle, I observed it did not have any occupants,

25  it to be clean.  And then as I approached the front

passenger window, I observed for just the sole

driver of the vehicle.

Q    Okay.  And the -- what -- the observations

you made of the large boxes and bags, did that -- did

you add that into the equation that piqued your

interest from earlier?

A    Yes, it did.

Q    How so?

A    So commonly what I have investigated and

seen through training and experiences is cardboard

boxes, especially large cardboard boxes that are taped

up are oftentimes used to conceal narcotics, large

sums of narcotics.

By seeing that, I was interested in that

as possibly being a large sum of narcotics in the

vehicle already.  And then at that point, I began

contact with the driver.

Q    Okay.  And that was also combined with --

were you able to see the construction vest hanging in

the vehicle as well?

A    I did.  I observed a single construction

vest to be in the same location I originally saw it.

And the only tool that I observed was a single DeWalt

drill.

Q    Okay.  So you approached the passenger side,

```
 1   is that your practice to do so when you're on the

 2   freeway?

 3        A    Yes.

 4        Q    Is that for safety reasons?

 5        A    It is.

 6        Q    And what are the first observations you made

 7   once you got to the passenger side?

 8        A    At that point, I could smell a strong odor

 9   of marijuana coming through the interior of the

10   vehicle as I was speaking to the driver.

11             And I began to inform the driver the

12   reason behind the traffic stop.

13        Q    Did you make any other observations?

14        A    I observed that the items that I originally

15   observed hanging from the rear-view mirror to be a

16   gold necklace, chain style.  And then a facial

17   covering mask.

18        Q    When you say a facial covering mask, like

19   similar to the masks that people wore during the COVID

20   epidemic?

21        A    That's correct.

22        Q    Or pandemic.

23        A    Yeah.

24        Q    Okay.  And those objects were hanging from

25   the rear-view mirror?
```

1     A     Yes.

2     Q     Okay.  So once you approached the vehicle on

3   the passenger's side, did that -- did you confirm what

4   you had already -- did the objects appear to be

5   similar or the same as what you had observed at the

6   Maverick down in St. George?

7     A     Yes.

8     Q     Okay.  But you were able to see them more up

9   close; is that fair to say?

10    A     That is correct.

11    Q     Okay.  And were those objects -- did you

12  form an opinion while up close with those objects that

13  those objects were materially obstructing the driver's

14  view or not?

15    A     I did.

16    Q     You did form an opinion?

17    A     Yeah.  I believe that they were.

18    Q     Okay.  And did you -- so you said you

19  advised the driver of the reason for the stop,

20  correct?

21    A     That's correct.

22    Q     And in doing so, what were the reasons that

23  you advised him?

24    A     I informed him that I had stopped him for

25  the front windshield obstruction violation for the

1   mask and the chain.  He looked at them, and I don't

2   remember what he said.  It was an acknowledgement.

3          And then I also informed him that the

4   vehicle in front of him, the white passenger vehicle

5   that was driving slow that he was traveling too

6   close at an unsafe distance.  And then he stated he

7   understood as well and acknowledged that.

8      Q   But by the time you advised him of why you

9   were making the stop, had you already smelled the odor

10  of marijuana coming from the vehicle?

11     A   Yes.  The odor was present instantaneously

12  as when I was walking up on the vehicle.

13     Q   How would you describe that marijuana odor?

14  As a light marijuana odor, strong, how would you

15  describe it as best you can?

16     A   It was a very strong odor of marijuana.  Raw

17  marijuana.

18     Q   Of raw marijuana?

19     A   That's correct.

20     Q   And did you have any doubt in your mind that

21  there was raw marijuana in that vehicle based on this

22  smell?

23     A   I did not.

24     Q   Okay.  Did you at the time that he was still

25  in the driver's seat of the vehicle and you were

1  advising him of the reason for the stop, did you

2  advise him of the fact that you smelled marijuana at

3  that time?

4       A    I did not confront him about the odor of

5  marijuana until we had asked him to get out of the

6  vehicle.

7       Q    Why is that?

8       A    There's a lot of different factors.  First

9  and foremost is safety.  I don't want him to be

10 overwhelmed that I know -- essentially I know what he

11 is doing or what he is possibly doing.

12          I always try to keep them calm, even if I

13 believe that they may be smuggling a large sum of

14 narcotics because I don't want them to flee, tamper

15 with the evidence, or possibly fight, things like

16 that.

17          So I usually do not inform them until I

18 have them safely out of the vehicle before I inform

19 them of why I want them out of the vehicle.

20      Q    Because he is still in the driver's seat so

21 it's possible he could drive away if you informed him

22 that you observe that smell, correct?

23      A    That is correct.

24      Q    Okay.  Did you advise him that you would be

25 giving him a warning?

1        A     I did, for the traffic violations.

2        Q     Okay.  Why did you advise you would only be

3    giving him a warning?

4        A     It goes back to what I originally stated.

5    I'm trying to keep him calm.  I don't want him

6    stressed out that he's going to get a citation.  I

7    want him to -- at this point, I have turned my

8    investigation from a simple traffic stop to a criminal

9    investigation.

10          So I know what the goal is at the end of

11   the day is I am going to be searching his vehicle

12   based off the odor of marijuana.  So if I can keep

13   him as calm as possible and think that there's a

14   possibility he just gets a warning citation, I am

15   hoping that that will eliminate the possibility of

16   him wanting to flee, fight, or anything like that.

17       Q     Okay.  So then what did you do next after

18   you advised him of the reason for the warning that you

19   were about to give him?  What did you do next?

20       A     So he had provided me his driver's license.

21   I asked him if he would be willing to come sit in the

22   front seat of my patrol vehicle.  I explained to him

23   so I didn't have to walk back and forth.

24          But it also goes back to I am trying to

25   separate him from the vehicle, knowing that I now

have a criminal investigation.  If I can get him out

of the vehicle, that's the number one goal.  He said

he didn't want to and he wanted to stay in the

vehicle.  And I told him that was totally fine.

     And at that point I began to return to my

patrol vehicle with his driver's license to do a

records check.

     Q    So did his driver's license identify him as

Adrian Alvarado?

     A    It did.

     Q    And do you see Mr. Alvarado in the courtroom

today?

     A    I do.

     Q    And can you point to him in the courtroom?

     A    Yes, he is wearing orange sitting at the

defense table.

          MS. REDDISH-DAY:  May the record reflect

that Officer Tanner has identified the Defendant.

          THE COURT:  It may.

BY MS. REDDISH-DAY:

     Q    And is Mr. Alvarado, he was in fact the

driver of that vehicle that day?

     A    That's correct.

     Q    And so you began to walk to your patrol

vehicle to begin working on the warning citations; is

that correct?

A    That is correct.

Q    Prior to that, had you already called out to another officer to respond?

A    I did.

Q    And when did you call the other officer to respond?

A    I was in contact with them via telephone at about approximately mile marker 11-ish.  But it was prior to the traffic stop when I was catching up to the vehicle?

Q    And why did you advise the other officer prior to the traffic stop rather than waiting until the traffic stop was happening?

A    Based off of my training and experiences, I believe that there was a possibility that I would be investigating a large sum of narcotics being seized out of this vehicle.

In case that was going to be the situation on this one, I wanted assistance with another officer at least responding to the area for officer safety as well as to assist with it.

Q    Okay.  And so you were in contact -- was that Deputy Montgomery that you called to the scene?

A    That is, yes.

1    Q    And you were in contact with him while you

2    were traveling up the freeway before you initiated the

3    traffic stop; is that correct?

4    A    That is correct.

5    Q    And then when did Deputy Montgomery arrive?

6    A    As I was returning to my patrol vehicle, he

7    was actually already arrived and he was walking

8    towards me.

9         We ended up meeting at the front of my

10   patrol vehicle, heading the opposite directions.  So

11   he arrived prior to me even being able to begin the

12   records check or a citation process.

13   Q    Okay.  And as he arrived, and -- were you

14   able to brief him on what you had?

15   A    Yeah.  I informed him that there was a

16   strong odor of marijuana coming from the vehicle, that

17   we would be searching the vehicle.

18        But prior to doing that, I warned him I

19   wanted to conduct a records check on the driver of

20   the vehicle.  I knew at this time that the driver of

21   the vehicle was not the registered owner of the

22   vehicle; he informed me it was his cousin's vehicle.

23        So my still first priority was officer

24   safety.  I wanted our dispatch to know that I was

25   out with this individual, not the registered owner

of the vehicle.  So I conducted a records check

of -- sorry, a records check of the driver.

           And as that was in process, I asked for

Deputy Montgomery to start by getting Adrian out of

the vehicle so we could continue the investigation.

     Q     And you also advised Deputy Montgomery when

he arrived at the scene that you smelled the odor of

marijuana; is that correct?

     A     That is correct.

     Q     Okay.  And then at some point, then did you

get in your patrol vehicle to begin the warning

process?

     A     No.  At that point I was moving on from the

simple traffic citation and into a criminal episode.

           And so what I did is I think I put his

papers in the car, and then I gave dispatch his

driver's license number to begin the records check.

And then I also began to approach Adrian to

investigate the narcotics.

     Q     Okay.  Did you ask Deputy Montgomery to get

Mr. Alvarado out of the vehicle?

     A     I did.

     Q     Was the purpose of that so you could engage

in a search of the vehicle?

     A     That is correct.

1      Q    Based on the odor of marijuana?

2      A    That is correct.

3      Q    And so when Mr. -- did Mr. Alvarado

4 willingly get out of his vehicle?

5      A    Yeah.  I wasn't there when Deputy Montgomery

6 asked him to get out of the car.  As I had began

7 approaching the vehicle, Deputy Montgomery was walking

8 towards the rear of the vehicle and Mr. Alvarado was

9 walking around the front of the vehicle.

10      So I don't think there was any contest of

11 him getting out of the vehicle because it was too

12 quick for him to do that to my knowledge.  And then

13 as he walked around the front of the vehicle, I

14 informed Montgomery he was walking around the front

15 of the vehicle and then that's when we made contact

16 with him at the front of the vehicle.

17      Q    And when you made contact with Mr. Alvarado

18 at the front of the vehicle, Deputy Montgomery was

19 with you at that time; correct?

20      A    That is correct.

21      Q    Okay.  And was the Defendant detained at

22 that point?

23      A    Yes, he was.

24      Q    Okay.  And was he handcuffed?

25      A    No.

Q    And what was -- what was your purpose at
that time for detaining him?

        A    We were going to investigate the narcotics
investigation based off the odor of marijuana in the
vehicle.

        Q    Okay.  And did you provide Mr. Alvarado his
Miranda rights?

        A    I did.

        Q    Okay.  While he was detained on the side of
the roadway; is that correct?

        A    That's correct.

        Q    And in doing so, did you provide him his
Miranda rights from your memory or from a card that
you read from?

        A    From memory.

        Q    Okay.  And can you provide the Court with
how you Mirandized Mr. Alvarado?

        A    Yes.  You have the right to remain silent,
anything you say can and will be used in this court of
law.  You have the right to an attorney.  If you
cannot afford an attorney, one will be provided by the
State.  During questioning at any time, if you would
like to seek counsel and stop answering questions, you
have the right to do so.  Do you understand your
Miranda rights.

1      Q     Okay.  And did Mr. Alvarado indicate to you

2    in some fashion that he understood his rights?

3      A     He acknowledged by making a head gesture of

4    yes.

5      Q     Okay.  And did he agree to talk to you?

6      A     Yes.

7      Q     Okay.  And did he make some statements to

8    you at that time?

9      A     He did.

10     Q     And was he -- so again, he wasn't handcuffed

11   at that point?

12     A     No.

13     Q     But was he free to leave?

14     A     No.

15     Q     Okay.  And then after you had -- did you

16   have a brief or a lengthy conversation with him

17   roadside; you and Deputy Montgomery?

18     A     I would say it was brief.  Just maybe a

19   minute before the search of the vehicle took place.

20     Q     Okay.  Was that your primary focus at that

21   time was to begin the search of the vehicle?

22     A     Yes.

23     Q     Okay.  And so then did you do so with Deputy

24   Montgomery?

25     A     Yes.

1    Q    Where was Mr. Alvarado when you searched his

2    vehicle?

3    A    He was at the front and off to the right so

4    that I could focus off on him while searching the

5    front passenger area as well as Deputy Montgomery have

6    a visual of him off to the right in the desert as

7    well.

8    Q    Okay.  So off the side of the roadway in the

9    grassy area off the side of the highway?

10   A    Yeah, the desert.

11   Q    Okay.  And so who began the search of the

12   vehicle?  Was it you or Deputy Montgomery?

13   A    I would say I technically began the search

14   of the vehicle at first because I was closest to the

15   area that I was going to search, which was the front

16   passenger door of the vehicle.

17        But Deputy Montgomery was not very far

18   behind on searching the cargo area of the vehicle.

19   Q    And then what, if anything, happened next?

20   Or what happened next?

21   A    So as I began searching the vehicle,

22   Mr. Alvarado asked me if I was going to get a warrant

23   for the vehicle.

24        I told him no, based off the odor of

25   marijuana being present.  Deputy Montgomery was

searching the cargo area of the vehicle and he had

informed me that he had located a large sum of

narcotics really quickly in the cargo area of the

vehicle.

Q    And how did Deputy Montgomery indicate to

you that he had found narcotics in the vehicle?

A    So we have a phrase that we use, and it

means that we have located a large sum of narcotics.

And the phrase is bang-bang.

So as soon as one of us say that, then we

know that that's our word that we are going to go

handcuff the suspects because a large sum has been

located.  And that's what he stated to me.

Q    And so when Deputy Montgomery said

bang-bang, then was the defendant then placed under

arrest at that time?

A    At that point, I approached Mr. Alvarado,

and I requested for him not to fight, and I placed him

in handcuffs.  And informed him that we'd talk to him

more about it, that we located a large sum of

marijuana in the vehicle.

Q    And why is that, the code words bang-bang

used when you are on roadside?

A    Oftentimes I don't want them to know if they

are out in the desert because we don't always handcuff

1  people based off just a search of the vehicle.  I

2  don't want them to know that we have found drugs in

3  the vehicle.  If we start saying drugs, things like

4  that, then it is a higher possibility that person

5  knows what we are doing versus they have no clue that

6  we located it and find them -- and then approach them,

7  sorry.

8       So it just gives us a little bit of

9  advantage that they don't know we have located what

10  we were looking for to deter them from fleeing or

11  fighting.

12     Q    Okay.  And so what was located in the cargo

13  area of that SUV that the Defendant was driving?

14     A    There was a large amount of narcotics.

15  There ended up being 24 pounds of marijuana, 400

16  individual THC carts, 19 approximately pounds of

17  methamphetamine, just short of one pound of fentanyl

18  pills, and just short of one pound of cocaine.

19     Q    Okay.  And those varieties of narcotics were

20  found in what sort of -- let's start with the

21  marijuana specifically.

22       Where was the marijuana located, the

23  approximately 24 pounds of marijuana that you

24  located?

25     A    In the large cardboard box that was taped.

1   There was -- the bulk amount of marijuana was located

2   in that box.

3         Then there was a second cardboard box

4   where another large amount of marijuana was located.

5   And then there was also marijuana kind of

6   sporadically located in the cargo area in duffel

7   bags and backpacks that concealed the majority of

8   the other narcotics.

9   Q    And as you were at the cargo area of the

10  vehicle, did the smell of marijuana increase or not?

11  A    Yes, it did.  Once we had lifted the latch

12  of the cargo area of the vehicle, the air flow was

13  coming directly at us, especially as vehicles move up

14  and down I-15, it blows a lot of air through there.

15        So the marijuana at that point was -- we

16  were directly in source of the odor of the marijuana

17  so it was stronger at that point.

18  Q    And was there any barrier in the cargo area

19  between the cargo area and the passenger compartment

20  of the vehicle where the Defendant would have been

21  driving the vehicle?

22  A    No.  There's no barriers.

23  Q    No barrier between the cargo area and where

24  you were at the passenger side window of that vehicle?

25  A    No.

1      Q    Okay.  So it wasn't as if the marijuana was
2 located in a locked trunk; correct?
3      A    No.
4      Q    Okay.  And then you and Deputy Montgomery
5 were still the only two responding officers at that
6 scene conducting a search of the vehicle; is that
7 correct?
8      A    That's correct.
9      Q    And then what did you do next once you
10 located that large sum of narcotics and marijuana that
11 you located, what did you do next?
12      A    Once we located it, like I said,
13 Mr. Alvarado was handcuffed.  Deputy Montgomery had
14 secured him in my patrol vehicle.  So now we didn't
15 have to -- we can put all our focus in the search of
16 the vehicle and continue that investigation.
17           Once he was secured in there, I began
18 contacting first our local Drug Task Force guy that
19 works for Washington City.  He wasn't able to
20 respond, but he began making calls to individuals
21 that were going to be able to respond to us and to
22 assist in the interviews and the furthering of the
23 investigation.
24      Q    Okay.  Is that the standard protocol when
25 you are doing drug interdiction investigations?

If you find a large load of narcotics, do
you call in investigators to continue the
investigation for you?

    A    Yes.

    Q    Okay.  When does your job generally cease
when you are conducting these type of investigations
roadside?

    A    That's a case-to-case basis, just because if
I am working for Homeland Security on a shift for
them, I run a lot of my cases myself through and
through.

         If I am working for patrol, then typically
I contact Drug Task Force.  Drug Task Force will
come out and depending on what I want to do, but a
lot of times they will take over the interviews and
the follow-up, and furthering that investigation to
that organizations that may be involved and things
like that.

    Q    Okay.  So specifically to this situation,
you reached out to the Task Force as you normally
would do, correct?

    A    Correct.

    Q    And your understanding is that the Task
Force then reached out to Federal agents; is that
correct?

1      A     That's correct.

2      Q     And what was the purpose of you wanting a

3 Task Force officer or a Federal agent there at the

4 scene?

5      A     To assist with the investigation.  It's a

6 lot of work that comes with it.  There's a lot of

7 things that on the back end of cell phone warrants,

8 things like that, further investigations.

9            And then there's always a possibility of

10 cooperation with suspects.  There's a possibility of

11 furthering this investigation to a possible

12 delivery.  So all those things are coming into

13 factor for this.  And so I wanted them to be

14 notified so that they would have the ability, if

15 they wanted to, to possibly do those things.

16      Q     And is one of the purposes also to

17 potentially conduct interviews with the subject if the

18 subject is willing to do so?

19      A     Yes.

20      Q     Okay.  And why do you not engage in a

21 detailed interview at the scene, rather than calling

22 out Federal agents to do so?

23      A     Typically it is because they need to have an

24 understanding of what is going on.  They can allot

25 more time to that while I am doing other things such

1  as continuing the search of the vehicle, collecting

2  the evidence.

3        I have to have a vehicle towed oftentimes.

4  So I have my own things that I have to get done.  So

5  they just assist on eliminating a lot of those tasks

6  that I would have to do by myself by doing

7  interviews and furthering it.

8     Q    Okay.  And how long do you think, if you

9  recall, how long it took you to do a full and complete

10  search of this vehicle?

11     A    This vehicle was a lot easier than normal.

12  But I would say 30 minutes tops.  Maybe 35, around

13  there.

14     Q    Okay.  And you also searched some door

15  panels and things of that nature; correct?

16     A    Correct.

17     Q    And do you recall -- if you recall, how long

18  it took for agents to arrive to assist you with the

19  further investigation that you just described?

20     A    I don't recall.  I don't even recall which

21  one showed up first, to be honest, of the two agents.

22  But it was before we were completed with the search.

23  So it would be within the 30-minute time lapse is when

24  the first agent would have showed up and began running

25  with the investigation on the back end.

1     Q    And who were the agents that did show up?

2  Even though you don't recall which one arrived first,

3  who were the agents that did arrive?

4     A    Marcus Jensen with the Drug Enforcement

5  Agency was one of the agents.  And then Nick Hershey

6  with Homeland Security Investigations also assigned to

7  the Drug Task Force was the second agent that arrived.

8     Q    So two different Federal agents arrived

9  after the search of the vehicle -- or at least 30

10 minutes after you began the search of the vehicle?

11    A    Yeah, within that 30-minute timeframe.  I

12 don't know if it was after or before that.

13    Q    Okay.  And in your vehicle, your patrol

14 vehicle, is your patrol vehicle equipped with a dash

15 camera?

16    A    It is.

17    Q    Okay.  And was it operational on that day?

18    A    It was.

19    Q    And have you viewed that dash camera footage

20 in preparation for your testimony today?

21    A    I have.

22    Q    Can you describe -- before we play any

23 footage from the dash camera, can you describe for the

24 Court how the dash camera works as far as when it is

25 activated and when it starts recording?

```
 1      A    So the dash camera is always running; it is
 2  always recording.  But it breaks it up into one-minute
 3  clips.  And so it is -- every single one minute is its
 4  own individual clip that is going through, if that
 5  makes sense.
 6      Q    Uh-huh.  Okay.  So it is a continuos video
 7  footage, but it is in one-minute increments; is that
 8  correct?
 9      A    That is correct.
10      Q    Okay.  And then if you have an incident or
11  you make an arrest, then you can download that dash
12  camera and view it and provide it as part of
13  discovery; is that correct?
14      A    That's correct.
15      Q    Okay.  And that was done in this case; is
16  that correct?
17      A    That is correct.
18      Q    Okay.  And where is the dash camera located
19  in your patrol vehicle?
20      A    The dash camera is dead center of my
21  windshield directly behind the rear-view mirror.  So
22  up high and behind the rear-view mirror.
23      Q    In the center of your vehicle?
24      A    Correct.
25      Q    Okay.  So it is not necessarily capturing
```

your view as you are in the driver's seat of the

vehicle, but it is capturing what -- what it can

capture from the middle of the vehicle; correct?

    A    Correct.

    Q    Okay.  And is it your experience in

reviewing dash cams in this case and other cases, that

the view from the dash cam is sometimes a little bit

different than what your actual perception was of the

events?

    A    Yes.  Your actual perception is going to be

far greater than the dash cam would be.

    Q    And you're making that statement based on

other cases where you have reviewed dash camera

footage and you recall certain events?

    A    Yes.

    Q    Okay.  I would like to start with playing --

we will start with Government's Exhibit 3-1.

        And before we do that, I just want to

clarify for the record and for the Court, I spoke to

this initially when we started the hearing; but

Government's Exhibit 3 is the dash cam video of this

officer, Officer Tanner, from when the camera was

initiated to -- for this incident to the ending of

the -- well, let me ask you this:

        When -- do you recall how long the dash

1  camera was activated in this case?

2      A    I don't remember how many individual clips.

3  It would have been from -- I don't remember how many

4  there were before this one, and then it would be -- I

5  think it would be until the suspect was taken to jail.

6  But it could be when the vehicle was taken away, but

7  it'd be at the end of the investigation.

8          MS. REDDISH-DAY:  So we'll start with -- so

9  again, Government's Exhibit 3 is the full dash cam

10 video that we have of this incident.

11          And then Government's Exhibit 3-1 through

12 3-5, are the one-minute clips that Officer Tanner

13 has referred to.  And the reason why we are

14 providing the clips, 3-1 through 3-5, is because the

15 audio on Government's Exhibit 3 glitches at those

16 one-minute intervals.

17          So when the dash cam is put together into

18 a full and complete footage, it glitches, the sound

19 glitches so but the clips don't.  So we are going to

20 play a couple of clips in order to show the Court --

21 I don't know that we can even see it -- but to show

22 the Court to the best of our ability what the dash

23 camera was capturing on that evening.

24          So if you can start with -- let's just

25 start with 3-1 which is the very -- which is when

the dash cam was activated.

And all of these exhibits, you know, the Court can view after the hearing and probably in a clearer fashion than how they are viewable on the videos screens here in the courtroom.  It is a little bit dark.

(Government's Exhibit 3-1 played)

BY MS. REDDISH-DAY:

    Q    So what is playing is Government's Exhibit 3-1.  Can you see that, Officer Tanner?

    A    Yeah.  Yeah.

    Q    Can you describe what you are doing while this is playing?

    A    Yeah.  I am trying to relocate the suspect vehicle that I observed at Maverick.

    Q    So you are traveling Northbound 15?

    A    Yes.

    Q    Do you see the subject vehicle in this video?

    A    Yes.  The suspect vehicle is in the number one lane.

(End of video)

BY MS. REDDISH-DAY:

    Q    So on that video you can see the subject vehicle in the number one lane traveling in front of

1  you, correct?

2      A    That is correct.

3      Q    And then you see a pickup truck change lanes

4  from the number two lane to the number three lane; is

5  that correct?

6      A    Two lane to one lane.

7      Q    Right.  Number two lane to number one lane?

8      A    Correct.

9      Q    Okay.  And so that truck was pulling behind

10  the subject vehicle; is that correct?

11     A    Yeah.  At the end of that clip, the truck

12  was behind the suspect vehicle.

13     Q    Okay.  So the next clip, Government's

14  Exhibit 3-2, has sound.

15         MR. BERARDI:  Your Honor, can I inquire on

16  that clip before we go to this next clip or how does

17  the Court want to --

18         THE COURT:  I think I'd like to watch them

19  through, but I will give you a chance in a minute.

20         MR. BERARDI:  Okay.

21         MS. REDDISH-DAY:  And before we play this

22  clip, this clip has audio from the very beginning so I

23  am not going to ask you any questions while this clip

24  is playing.  This is Government's Exhibit 3-2.

25             (Government's Exhibit 3-2, video played.)

BY MS. REDDISH-DAY:

Q    Were you able to see that clip, Officer
Tanner?

A    Yes.

Q    Okay.  And at the very beginning of that
clip, we can hear you talking about this is probably
going to be a good car, he is showing every sign, he's
showing a lot of the travel signs, signaling for five
seconds before he goes over, pulled in the signal lane
for an additional three seconds, driving super
cautious.  I'm going to try to stop him at 15 and a
half.

What are you -- first of all, who are you
talking to when you are saying that?

A    I am speaking with Deputy Montgomery with
the sheriff's office that will ultimately end up
responding to this stop as well.

Q    Okay.  And why are you saying those things
in your vehicle while you are following the subject
vehicle?

A    So I am explaining to him based off of both
of our trainings and experience with investigating
interdiction style stops, we typically see that
somebody that may be engaged in criminal activity,
they will take extra precautions when a vehicle -- or

a patrol vehicle or a police officer is behind them.

Such as they -- instead of signaling for two seconds, they may signal for an additional two seconds on top of that two seconds to avoid being stopped. And then once they're in the lane, they will signal for another three seconds in that lane.

They are overly cautious, and those kind of situations stick out to us versus the innocent motoring public that will not take those extra precautions because they are not as concerned about being stopped as somebody that may be involved in criminal activity.

Q   Okay. So those different indicators you just described and that you stated that are captured on the dash cam, those are not reasons to pull over a subject vehicle; is that correct?

A   That is correct.

Q   Okay. And at that point, had you already witnessed the violations that you've previously described in your testimony?

A   Yes. At that point, I had already observed the front windshield obstruction violation. And I was also observing the vehicle following too closely.

I got cut off a couple times when I was going to explain to him that I was going to stop him

1  for that.  And then eventually I get back on track,

2  and tell him hey, I am stopping him for these two

3  reasons.

4      Q    Okay.  So if we can play that clip again.

5  Is there a point -- and I will tell you when -- is

6  there a point when you are explaining the reason that

7  you are ultimately going to make the stop, you are

8  explaining that reason to Deputy Montgomery and he

9  interrupts you?

10     A    Yes.

11     Q    Okay.  So let's listen to that, listen to

12  this again with that in mind.

13          (Video played)

14     Q    Stop it.

15     A    It was where I say I have -- and then he

16  starts talking about Quail Reservoir.

17     Q    So when you start to say, "I have," what

18  were you intending to convey at that point before you

19  got interrupted?

20     A    I have a stop on him for front windshield

21  violation.

22     Q    Okay.  So we can we continue again.

23          (Video played)

24     Q    What was Deputy Montgomery talking about

25  when he interrupted you?

1      A      Fishing at Quail Lake.

2      Q      And during that clip, that video clip, is --

3  either on the previous video clip or this video clip,

4  do either of those video clips show the second

5  violation that you observed, the following too close

6  violation?

7      A      So based off of where I am sitting in the

8  vehicle and where the dash cam, it is not going to be

9  very clear to see.  I am looking through the left

10 side, engaging it off of the guardrail, the posts; and

11 then that's where I am counting the distance between

12 those fixed objects.

13            So because of my perspective versus the

14 dash cam, it is not going to show the distance

15 between the two.

16     Q      Okay.  But was there -- let's queue up the

17 video again at the very beginning.  And again, it is

18 Government Exhibit 3-2.

19            (Video played)

20     Q      So at this point -- we'll stop it there.  At

21 the beginning of this clip, 3-2, have you observed the

22 violations yet at this point?

23     A      Can you play it just for one more second?

24     Q      Yeah, absolutely.

25            (Video played)

1    A.    No.  At that point I hadn't observed it and
2    hadn't started counting.
3    Q    Okay.  So we will continue to play the
4    video.  And then can you alert, can you just say stop
5    when there's a point where you are observing the
6    violations as based on your recollection.
7    A    Yes.
8       (Video played)
9    A.    Stop.  So at that point is when I started
10   positioning my car over on the shoulder and start
11   gauging off of the little post you can see on the
12   cement barrier.
13   Q    Okay.  So that based on this video and your
14   testimony earlier that you were counting one,
15   one-thousand; two, one-thousand, you are you doing
16   that at about this point roughly?
17   A    Yes.  For the course of pretty much the
18   conversation between me and Deputy Montgomery.
19   That's -- I am not really engaged in the conversation
20   with him, that's why I keep saying what is because I
21   am getting sidetracked and I am doing something else.
22       And then once I observe the violation, I go
23   back to okay, cool, I'm stopping him here and moving
24   on.
25   Q    How are you able to observe the following

1 too close when you are behind the subject vehicle and

2 there's a pickup truck in between the two of you?

3      A    That's correct.  I am positioning my

4 vehicle, which is hard to see, but where I am sitting

5 offset to the left of my dash cam, I can see the

6 vehicle in front of this pickup truck, which is the

7 vehicle that I have been watching.  And then in front

8 of him is a white passenger vehicle.

9           And I can see all three of their

10 taillights as I am traveling up I-15.  I am using

11 the front lead car, the white passenger vehicle, as

12 my start point.  When they pass a fixed object,

13 which is what I am using as these posts on the side

14 of the guardrail, as soon as the taillights pass

15 that -- on the white passenger vehicle passed the

16 points I began counting in my head one,

17 one-thousand; two, one-thousand, and I am seeing if

18 the vehicle, the black SUV is passing within that

19 two seconds.

20      Q    Okay.  And this is about the point that you

21 are making those or you begin to make those

22 observations?

23      A    That's correct.

24      Q    So does this camera footage now that you are

25 seeing it, you reviewed this prior to your testimony

```
 1   today; correct?

 2        A    Yes.

 3        Q    And was it more clear when you viewed it

 4   prior to today's testimony on a more clear screen than

 5   what the Court has today?

 6        A    Yes.  It's got really bad reflection.

 7        Q    So based on your earlier review, coupled

 8   with your review of it today, is this dash camera

 9   footage showing what your actual view was that day the

10   vehicle was traveling in front of you?

11        A    No.

12        Q    We can just continue with that video.

13             (Video played)

14        Q    And is your patrol vehicle driving on the

15   shoulder at this point?

16        A    Yeah.  I am not in the lane of -- well, I am

17   splitting the lane right now and I have been for a

18   while.

19        Q    While you are making the observations you

20   just described?

21        A    Correct.

22        Q    Continue.

23             (Video played)

24             MS. REDDISH-DAY:  And then if we can play

25   Government's Exhibit 3-3, please, from the beginning.
```

1          (Government's Exhibit 3-3, Video played.)

2          MS. REDDISH-DAY:  Stop that, please.

3     Q    At this point, what are you doing?

4     A    I am waiting for a safe location to stop the

5     vehicle.

6     Q    Okay.  Is the subject vehicle still in front

7     of you?

8     A    He is in front of the pickup truck.  And in

9     front of -- yeah, in front of the pickup truck that is

10    in front of me.

11    Q    Okay.  And are you traveling up an incline

12    at that point?

13    A    Yes, we were going up the hill towards

14    Hurricane.

15    Q    And you are headed towards the place that

16    you've already decided you are going to initiate a

17    traffic stop, correct?

18    A    That's correct.

19         MS. REDDISH-DAY:  Okay.  If you can play it

20    again, please.

21         (Video played)

22         MS. REDDISH-DAY:  We can hit stop.

23    Q    Do you see the subject vehicle in that

24    video?

25    A    I do.  He is in the number two lane of

```
 1   travel, just the -- right in front of the pickup truck

 2   in the one lane.

 3        Q    So he switched lanes just before that to the

 4   number two lane?

 5        A    Correct.

 6        Q    If you can hit play again.

 7             (Video played)

 8        Q    At this point, you have already observed the

 9   two traffic code violations; is that correct?

10        A    That's correct.

11             MS. REDDISH-DAY:  And then if you can play,

12   there's just two more clips.  Government's Exhibit

13   3-4.

14             (Government's Exhibit 3-4, Video played.)

15   BY MS. REDDISH-DAY:

16        Q    You can stop that briefly.  What is depicted

17   in the video at this point?

18        A    The white passenger vehicle that was

19   originally leading the pack is by itself in the number

20   one lane.

21        Q    Okay.  And that -- is that the same vehicle

22   that you described that subject vehicle was following

23   too closely at an earlier point?

24        A    Yes.

25        Q    And is the subject vehicle now passing that
```

white vehicle?

A    It is, in the number two lane.

Q    So was that white vehicle, do you have any idea how fast that white vehicle was traveling?

A    Probably 60 to 65.  Under the speed limit.

Q    Can you hit play again.

(Video played)

Q    Are you following directly behind the subject vehicle now?

A    I am.

Q    And you have not initiated the traffic stop yet, correct?

A    That's correct.  I was trying to --

(Video played)

Q    Before we play the last clip, at that point are you simply following the subject vehicle?

A    Sorry?  One more time.

Q    At that point where we've ended this clip, are you simply following the subject vehicle at that point?

A    Yes.  So I had just called out to dispatch, which is a process.  I have to say, control 61-10-60, which is I am going to make a traffic stop; they have to acknowledge me; and then they say go ahead, and then at that point I am giving them the vehicle or the

vehicle and then the location we're stopping.

So I have to get all that out. And then once all that's out, I know that I am not going to get to the 16 exit at that point so it's going to be just north of 16 when there's a safe place, a large shoulder.

And so that I am waiting until he passes that and then I am going to activate my emergency lights so he knows now it is safe to pull over, let's pull over here.

Q    Okay. So let's start the next clip, please. Government Exhibit 3-5.

(Government's Exhibit 3-5, video played.)

Q    So, Officer Tanner, can you describe what is depicted in that last clip, Government's Exhibit 3-5, for the Court?

A    That's me conducting the traffic stop on the vehicle just prior to approaching the vehicle.

Q    Okay. And if we can shift over to the body cam for a moment.

When you are on duty, is it your practice to wear a body camera to capture your actions?

A    Yes.

Q    And were you wearing a body camera on that day?

1      A     Yes.

2      Q     Or on that evening?

3      A     Yes.

4      Q     Okay.  And have you reviewed that body cam

5  footage in anticipation of your testimony today?

6      A     Yes.

7      Q     We'll pull up exhibit -- Government's

8  Exhibit 1, please.  If we can hit pause on that

9  quickly.

10         So before we start playing some of this

11  footage, can you describe how your body camera works

12  as far as timing, when it is activated and what it

13  is capturing?

14      A     Yes.  So it is positioned on the center of

15  my vest.  Once I activate the body camera, it will on

16  video go back 30 seconds without audio where it just

17  back records.

18         And then at the time that I actually in

19  realtime had activated my body camera is when the

20  sound will kick on.

21      Q     Okay.  So in this particular instance, when

22  did you activate the body cam?

23      A     I have a standard procedure.  I call out the

24  traffic stop and the location.  And then it is usually

25  as I activate my lights or just before I activate my

```
 1   lights I activate my body camera so I am not messing
 2   with that as I exit the vehicle.
 3            And then the body camera is already
 4   activated and the vehicle comes to a stop and then I
 5   exit my patrol vehicle.
 6       Q    So is it not your practice to have your body
 7   camera activated while you are driving in your
 8   vehicle, but only prior to making a contact with a
 9   subject?
10       A    Yeah, yes.
11       Q    So it is not on the whole time that you are
12   traveling the freeway?
13       A    No.
14       Q    Is that fair to say?
15       A    Yes.
16       Q    So you activate it sometime before you make
17   that traffic stop; is that correct?
18       A    Yeah, prior to making contact with the
19   driver of the vehicle.
20       Q    Okay.  And it's your testimony that it's
21   going to capture 30 seconds back without audio,
22   correct?
23       A    Correct.
24       Q    Okay.  So we can go ahead and hit play at
25   this time.
```

1          (Government's Exhibit 1, video played.)

2      Q     Were you able to see that on your video

3   screen, Officer Tanner?

4      A     Yes.

5      Q     Okay.  And can you describe what is

6   happening during that segment of the body camera

7   video?

8      A     This is my initial contact with

9   Mr. Alvarado.  I am explaining to him the reason

10  behind the traffic stop, the violations I observed.

11         I am also requesting for his driver's

12  license, registration, insurance and figuring out

13  who owns the vehicle because he wasn't the owner of

14  the vehicle.

15         And I am explaining to him my process of

16  what I am going to do with the traffic stop, which

17  is give him warnings.  And at that point, I began to

18  return to my car.

19     Q     Okay.  If we can scroll that back to based

20  on the time on the bottom of the screen at one minute,

21  six seconds.

22         (Video played)

23     Q     If you can pause it where you can see into

24  the passenger window where he is at the passenger

25  window, when he first approaches the passenger window.

1          (Video played)

2     Q    So at this point, are you -- does the camera

3  footage as you viewed it previously and then today,

4  does that capture what you were able to see with

5  regard to what is hanging from the rear-view mirror?

6     A    Yes.  At this point, I am able to identify

7  the exact objects that I observed originally at the

8  gas station and what they were.

9          And that's where I observed it to be a

10 COVID face mask covering and then the gold chain.

11    Q    Okay.  And then if we can fast forward to

12 three minutes and -- 3:00.

13         (Video played)

14    Q    So during that time period beginning at 3:10

15 up to about six minutes, almost seven minutes, does

16 that capture the timeline that Deputy Montgomery

17 arrived and you two were beginning to search the

18 vehicle?

19    A    Yes.

20    Q    Okay.  And at some point, did you hear in

21 that video where at which point Deputy Montgomery

22 indicated to you that he had found narcotics in the

23 vehicle?

24    A    Yes.

25    Q    How did he do so?

1        A    He stated bang-bang as I was going to open

2   the passenger back door.

3        Q    Okay.  And that was about how long after you

4   had initiated the stop of the vehicle?

5        A    Probably -- when I initiated the stop of the

6   vehicle?  Probably less than five minutes from

7   beginning to location of the narcotics.

8        Q    Okay.  What was the length of time, if you

9   can approximate, between when you smelled the strong

10  odor of marijuana at the passenger side of the vehicle

11  and Deputy Montgomery found narcotics in the vehicle?

12       A    I could smell the odor right when I walked

13  up on the car, so that would have began 30 seconds

14  into my body cam starting.

15            And then we probably located the marijuana

16  three minutes after that.  So probably a three

17  minute differentiation between the two.

18       Q    Okay.  And that's all captured on this body

19  cam footage; is that correct?

20       A    That's correct.

21       Q    Okay.  And then if we can fast forward to --

22  skip through a little bit of this.  The entire video

23  is about 36 minutes.  And then the Court will be able

24  to review the entire video from beginning to end.

25            But just to highlight a couple portions of

```
 1   video to the extent we can see them.  Fast forward

 2   it to approximately 8:55.

 3              (Video played)

 4        Q    You can pause it there.

 5              So in viewing that portion of the video, are

 6   you able to see the cargo area of the vehicle that's

 7   open to the passenger compartment?

 8        A    Sorry?  One more time.

 9        Q    In viewing this portion of the video, is

10   this consistent with your view of the -- at the scene

11   of the cargo area that's open to the passenger

12   compartment of the vehicle?

13        A    Yes.

14        Q    Okay.  And did the odor of marijuana become

15   stronger as you were back there?

16        A    Yes.

17        Q    Okay.  Where did you find the marijuana

18   specifically in this cargo area?

19        A    It was spread out in different locations.

20   But the bulk amount of marijuana was located in a

21   large cardboard box that was off to the driver's side

22   of the vehicle.  And then just to the right of that

23   was a smaller cardboard box that also contained a

24   large sum of marijuana.

25              But then there was also marijuana that was
```

1    like -- a bundle was here and there mixed in with

2    the meth and the cocaine and other drugs that were

3    located as well.

4        Q    So the cardboard boxes that most of the

5    marijuana was located in, were those sealed with tape

6    or how were they sealed?

7        A    Yeah, they were cardboard boxes.  The

8    marijuana was placed in vacuum sealed bags in the

9    cardboard box.  There was a shirt placed over the top

10   of all the bundles and then it was -- the cardboard

11   box was taped up.

12       Q    And so the marijuana packages were vacuum

13   sealed from your recollection?

14       A    Yes.

15       Q    Inside the cardboard box?

16       A    Yes.

17       Q    Did the vacuum sealing prohibit you in any

18   way from smelling what the contents of those packages

19   were?

20       A    I am sure it assisted a little bit; but it

21   didn't do a very good job, no.

22       Q    Okay.  And so your testimony is that you

23   could smell the odor of marijuana back there as well

24   in the cargo area?

25       A    Yes.

Q    Okay.  Despite the fact that they were in

    sealed packages?

         A    Yes.

         Q    And let's fast forward to 11:50.

              (Video played)

         Q    Let's stop right there for a second.  So

    this capturing right here on this video, what is

    there?

         A    It was an orange construction vest that is

    hanging behind the driver's seat in the back window

    area.  And then there's a single DeWalt drill on the

    floorboard below it.

              MR. BERARDI:  What was that?

              THE WITNESS:  A DeWalt drill.

    BY MS. REDDISH-DAY:

         Q    And is this the same vest you described in

    your testimony that you saw while the vehicle was

    traveling?

         A    Yes.

         Q    And we'll just hit play on this and let it

    play for a few seconds.

              (Video played)

              MS. REDDISH-DAY:  If you can hit pause.

    Will you go back to 11:50 and hit pause.

    BY MS. REDDISH-DAY:

1    Q    So in viewing -- this view is from the

2 driver's side of the vehicle, correct?

3    A    Correct.

4    Q    Are you able to see the objects hanging from

5 the rear-view mirror there as well?

6    A    I am.

7    Q    Okay.  So the Defendant did not remove the

8 item, is that the same way the items were when you

9 first approached the vehicle on the passenger side?

10    A    It is.

11    Q    Okay.  And when you were able to observe

12 from this angle, were you able to observe the same

13 thing that you previously described?

14    A    Yes.

15    Q    Okay.  And that is what?

16    A    There is a gold chain hanging from the

17 rear-view mirror that proceeds past the face mask that

18 is also hanging from the rear-view mirror.  The chain

19 is longer, but it goes a little -- or longer down, but

20 they are both hanging from the rear-view mirror.

21    Q    Thank you.  And if we can fast forward to

22 13:42.

23         (Video played)

24         MS. REDDISH-DAY:  Can you go back a little

25 bit, please.  Will you keep playing it, please.

1         (Video played)

2         MS. REDDISH-DAY:  Will you pause, please.

3    Q    So the passenger area is illuminated at

4    this point with some light, is that correct?

5    A    Yes.

6    Q    And are you able to even more clearly see

7    the objects hanging from the rear-view mirror at that

8    time?

9    A    Yes.

10   Q    And did your opinion at all change with

11   regard to those objects materially obstructing the

12   operator's view while driving?

13   A    No.

14   Q    Did you become more concerned or less

15   concerned once you saw them up close?

16   A    Both times -- when I saw him at the gas

17   station, I was able to see that it was a larger

18   object.  I didn't know what exactly it was, but I knew

19   that based off the size that it was a concern.

20        When I saw it up close, I was just able to

21   confirm what the specific objects were.  But as far

22   as my concern level, my concern level didn't change

23   at all between the two because I -- it didn't really

24   matter what it was at that point, I just could see

25   that it was a large enough item to be of concern.

1      Q    Okay.  And that it confirmed for you that it

2  was a violation of the Utah Code?

3      A    Correct.

4      Q    And then this body camera footage is -- goes

5  to 36:24.  If we can go to the very end.  Maybe about

6  ten seconds from the end and then just hit play.

7           (Video played)

8      Q    So the body camera ends at that point.

9           What is depicted just prior to your body cam

10 deactivating?

11     A    That is all the narcotics that we located

12 during the search of the vehicle that were stacked up

13 in the back.

14     Q    Is that after they were removed from the

15 vehicle?

16     A    That's correct.

17     Q    And then put back into the vehicle?

18     A    That's correct.

19     Q    Why were they put back in the vehicle?

20     A    They were put back in the vehicle because at

21 this time, we still needed to wait for a wrecker to

22 come.

23          There was a possibility that we were going

24 to deliver the narcotics if cooperation went on.

25 And then also to show that where the narcotics were

                              99

1    located and what vehicle it belonged to for

2    documentation.

3         Q    Thank you.  And then did you physically

4    deactivate your body camera at that point?

5         A    Yes.

6         Q    Why did you do that?

7         A    My investigation was completed at

8    that point.  The agents were still working away in

9    their own vehicle with Mr. Alvarado; but at

10   this point, I was -- my investigation was complete.  I

11   wasn't going to be taking any more actions speaking

12   with Alvarado or anything like that.

13        Q    Okay.  So is it your recollection that Agent

14   Jensen had already arrived at the scene by then?

15        A    Yes.  He was already on scene and speaking

16   with Mr. Alvarado with Hershey, I believe.

17             MS. REDDISH-DAY:  Okay.  I have nothing

18   further of this witness at this time.

19             THE COURT:  Thank you.  Officer Tanner, I

20   have just one or two quick follow-up questions for

21   you.

22                          EXAMINATION

23   BY THE COURT:

24        Q    I just want to make sure.  Ms. Reddish-Day

25   asked you a time or two whether you formed an opinion

1    about the hangings and whether there was concerns and

2    so forth.  I just want to ask you for a real clear

3    answer.

4            Was after seeing the items hanging from

5    the rear-view mirror up close, was your opinion that

6    they were obstructing the driver's view?

7        A    Yes.

8        Q    And that they were a violation of Utah Code?

9        A    Yes.

10       Q    Okay.  Very good.  And I wanted to ask, when

11   you were observing Mr. Alvarado at the gas station,

12   what did he do?  Did he get gas or what was he doing?

13       A    He did get fuel.  He was sitting in the

14   driver's seat waiting for fuel to be done.  And then

15   at that point, he left the gas station.

16       Q    Okay.  Thank you.  And what's your dog's

17   name?

18       A    Zook.  Z-o-o-k.

19       Q    Okay.  And finally, would you -- I am sure

20   you have a fairly extensive cross-examination, do you

21   need any break, bathroom, anything like that before we

22   move on?

23       A    Can I just get some water?  I will be fine

24   after that.

25            THE COURT:  And, Mr. Berardi, I will just

1  let you know for planning purposes that I do need to

2  send Mr. Alvarado back with the marshal at 4:30 is

3  when I'm going to have to let him go for the day.

4        MR. BERARDI:  Okay.  Well, I will start here

5  now.

6        THE COURT:  Okay.  Do what you can.  Thank

7  you.

8                    CROSS-EXAMINATION

9  BY MR. BERARDI:

10     Q    Officer, let's go back to the 3.1, the very

11  first video we watched.  Can you replay that from the

12  very beginning?

13        THE COURT:  Let me interrupt you for just

14  one second.  What is the styrofoam piece on your mic?

15  I don't know if it affects the recording, but let's

16  put it back on in case it does.  Thank you.

17  BY MR. BERARDI:

18     Q    So as you are playing this, if you watch, it

19  happens very quick on the right-hand side, we see

20  another police vehicle go off the ramp?

21     A    Uh-huh, (affirmative).

22     Q    So who was that?

23     A    That is Sergeant Joe Watson with St. George

24  Police Department.

25     Q    Okay.  Was he watching this vehicle before?

1        A       No.

2        Q       No?  Okay.  So you're not switching places

3   with him then?

4        A       No.  So this -- what I testified to earlier,

5   there was an officer that was already at the Maverick

6   that I pulled up next to.

7                That is this officer that just happened to

8   be there at that location at the time.  This is the

9   officer that I pulled up, he asked me what I was

10  doing.  I said I was watching that vehicle off to

11  the right.

12               And then at that point he began following

13  the vehicle, too.  But I -- I don't know what he was

14  following it, if he was going to try to stop it or

15  what.  But he ultimately just gets back off the

16  exit.  I don't know if he was responding to a call

17  or what he was doing.

18       Q       So there was only one other officer at the

19  Maverick with you?

20       A       That is correct.

21       Q       Okay.  So you said that what roused your

22  suspicions was his conduct, which he signaled too

23  long, he took twice as much time -- or had twice as

24  much distance between him and the vehicle in front of

25  him; things that a defensive driver I think would do.

1       But you determined these things to be
2  things that stick out that again of someone you're
3  going to potentially stop, correct?
4       A    No.  Not correct.  So I never say that he
5  was too far from the vehicle.
6            I said that when he would signal, he would
7  signal for a greater time than normal, but I never
8  mentioned anything to do with him not traveling too
9  close to a vehicle.  It is correct that those things
10 do draw my attention to the -- to individuals based
11 off training, yes.
12      Q    So if you're a defensive driver, then you're
13 going to draw your attention --
14      A    If you are a defensive driver?
15      Q    The things that he is doing seem to be
16 things that a cautionary driver would do?
17      A    Correct.
18      Q    Okay.  So how long was he at mile marker
19 eight at the Maverick?
20      A    For a couple of minutes.  When I showed up,
21 he was just pulling in to get fuel as well.  I
22 estimate it to be between three and five minutes
23 before he left.
24      Q    Okay.  And how do we know -- he paid cash
25 for the gas?

```
 1        A    I don't know if he paid cash for the gas or
 2   how he paid for the gas.
 3        Q    An officer didn't go into the Maverick with
 4   him or to follow him in there?
 5        A    Not to my knowledge.
 6        Q    Okay.  Are you familiar with the ALPR
 7   system?
 8        A    I am.
 9        Q    Okay.  And the restrictions that go with
10   that system?
11        A    As of May of 2023, yes.
12        Q    Okay.
13             THE COURT:  For my sake, Mr. Berardi, would
14   you ask him to just clarify what that system is for
15   me.
16             MR. BERARDI:  I'm sorry?
17             THE COURT:  I don't know what that system
18   is.  Would you just clarify that for me.
19             MR. BERARDI:  Oh, okay.  Sure.
20   BY MR. BERARDI:
21        Q    Officer, would you describe the ALPR system?
22        A    ALPR stands for Automated License Plate
23   Reader.  Essentially there's license plate readers
24   throughout the country owned by entities such as
25   Vigilant, Diesel, Flock.
```

1          And what it does is when a vehicle passes

2     locations, it takes a still image of the vehicle and

3     time stamps where it was at and the time.

4          THE COURT:  Very good, thank you.  I didn't

5     recognize the acronym.  Please go ahead.

6     BY MR. BERARDI:

7     Q    Sure.  And -- did you use that system that

8     day?

9     A    For this vehicle?

10    Q    Yeah.

11    A    Yes.  My automated license plate reader is

12    run 24/7 when I am working.

13    Q    Okay.  And did you pull a report from it?

14    A    What do you mean by report?

15    Q    I mean did you pull up that -- the car he

16    was driving?

17    A    Did I research his travel history?

18    Q    Yeah.

19    A    Yes.

20    Q    And that's not in your report anywhere,

21    right?

22    A    That's correct.  Our reports are off of

23    recollection.

24    Q    All right.  And so why wasn't that in your

25    report?

1    A    Because my report is for officer

2 recollection.

3    Q    Oh, okay, all right.  And did you have an

4 active investigation going when you accessed that

5 system?

6    A    At this time, there's an investigation based

7 off of the vehicle's travel, the suspicion that I had

8 in the vehicle.  And this is also after May of -- or

9 prior to the new legislature of May of 2023.

10    Q    Okay.

11    A    Which with ALPR at that time before May of

12 2023, you could use ALPR for traffic offenses, wanted

13 persons, to conduct investigations, it was a lot more

14 broad until May of 2023 came into effect and

15 restricted it to only have an active investigation.

16    Q    Okay.  And what time did you make the call

17 to Agent Hiroshi for backup or to come to your scene?

18    A    I didn't call Agent Hershey.  I called

19 Detective Gibson, the Drug Task Force, after I located

20 the narcotics, which is seen on body cam that I

21 request dispatch to give him a call.

22         I don't know the exact time.  We would

23 have to watch the body camera to get that.  He then

24 does the contacting for Agent Hershey and Agent

25 Jensen to respond to my location.

1    Q    Okay.  And so -- you are saying you didn't

2    make that call until after you had stopped the

3    vehicle, right?

4    A    After I had found the narcotics is when

5    Detective Gibson was notified to make those calls,

6    correct.

7    Q    I mean that's after you stopped the vehicle

8    then obviously?

9    A    Yes.

10    Q    Okay.  So why does his report reference mile

11    masker eight for a possible drug smuggling load if you

12    had already made the stop?

13    A    You're going to have to ask Agent Hershey

14    that.  I didn't write his report.

15    Q    If you can, just give me specifically what

16    your hunch was or, you know, in this vehicle, or

17    reasons for the stop as far as what you actually

18    observed to give you, you know, reasonable suspicion

19    to stop the vehicle?

20    A    The two traffic violations.

21    Q    Okay.  Anything else?

22    A    No.  That's why I stopped the vehicle.

23    Q    And you said you made this -- you said the

24    violation of the following too close was observed

25    after you had already determined you were going to

1    stop the vehicle, right?

2        A    For the front windshield obstruction

3    violation, correct.

4        Q    And when you did the check on the vehicle,

5    did they inform you where the vehicle was registered

6    to or the address like where it was from?

7        A    It was out of northern Utah.  I can't

8    remember the exact address or city or who the

9    registered owner even was other than that it was his

10   cousin is what he stated.

11       Q    What did you say?  Something in Utah, did

12   you say northern Utah; is that what you said?

13       A    Northern Utah.

14       Q    Okay.  So your report claims that you were

15   traveling on I-15 at mile marker 11 when you first

16   observed Mr. Alvarado; is that right?

17       A    When I observed him, yes.

18       Q    I am sorry, what?

19       A    It says when I observed Mr. Alvarado's car,

20   yes.

21       Q    And so you actually encountered Mr. Alvarado

22   23 minutes prior to mile marker 11, correct, at mile

23   marker eight; right?

24       A    Sorry?  One more time.  I think you said

25   23 miles or something like that.

1      Q    I said that you actually -- I said 23

2  minutes prior to mile marker 11 at mile marker number

3  eight.

4           I mean you encountered him first at eight,

5  right?

6      A    That's correct.  That's when I first

7  observed him.

8      Q    So not 11 like it's -- I have here in your

9  report, it states that you are traveling on I-15 at

10 mile marker 11 when you first observe Mr. Alvarado?

11     A    I don't believe it says first observed.

12 It's just when I reobserved him and located him,

13 correct, but not first.

14          MS. REDDISH-DAY:  Your Honor, can I approach

15 for a moment?  I realize I left my file on the podium.

16          THE COURT:  You may.

17          MS. REDDISH-DAY:  Sorry about that.

18 BY MR. BERARDI:

19     Q    So let's go back to the body cam footage

20 again.  I notice the time is not right on that, is

21 that correct?  Does it say 15:29?

22     A    So this is the dash cam.  And that must not

23 be correct, no.

24     Q    That's what I'm saying, so the time stamp is

25 incorrect on that; right?

```
1        A    Yeah.

2        Q    It's not three in the afternoon?

3        A    No, there is no way it is 3:30 in the

4   afternoon.

5        Q    How is that set on those -- on that?

6        A    I don't program my dash cam or anything in

7   my vehicle.  That's how it is issued to me, so I

8   couldn't tell you how it is programmed or anything to

9   do with it.  I just turn it on.

10       Q    So you just turn it on or off?

11       A    When I activate my vehicle, turn my vehicle

12  on is when the dash cam starts going.  So I don't have

13  anything to do with that stuff.

14       Q    Okay.  So you turned your body cam video on

15  back at mile marker eight, correct?

16       A    No.  Not my body camera.  My body camera

17  gets activated as I am exiting my vehicle to make

18  contact with the driver.

19       Q    So what time did you activate your body cam?

20       A    I'd have to go back to the body cam video to

21  tell you the exact time.  But when I would activate my

22  body camera would be as I call out the traffic stop, I

23  activate it prior to making contact with the vehicle I

24  had stopped.

25       Q    Okay.  So your first encounter with my
```

1    client based off the ALPR report was 20:13 hours; is

2    that right?

3        A    If that's when he passed my vehicle

4    stationary, then that would be correct.

5        Q    At mile marker eight?

6        A    At mile marker eight.

7        Q    And you activate your body cam at 20:34

8    hours at mile marker eight; is that right?

9        A    One more time with the body camera at mile

10   marker eight?

11       Q    I said then you activated your body cam at

12   20:34 hours at mile marker eight?

13       A    Not at mile marker eight, no.  At mile

14   marker 16 when I began to approach the vehicle on the

15   traffic stop is when my body camera would be

16   activated.

17       Q    So you are saying you activated it at mile

18   marker 16?

19       A    Correct.

20       Q    So I am looking at 21 minutes between the

21   first encounter and the second encounter.

22            When you pulled back on to the highway,

23   you were continuously moving and you didn't stop

24   anywhere, correct, after you left the Maverick?

25       A    Correct.

1      Q     And you were attempting to catch up you said

2   to my client, correct?

3      A     After he proceeded back on to I-15 to go

4   northbound from the gas station, that's correct.

5      Q     Okay.  Were you doing anything else in that

6   time period or were you just trying to locate or stop

7   that vehicle?  Did you -- you had already done the ALR

8   check, right?

9      A     The ALPR?

10     Q     Yeah.

11     A     So the ALPR -- when he exits mile marker

12  eight and goes to the gas station, sits in the gas

13  station, and I am sitting with that officer that we

14  talked about before, that's when the record check on

15  the LPR was done as well as any registration or

16  anything like that for the traffic side of it.

17           And then he proceeds to leave, and then

18  that's when I proceed to follow him.

19           MR. BERARDI:  If I could have one moment,

20  Your Honor.

21           THE COURT:  You may.

22           (Counsel confers with client off the

23            record.)

24  BY MR. BERARDI:

25     Q     So, Officer, let's back up to the things you

1  observed that give you indications that a vehicle may

2  be transporting drugs or whatever.

3          I mean do you profile vehicles then?

4      A    No.  I profile behaviors based off of what

5  they do in my presence.

6      Q    Okay.  How about as far as out of state

7  plates?

8      A    Nope.  This is a Utah plate.

9      Q    What if the vehicle -- vehicles with out of

10 state plates, you said you don't profile that?

11     A    All vehicles transport narcotics, as you can

12 see.  Utah, narcotics loads out of every state.

13     Q    So certain -- so certain states don't raise

14 your suspicion or anything?

15     A    No.

16     Q    Okay.  Are you familiar with Saul Marino or

17 Eddie Uncera or Red Jones, those individuals,

18 defendants?

19     A    Yes.  The last one, Red Jones, is familiar.

20     Q    I think they are all your cases?

21     A    Correct.

22     Q    Okay.  All these vehicles that were pulled

23 over in those cases all have out-of-state plates?

24     A    Possibly.

25          MS. REDDISH-DAY:  Your Honor, I'm going to

object to relevance.  If we are going to be getting

into additional cases this officer has been involved

in, especially with regard to out-of-state plates when

this wasn't even an out of state case.

MR. BERARDI:  Strike it, Your Honor.

THE COURT:  Very good.  Sustained.

BY MR. BERARDI:

Q    Okay.  So one thing -- one reason you have

for the stop is the fact that there was large items

hanging from the mirror, correct?

A    Correct.

Q    Okay.  And how did he end up being charged

with the illegal tint and following too closely?  I

can understand following too close; how did the

illegal tint get charged?

A    I don't recall the tint charge at all.

Unless it was something that was investigated

afterwards, but I don't remember the tint charge.  It

would have been --

Q    If it was on the charging Information, I

think the lower court here, but you don't recall --

you don't know why or how?

A    Unless it was a glitch of instead of being

front windshield violation because I don't know where

the tint would have came from in substitution of the

windshield obstruction violation.

Q    So you work for Washington City, correct?

A    That's correct.

Q    And so mile marker eight, is that -- is just outside of that jurisdiction, right?

A    Correct.

Q    Okay.  So the ALPR also revealed that two minutes after the first encounter you inquired about the license plate; is that correct?

A    What do you mean by inquire about the license plate?

Q    That you inquired about the license plate.

A    Like I researched it after it passed?

Q    Yeah.

A    That's probably correct.  I don't know the exact time.

Q    And what did that inquiry reveal?

A    That the vehicle had traveled into California and out of California in I believe less than 48 hours or something like that.  I can't remember the exact dates and times.

Q    And you are saying at the time this incident happened, you didn't have to have a warrant to search the historical data?

A    This is prior to May of 2023, when you could

run ALPR for a majority of different reasons.  For

investigation of traffic offenses, for missing

persons, wanted persons, active investigation

purposes.  It was very broad on what you could use it

for.

        ALPR was commonly used for expired

registrations or if they were wanted persons it

would tell you that and that's what you would run it

for.  So that that's what it was, for that purpose.

After May 2023, it restricted itself with the new

legislature.

    Q    So you're saying at this time that it wasn't

restricted?

    A    No.  This is prior to April of 2023 -- or

May of 2023, sorry.

    Q    And you said that -- what was the name of

the officer you called for the backup?  You said it

wasn't Hiroshi, who was it?

    A    So it's Agent Hershey.  But the officer that

I contacted was Deputy Montgomery that you hear

talking on the phone with me.

    Q    Okay.  I thought you said you called

somebody else and then they contacted Hiroshi; is

that --

    A    So I contacted -- once the narcotics were

```
1    located, Detective Gibson, who is assigned to the
2    Washington County Drug Task Force but is employed with
3    Washington City Police Department where I work, he was
4    not able to respond to assist with the investigation.
5    So at that point he contacted Agent Hershey and Agent
6    Jensen to come assist me with the investigation.
7         Q    Okay.  Now the dispatcher record shows I
8    have three different officers including you arriving
9    at the same time at the traffic stop.
10        A    Okay.
11        Q    Who -- who is the third one?
12        A    That's -- I don't know.
13        Q    You are saying there's just two officers,
14   you and Montgomery?
15        A    Me and Montgomery, yes.
16        Q    And -- may I approach the witness, Your
17   Honor?
18             THE COURT:  You may.
19   BY MR. BERARDI:
20        Q    So down here on this record right here, I've
21   got three officers.
22             THE COURT:  What are we looking at,
23   Mr. Berardi?
24             MR. BERARDI:  I'm sorry, Your Honor.  It
25   is --
```

1          THE WITNESS:  Cad comments is what it's

2     called.

3     BY MR. BERARDI:

4          Q    What's it called?

5          A    Cad comments.  It's our spillman system when

6     they log officer's activities, I guess.

7               THE COURT:  Okay.

8               MS. REDDISH-DAY:  Your Honor, I ask this be

9     marked.  Does defense intend to enter those as

10    exhibits or just question the officer about them?

11              MR. BERARDI:  Probably so, if we can get a

12    sticker.  This is marked Defense Exhibit 1.

13                   (Defense Exhibit No. 1 marked for

14                    identification.)

15    BY MR. BERARDI:

16         Q    So on the bottom, you see it said three

17    officers?

18         A    Correct.

19         Q    So who is that third officer?

20         A    So 6XA is my sergeant that responds later on

21    after me and Dan Montgomery show up.

22         Q    Okay.  Because it shows you all arrived at

23    the same time, right?

24         A    No.  I don't know why it would show that.

25    But as you can see on body cam, things like that, he

1    does not show up at the same time.

2         He shows up after narcotics have already

3    been located and everything.  But yes, they logged

4    it like that.  I don't know, I can't tell you why, I

5    don't run that system.

6         Q    So you are saying that's inaccurate?

7         A    The time of arrival?

8         Q    Yeah.

9         A    Yes, is inaccurate.  But he does show up and

10   you will see him on the body cam, but it is later.  It

11   is not the same time.

12        MR. BERARDI:  Okay.  I will hold that

13   exhibit, Your Honor.

14        THE COURT:  Okay.

15        MR. BERARDI:  For now.

16   BY MR. BERARDI:

17        Q    Approximately what time did you say your

18   supervisor showed up?

19        A    It is probably at least 10-15 minutes into

20   the investigation from the time I stopped the vehicle

21   after he had showed up, and the vehicle had already

22   been searched.

23        The suspect had already been placed into

24   handcuffs and already placed in the patrol vehicle.

25   And we were continuing to search the vehicle when he

```
 1   showed up.  So however much time that was.  I'd say

 2   about 10-ish, 15 minute.

 3        Q    But it was before the other two officers

 4   showed up, your DEA agent and --

 5        A    I don't recall exactly when they showed up.

 6   I was focused on the vehicle.

 7             I wasn't necessarily taking mental notes

 8   on when people were showing up on the scene.

 9        Q    Were those two officers and you three

10   officers, were you all there at the same time at

11   some point?

12             UNIDENTIFIED SPEAKER:  (From the gallery)

13   What about the tinted windows?

14             THE WITNESS:  One more time, sir.

15   BY MR. BERARDI:

16        Q    You, Montgomery, and your supervisor, were

17   you guys all present at the same time those other two

18   officers showed up later?

19        A    Yes, I believe so.

20        Q    Okay.  So at some time, some point, all five

21   of you were there together?

22        A    Correct.

23             MR. BERARDI:  I think that's all I have as

24   far as cross-examination goes.

25             THE COURT:  Okay, very good.  Any redirect?
```

MS. REDDISH-DAY:  Just briefly, Your Honor.

                    REDIRECT EXAMINATION

BY MS. REDDISH-DAY:

    Q    Counsel asked you a few questions about the
ALPR and you running the license plate through that
system, correct?

    A    Correct.

    Q    And just so we are clear, you did that while
you were at the Maverick gas station observing the
Defendant's vehicle?

    A    Correct.

    Q    Okay.  And is that a common practice that
you engage in as a drug interdiction officer?

    A    This was prior, yes.  Prior to May of 2023,
when you could run ALPR for different reasons.

         So if I had a vehicle of interest, I would
run LPR if I was either prior to this -- always
prior to the stop, but to build more of an
understanding of this vehicle's travel for
discussion to see if their story matches the travel,
so yes.

    Q    But did you use that information as a basis
for your later traffic stop?

    A    No.

    Q    And did that impact your ability to view the

1  Utah Traffic Code violations that you viewed with the

2  objects hanging in the rear-view mirror at the

3  Maverick gas station?

4      A    No.

5      Q    As well as the following too close violation

6  later?

7      A    No.

8      Q    And you wrote a report in this case,

9  correct?

10     A    Correct.

11     Q    And you also drafted a probable cause

12 statement?

13     A    Correct.

14     Q    And that probable cause statement is

15 provided to the State Court prosecutors who then later

16 file charging documents; is that correct?

17     A    Correct.

18     Q    Okay.  And are you responsible in any way

19 for how this case ultimately gets charged in court?

20     A    No.

21     Q    Okay.  And in your probable cause statement,

22 do you mention anywhere that there's a window tint

23 violation?

24     A    This is all news to me.  I don't recall it

25 so I don't believe so.  I'd have to --

```
 1       Q    Would --

 2       A    Yes.

 3       Q    Would looking at the report refresh your

 4  recollection?

 5       A    Yes.  Because I don't recall ever writing

 6  that or where that is coming from.

 7            MS. REDDISH-DAY:  May I approach the

 8  witness, Your Honor?

 9            THE COURT:  You may.

10            MS. REDDISH-DAY:  I am handing the officer

11  his probable cause statement.

12  BY MS. REDDISH-DAY:

13       Q    Have you reviewed that document?

14       A    Yeah.

15       Q    Does that refresh your recollection?

16       A    Yes.

17       Q    Did you at any point in your probable cause

18  statement indicate that you initiated a traffic stop

19  based on a window tint violation?

20       A    No.

21       Q    And did you in your report in this case,

22  which is in addition to your probable cause statement,

23  did you put in your report in any place that you

24  initiated this traffic stop based on a window tint

25  violation?
```

124

```
 1        A    No.

 2        Q    So if that was charged by the State

 3   prosecutor; is that news to you today?

 4        A    Yes.

 5        Q    And you are not responsible again for that

 6   charging document; is that correct?

 7        A    Correct.

 8        Q    Have you ever reviewed that charging

 9   document?

10        A    No.

11        Q    And the -- just to reiterate, the -- your

12   Sergeant from Washington City who responded, what is

13   his name?

14        A    Lance Bartriff.

15        Q    And he did, in fact, respond after you had

16   already located drugs in that vehicle; correct?

17        A    Correct.

18             MS. REDDISH-DAY:  I have nothing further,

19   Your Honor.

20             THE COURT:  Okay, very good.  Officer

21   Tanner, appreciate you being here today.  You are

22   excused and are free to go.

23             THE WITNESS:  Do I just leave this here?

24             THE COURT:  Leave that right there,

25   Ms. Reddish-Day will collect that.
```

```
 1              (Witness excused.)

 2         THE COURT:  Since we are getting short on

 3    time here, before we call any other witnesses, if at

 4    all, let me just ask whether there's anything else we

 5    should take care of while we have Mr. Alvarado with

 6    us, here with us today.

 7             Mr. Berardi, any suggestion there?

 8             MR. BERARDI:  I mean -- I think we just

 9    continue on.

10         THE COURT:  I understand.  I just want to

11    make sure if there's any legal issues or something

12    like that, that we want Mr. Alvarado here for, we do

13    that in the next few minutes here.

14             Ms. Reddish-Day, anything of that nature

15    we ought to take up?

16             MS. REDDISH-DAY:  No, no.  We do have

17    additional witnesses, Your Honor.

18             THE COURT:  Okay.  I think it makes sense to

19    me not to start for five minutes or so and then

20    interrupt a witness; but I am open to objections to

21    that.

22             MS. REDDISH-DAY:  I will do whatever the

23    Court would like to do.  I do not believe we will

24    finish Deputy Montgomery in ten minutes with

25    cross-examination.
```

THE COURT:  Okay.  Let's begin with him as

soon as we start tomorrow.

                   It sounds like Judge Nuffer laid out a

schedule in which he suggested this could be picked

up at 11:00 a.m. tomorrow.  That works for me.  I

will let you know my 10:00 calendar, I don't think

it will take an hour.

                   If you want to show up any earlier than

11, I think we can start earlier than 11; but I

think we have the rest of the afternoon as needed

tomorrow.

                   Ms. Reddish-Day, anything else we ought to

take care of today?

                   MS. REDDISH-DAY:  Your Honor, I will just

readdress since we are going to reconvene tomorrow at

11:00 a.m., if there is still a need for us to have

HSI Task Force Officer Agent Hershey available to

testify as well as DEA Agent Marcus Jensen.

                   They have been outside all afternoon, and

again I don't want to reiterate what I argued earlier

as to the relevancy of their testimony since we are

not, I don't believe, going to be litigating the

admissibility of the statements of the Defendant.

                   But I just wanted to bring that objection

up again, and see if we can dismiss Mr. --

MR. BERARDI:  I am still not agreeing to let

them go.  I don't know about the others, but Hiroshi I

definitely want to.

          THE COURT:  Okay.  Let's ferret that out a

little bit.

          And I hope that doesn't sound insulting, but

I just want to make sure that any time that you

mention the name Hiroshi on the record, I think you

mean Agent Hershey; is that correct?

          MR. BERARDI:  Excuse me, Your Honor, yes,

Hershey.

          THE COURT:  Okay.  Just for clarity sake.

So it sounds like you would like Agent Hershey here

tomorrow, but not Marcus Jensen; is that correct?  Or

are you keeping that in reserve for now?

          MR. BERARDI:  Yeah, I'd like to keep that in

reserve, too.  Yeah, I -- I think he can probably be

released.  I am not anticipating anything for him; but

again, if something comes up, then I am, you know.

          THE COURT:  I understand.  Let's do this

then.  I am not going to require Agent Jensen to be

here tomorrow.  He is local.  We might be able to

bring him here quickly.  If not, we will entertain

what we need to do beyond that; but maybe you can ask

him not to disappear too far out of town.

1        But these things are factually based enough,

2   I think I am going to require Agent Hershey to be

3   available until it becomes obvious he is not needed.

4   Are you content with that plan?

5        MR. BERARDI:  Yeah.  Very well, Your Honor.

6        THE COURT:  Okay.  Let's do that.  If

7   there's nothing else for the record then, we will

8   adjourn this hearing until 11:00 a.m. tomorrow or a

9   few minutes earlier if everybody is ready to go.

10        We are adjourned.

11    (Proceedings adjourned for the day at 4:23 p.m.)

12

13                        *****

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  C E R T I F I C A T E

 2   STATE OF UTAH                    )

 3                                    )   ss.

 4   COUNTY OF WASHINGTON             )

 5

 6        This is to certify that the proceedings in the

 7   foregoing matter were reported by me, Tasha Sisneros,

 8   RPR, CRR, CSR, CRC, in stenotype and thereafter

 9   transcribed into written form;

10        That said proceedings were taken at the time and

11   place herein named;

12        I further certify that I am not of kin or

13   otherwise associated with any of the parties of said

14   cause of action and that I am not interested in the

15   event thereof.

16        In witness whereof I have subscribed my name this

17   15 day of December 2023.

18

19
                              _____
20

21           Tasha Sisneros, RPR, CRR, CRC, CSR

22

23

24

25
```