IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

SOUTHERN DIVISION

_____
                              )
                              )
USA,                          )
                              )
            Plaintiff,        )
                              )        Case No.
     vs.                      )    4:22-CR-00103-DN
                              )
ADRIAN JOSEPH ALVARADO,       )
                              )
            Defendant.        )
_____)

DAY 2 OF 2 SUPPRESSION HEARING

BEFORE THE HONORABLE

JUDGE PAUL KOHLER

NOVEMBER 9, 2023

Reported by:   Tasha A. Sisneros, RPR, CRC, CRR, CSR
               United States Federal Court
               206 West Tabernacle Street
               St. George, Utah 84770
               435-773-5115
               Tasha_Sisneros@utd.uscourts.gov

```
 1                    APPEARANCES

 2    FOR THE PLAINTIFF:

 3    Angela Marie Reddish-Day
      US ATTORNEY'S OFFICE
 4    20 NORTH MAIN ST STE 208
      ST. GEORGE, UTAH 84770
 5    435-634-4265
      angela.reddish-day@usdoj.gov
 6
      Joseph Hood
 7    US ATTORNEY'S OFFICE
      20 NORTH MAIN ST STE 208
 8    ST. GEORGE, UTAH 84770
      435-634-4264
 9

10

11

12    FOR THE DEFENDANT:

13    Frank A. Berardi
      ATTORNEY AT LAW
14    3378 South 275 East
      Salt Lake City, Utah 84115
15    801-466-1266
      jsable@gmail.com
16

17

18

19

20

21

22

23

24

25
```

1                          INDEX

2

3

4   WITNESS                                    PAGE

5

6   DAN MONTGOMERY

7        Direct Examination by Ms. Reddish-Day . . .  145

8        Cross-Examinaton by Mr. Berardi . . . . . .  173

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2                      * * *

 3         THE COURT:  Hello, everyone.  We are

 4   reconvening in the United States vs. Adrian Alvarado.

 5   Case No. 4:22-CR-103.  This is the continuation of the

 6   motion to suppress evidentiary hearing that we began

 7   yesterday.

 8         Let me just ask before we call a witness

 9   of the lawyers, anything else we need to take care

10   of before we jump back in?

11         MS. REDDISH-DAY:  No, Your Honor.  I will

12   give the Court some indication as far as the timeline

13   for today.

14         The Government has three additional

15   witnesses because defense counsel is still

16   indicating he wants to proceed forward on the issues

17   to be addressed that were laid out in his initial

18   motion, including the constitutionality of the

19   interrogation of Mr. Alvarado.

20         So for -- if that issue remains and is not

21   being rescinded or retracted, then we will be adding

22   an additional two witnesses in addition to the one

23   witness we are going to call next.  So it will be

24   three total instead of just one, based on those

25   issues.
```

1        So unless the defense has had a change of

2    position with regard to that, that's how we plan to

3    proceed.  Each witness should be relatively brief,

4    but it probably will be a couple of hours total, I

5    would imagine.

6            THE COURT:  Okay.  Thank you for that.

7    Mr. Berardi, anything you would like to put on the

8    record?

9            MR. BERARDI:  Yes, Your Honor.  First, my

10   client has asked to have a continuance for today based

11   on some of the evidence that was presented yesterday

12   which was new to us, hadn't been provided in discovery

13   to us, the ALRP report particularly.  That information

14   wasn't in the officer's report either.

15       So, you know, I don't know what the State knew or

16   didn't know, but the officer definitely had

17   information that wasn't provided.  And so my client is

18   asking for a continuance for time to ready for those

19   things that were brought up yesterday.

20           THE COURT:  Give me some additional context

21   there.  How would extra time help your motion?

22           MR. BERARDI:  Well, it would allow us to get

23   some information to address those issues with the ALPR

24   and --

25           THE COURT:  I am not clearly identifying

what those issues are.  You need to lay that out for
me.  If you are making a motion to continue, I need
more than that.

          MR. BERARDI:  Okay.  Well, we had -- the
other witness that we didn't subpoena, which we didn't
know about, was that officer that was at the Maverick
with Officer Tanner.

          We know who that is now, but we didn't
know about that officer before.  And we haven't
heard yet from the other officer that shows up later
on, the DEA or Homeland Security officer.  So, I
mean, any question that goes with those guys -- I
mean, we'd like some time to prep for those, you
know.  They weren't witnesses that we anticipated or
questions that we had anticipated from the
information we had.

          THE COURT:  Help me out.  So let's do those
one at a time.  There was an officer at the Maverick.

          MR. BERARDI:  Who follows the Defendant.

          THE COURT:  But I am not sure what you are
asking.  You want him at the hearing?

          MR. BERARDI:  Yeah, we'd like to question
him.

          THE COURT:  Because what?  What role did he
play that would be relevant to your motion?

1          MR. BERARDI:  Well, because we -- our theory

2     is that the officer -- that officer followed him from

3     back before he gets off the ramp, and Officer Tanner

4     was waiting there and then follows him off the ramp.

5          They had the ALPR report at that time, which is

6     when Officer Tanner decided he was going to stop the

7     vehicle.  He then says that they pulled into the

8     Maverick.  The client is out of his vehicle and he

9     gets gas for half an hour or so.  And he has mentioned

10    that he was going to just give him a warning.

11         Well, then why didn't he just give him the

12    warning then?  He had the half hour while my client

13    is in the Maverick.  But he doesn't, he lets him

14    leave.

15         And then both officers pursue him again on

16    to the highway, including that officer.  Officer

17    Tanner's testimony was -- I think yesterday was that

18    he didn't know that that officer was going to pursue

19    him or why he was pursuing him.  You know, I think

20    we'd like to ask the officer himself why he was

21    following.

22         THE COURT:  What connection does that have

23    to the evidence that you are looking to suppress?

24         MR. BERARDI:  Well, it goes -- it all goes

25    to the stop.  The stop comes down to the items hanging

```
1    off the rear-view mirror and the statute.  The statute

2    doesn't say anything about rear-view mirror -- in the

3    statute.  It doesn't state whether something -- it

4    doesn't state that nothing can hang from the rear-view

5    mirror.  In fact, you know, like the handicap cards

6    that you get, they are hung on the mirror.

7              THE COURT:  That may be true, but what does

8    that have to do with the officer at the Maverick?

9              MR. BERARDI:  What does that have to do with

10   the officer at the Maverick?

11             THE COURT:  Yeah, you are telling me.

12             MR. BERARDI:  I mean the whole thing, the

13   whole thing shows the reason why this stop actually

14   happened, and what they were planning at this point

15   before anything else happens.

16             You know, Officer Tanner is saying that he

17   decides to stop that vehicle and give him a warning

18   for the stuff hanging from the thing.

19             THE COURT:  That's not my recollection.  He

20   didn't decide to stop him and give him a warning.  He

21   decided to stop him.  Later he decided to give him a

22   warning.  That was the testimony from yesterday.

23             MR. BERARDI:  You mean he decides to stop

24   him after he leaves the Maverick; is that what you are

25   saying?
```

```
1          THE COURT:  No, you are combining the stop

2   and the decision to give him a warning.  I don't

3   remember that from yesterday.

4          He decided to stop him based on the

5   windshield presumed violation.  You can argue

6   legally whether that's an issue or not.  Later after

7   he smelled the marijuana and so forth, he decided to

8   give a warning as to the traffic violation.

9          You conflated those two a moment ago and

10  said he decided to stop him and give him a warning.

11  That's not my recollection of the testimony.  But I

12  still don't see what that has to do with the officer

13  at the Maverick, the second officer at the Maverick.

14         MR. BERARDI:  Well, because all of the

15  officers were in cahoots together.  They were all

16  communicating.

17         THE COURT:  What are you basing that on?

18         MR. BERARDI:  Well, the other -- well, some

19  of this information we have.

20         THE COURT:  In cahoots to do what?

21         MR. BERARDI:  To make this -- he was making

22  this stop as a drug stop.  It wasn't -- you know, the

23  mirror thing came in, we are claiming, after the fact,

24  I mean, as a reason to justify the stop.

25         THE COURT:  Is there a legal problem with
```

```
 1   that?  You are not giving me anything here,

 2   Mr. Berardi.

 3           MR. BERARDI:  Yeah.  There is a legal

 4   problem with that.

 5           THE COURT:  Based on what?  What case says

 6   he cannot make a drug stop as long as there is a

 7   legitimate traffic violation?

 8           MR. BERARDI:  Okay.  Give me one second.

 9           THE COURT:  But even then, you have got to

10   connect it to the officer.  If that's what you are

11   saying, you didn't know about the second officer at

12   the Maverick, therefore we need to continue today's

13   hearing, you are not connecting any dots for me.

14           MR. BERARDI:  Okay.  All right.  So first

15   off, Your Honor, on the stop, the case law that I have

16   got all says that it doesn't come down to a question

17   of whether or not there was an actual legitimate

18   reason for the officer to make the stop; it comes down

19   to whether or not another reasonable officer with that

20   same information would stop that vehicle.

21           THE COURT:  I don't understand what you're

22   saying.

23           MR. BERARDI:  Okay.  Utah Supreme Court

24   case.

25           THE COURT:  First of all, the Utah Supreme
```

Court does not govern this Court.

MR. BERARDI:  I know.  I understand.

THE COURT:  I need 10th Circuit case law if you are making a motion about this to me.

MR. BERARDI:  And I've got 10th Circuit here, too, Your Honor.  So Utah -- uhm.  So I've got -- let's see.  9th Circuit.  The United States Supreme Court.  So I've got United States vs. Smith. 799 F.2d 711.  We've got dealing with a stop based on a legitimate misdemeanor infraction.

THE COURT:  All right.  Here is what I'm going to do, Mr. Berardi, rather than everybody standing here watch you read from a document that I don't even know what it is.

MR. BERARDI:  I'm sorry.

THE COURT:  The motion to continue today's hearing is denied.

If you would like later to put together a written, cogent motion to add evidence that we may need, then I am happy to entertain that.  But this is getting us nowhere here, and we've got witnesses waiting outside.  The motion is denied.

Anything else?

MR. BERARDI:  No, I just -- well, just one point of clarification.

1          So normally when I have done suppression

2     motions, we always go first.  The Court had the

3     State go first, and so I was limited on some of the

4     questions I could ask Tanner because --

5          THE COURT:  How so?

6          MR. BERARDI:  Because the issues weren't

7     addressed in the direct examination.

8          THE COURT:  But it would have been easy

9     enough to simply say that I would like to use this

10    witness for direct examination and ask anything you

11    wanted.

12         MR. BERARDI:  Right.  And that's what I was

13    planning on doing when the end of the day came, but --

14    you know, I finish up the questioning with him on that

15    subject, and then I didn't know what happened.

16         THE COURT:  And then what?

17         MR. BERARDI:  We called it a day.

18         THE COURT:  We didn't call it a day.  You

19    finished your examination.  I asked if there was

20    anything else, you said no, and I excused the witness.

21    If you decide you need to recall him, we can talk

22    about that.

23         MR. BERARDI:  Okay.

24         THE COURT:  But I don't understand what that

25    has to do with the --

1          MR. BERARDI:  No, I just -- you said we need

2    stuff before we started, that was a question I had, so

3    yeah, that's why I brought it up.

4          THE COURT:  Anything else?

5          MR. BERARDI:  No, that's all.

6          THE COURT:  Okay, at the end of -- and let

7    me note, for the record, the reason we put the

8    Government's case on is because you filed a motion

9    dealing with suppression of evidence under the fruits

10   of, you know, a poisonous tree under the exclusionary

11   rule, correct?

12         MR. BERARDI:  Correct.

13         THE COURT:  That burden falls on the United

14   States to prove that, correct?

15         MR. BERARDI:  Correct.

16         THE COURT:  Okay.  Well, that's why they are

17   going first.  You don't have to do anything.  You

18   don't have to cross-examine.  You don't have to call a

19   witness.  You don't have to do anything, so I don't

20   understand why there's confusion here.

21         MR. BERARDI:  I am just -- we have always

22   gone first.  I don't know.

23         THE COURT:  Under what circumstance?

24         MR. BERARDI:  What's that?

25         THE COURT:  Under what circumstance are you

putting your case on first in a motion to suppress?

I can see if a judge says I want to hear some evidence on standing, or something like that, that you have to go first. But under the exclusionary rule, I don't understand what context are you talking about?

MR. BERARDI: Well, no, I am just -- every motion to suppress I have had -- I don't know how many -- we have gone first. I mean -- you are right. I mean when I look at it, I think they all did have issues on standing or something to that effect, so --

THE COURT: Okay. As the driver of the vehicle, standing was a non-issue.

MR. BERARDI: No. I agree. I understand what you are saying.

THE COURT: Okay. Very good. Then let's proceed with the evidence.

If after the conclusion of the Government's evidence gathering and testimony, if you want to make a motion to have additional evidence brought before the Court, I will entertain that motion.

Okay. Ms. Reddish-Day.

MS. REDDISH-DAY: Your Honor, the Government calls Deputy Dan Montgomery.

1          THE CLERK:  Please raise your right hand.

2      You do solemnly swear that the testimony you

3   shall give in the case before the Court shall be the

4   truth, the whole truth, and nothing but the truth so

5   help you God?

6          THE WITNESS: I do.

7          THE COURT:  Will you please state your name

8   and spell your last name for the record.

9          THE WITNESS:  Daniel Montgomery.

10  M-o-n-t-g-o-m-e-r-y.

11                  DANIEL MONTGOMERY

12      called as a witness herein by the Plaintiff,

13      having been first duly sworn, was examined and

14      testified as follows:

15                  DIRECT EXAMINATION

16  BY MS. REDDISH-DAY:

17      Q    And you will have to speak pretty close to

18  that microphone, and the microphone will move closer

19  to you as well so you can do that.

20      A    Is that better?

21      Q    That's better.  Thank you.

22           Good morning, Deputy.

23      A    Good morning.

24      Q    Can you state what your occupation is for

25  the record?

1      A    I am a lieutenant with Washington County

2    Sheriff's Office.

3      Q    And how long have you been a Washington

4    County Deputy Sheriff?

5      A    Since 2015.

6      Q    And how long have you been a K9 handler with

7    the Washington County Sheriff's Office?

8      A    Since 2016.

9      Q    And did you have any other prior law

10   enforcement duties prior to joining the Washington

11   County Sheriff's Office?

12     A    I did not.

13     Q    And did you attend a police academy to

14   become a Washington County Sheriff's Deputy?

15     A    I did.

16     Q    Okay.  And that would have been back in

17   2015?

18     A    2014, I believe.

19     Q    Okay.  And then have you participated in

20   additional trainings over the years in order to assist

21   you in doing your job as a Washington County Sheriff's

22   Deputy?

23     A    I have.

24     Q    Okay.  So do you receive ongoing training to

25   maintain your post certification?

1     A    I do.

 2     Q    Okay.  And then specifically as a K9

 3  handler, you have been a K9 handler for most of your

 4  career in law enforcement; correct?

 5     A    Correct.

 6     Q    And you and your K9 handler partner are both

 7  certified in narcotics detection; is that correct?

 8     A    Correct.

 9     Q    And in order to become certified as a K9

10  handler, do you go to a separate academy, if you will,

11  to become a K9 handler?

12     A    You do.

13     Q    And does that involve the handling of a

14  variety of narcotics?

15     A    Yes.

16     Q    Along with your K9 partner?

17     A    Excuse me.  Yes.

18     Q    Okay.  And do you receive continuous

19  training with regard to identifying various narcotics

20  in your capacity as a K9 handler?

21     A    We do.

22     Q    Okay.  And do you also carry -- in order to

23  keep your K9 partner trained, do you carry various

24  narcotics with you in the field?

25     A    I do.

1      Q     And can you describe that for the Court?

2      A     Depending on the odors that the dogs are

3  trained on is what you would carry.  Cyrus, which is

4  my partner now, he is trained on marijuana, heroin,

5  meth, cocaine, so I carry varying quantities of each

6  of those.

7      Q     Okay.  And so you indicated that you

8  actually carry marijuana in your vehicle?

9      A     I do.

10     Q     Okay.  And how much marijuana do you carry

11  in your vehicle?

12     A     I have two separate marijuana hides.  I have

13  15 grams of a derivative like a dab.  And then I have

14  a couple grams shy of a pound of raw looseleaf

15  marijuana.

16     Q     Okay.  And then, again, that's used -- how

17  do you utilize that for training of your K9 partner?

18  Why do you have it in your vehicle?

19     A     We have to maintain 12 hours a week of

20  training.

21           And more times than not, in addition to that

22  12 hours which takes place one day a week, we try and

23  train throughout our shift to keep the dog engaged.

24           So we will utilize those controlled

25  substances.  We will put them in a car in a

1   controlled environment for hide or we'll go and hide

2   them in a building or something like that.  Give the

3   dogs time to get out of the car and use their nose.

4       Q    Okay.  And so do you do that periodically

5   while you're on your shift in between radio calls and

6   things of that nature?

7       A    I do.

8       Q    Okay.  So in your frequent handling of

9   marijuana in your capacity as a K9 handler, have you

10  become familiar with the odor of marijuana?

11      A    I have.

12      Q    And have you also become familiar with the

13  odor of marijuana based on your general duties as a

14  patrol officer?

15      A    I have.

16      Q    Okay.  And is there any other mechanism or

17  training that you can describe for the Court that

18  would allow you to identify the odor of marijuana?

19      A    Each year I attend a narcotics officers

20  conference, which is a 40-hour training.  Each year

21  there's something specific to marijuana, especially

22  with the change of rules and laws of it.

23           One in particular was a full-day course

24  that we actually operate a marijuana lab.  So we

25  started with primarily looseleaf marijuana.  And the

1   object of the class was to learn how to change it

2   into derivatives, whether it be a liquid, an edible,

3   a powder derivative.  So we were able to actually go

4   through and break down how to operate a marijuana

5   lab.

6        Q    Okay.  And based on your training and

7   experience, is it your belief that marijuana has a

8   distinctive smell?

9        A    It does.

10       Q    And can you describe how you would describe

11  the odor of marijuana based on your training and

12  experience?

13       A    Everybody always says it smells like skunk.

14  In a certain way to me skunk smells more -- this is

15  going to sound strange -- like an eraser.  If you

16  erase something really hard, you have a burnt rubbery

17  smell.  Skunk smells like that.  Marijuana smells like

18  that minus the rubber.

19       Q    Is it -- do you know it when you smell it?

20  Is your training and experience significant enough

21  that you just -- you know it when you smell it?

22       A    I do.

23       Q    Are you able to distinguish between the

24  smell of raw marijuana and burnt marijuana?

25       A    Yes.

```
 1        Q    Okay.  So let me turn your attention to
 2   August 29, 2022.
 3             Were you on duty that evening at
 4   approximately 20:30 hours, right around there,
 5   20:30-20:40 hours?
 6        A    I was.
 7        Q    And did you receive a call from Officer
 8   Tanner to assist him on a traffic stop?
 9        A    I did.
10        Q    And did you receive that call while he was
11   en route to the traffic stop to make the actual
12   traffic stop?
13        A    I did.
14        Q    Okay.  And where were you, if you recall,
15   when you received that call from Officer Tanner?
16        A    I was doing focus patrol in the Town of
17   Leeds.  And moving back towards -- south towards the
18   freeway via --
19        THE COURT REPORTER:  Via what?
20        THE WITNESS:  Quail Lake.
21   BY MS. REDDISH-DAY:
22        Q    Yeah.  You'll have to speak up a little bit.
23   As you talk, you get a little bit quieter?
24        A    Sorry.  I was heading from the Town of Leeds
25   south along Highway 318 which is the Quail Lake Road.
```

1      Q    Okay.  So you were coming by Quail Lake when

2   you received the call from Officer Tanner?

3      A    Correct.

4      Q    And did he -- did Officer Tanner indicate to

5   you where he was going to be making a traffic stop?

6      A    He did.

7      Q    And where did he indicate to you?

8      A    We spoke briefly about where I was coming

9   from.  And based on that, he decided that it would be

10  north of exit 16 so that I would have to go south on

11  the freeway to flip in the median and come back to 16.

12     Q    Okay.  So you were driving near the lake and

13  you headed towards mile -- approximately mile marker

14  16 on Interstate 15; is that correct?

15     A    Correct.

16     Q    Okay.  And then when you arrived, was there

17  a vehicle that was, in fact, stopped in that location

18  by Officer Tanner?

19     A    There was.

20     Q    Okay.  So the stop had already been made; is

21  that correct?

22     A    Correct.

23     Q    And can you describe the vehicle generally

24  that Officer Tanner had stopped at mile marker 16?

25     A    It is a smaller compact SUV.  I don't recall

1    the color of it.  Just a general kind of nothing

2    special SUV.

3         Q    A small SUV?

4         A    Yeah.

5         Q    Okay.  And do you recall how long it took

6    you to arrive from when you first got the call?

7         A    Time wise I don't.  I know it's -- from

8    Quail it is a mile or two miles to the freeway, and

9    then a quarter of a mile to the traffic stop.  So less

10   than three miles probably, about three to four

11   minutes.

12        Q    That's a relatively short distance, correct?

13        A    Correct.

14        Q    And so when you first arrived, what was your

15   first observations?  Was Officer -- with regard to who

16   was present at the scene?

17        A    When I exited my vehicle, Officer Tanner was

18   walking back to his from the violator vehicle.  He was

19   walking back to his driver's side door.

20        Q    When you say his, so Officer Tanner was

21   walking back to his patrol vehicle, driver's side

22   door?

23        A    Correct.

24        Q    Okay.  And did you have an interaction with

25   Officer Tanner as you arrived and Officer Tanner was

1    walking back to his patrol vehicle?

2        A    I did.

3        Q    And what -- can you describe that

4    interaction with Officer Tanner?

5        A    Officer Tanner advised me that the driver

6    didn't want to exit his vehicle.  Typically when we do

7    that, sometimes somebody is a little more agreeable

8    with one of us versus the other one.

9            So at that point I knew that I would go up

10   there and talked to him.  He also advised me that he

11   did detect the odor of marijuana.

12       Q    Can you repeat that?

13       A    He also advised me that he could detect the

14   odor of marijuana coming from the vehicle.

15       Q    And then Officer Tanner asked you to help

16   remove him from the vehicle?

17       A    Correct.

18       Q    And then what would be the reason for

19   removing the driver from the vehicle based on what

20   Officer Tanner told you?

21       A    Based on the odor, we were going to conduct

22   a probable cause search.  So for our safety all

23   occupants are invited out of the vehicle and stood off

24   to the side of the road.

25       Q    Okay.  So then did you do so after Officer

1    Tanner asked you to ask the driver to exit the

2    vehicle?

3        A    I did.

4        Q    Okay.  And when you approached the subject

5    vehicle, the small SUV, how did you approach the

6    vehicle, on the driver's side or passenger's side?

7        A    The passenger's side.

8        Q    Okay.  And what observations did you first

9    make when you approached the passenger side of that

10   vehicle?

11       A    I approached every vehicle the same.  I come

12   up and I look through the back windows.  And as I am

13   moving towards the front of the vehicle, I cleared

14   each window that I walked past.  I got up to the front

15   passenger window, which was open, and observed the

16   driver sitting there.  I made conversation with the

17   driver and invited him out.

18       Q    Was the driver the only occupant in the

19   vehicle?

20       A    He was.

21       Q    What observations, if any, did you make as

22   you were scanning the -- into the -- you said you were

23   looking into the vehicle as you were approaching the

24   passenger window?

25       A    Correct.

1      Q    Did you make any observations in doing so?

2      A    I did.  I could see a couple of cardboard

3 boxes in the rear storage area that were pretty

4 heavily taped.

5      Q    Okay.  And why are you looking into a

6 vehicle like that when you are approaching it?

7      A    So my job assignment is criminal

8 interdiction specializing in smuggling enforcement,

9 particularly narcotics.  So I want to see what's in

10 there.

11          Also, as I am walking past the vehicle, I

12 want to know what I am going to be walking past to

13 turn my back to while I am engaged with somebody in

14 conversation.

15     Q    Okay.  Are you looking to see, perhaps, if

16 there's other occupants in the vehicle as well that

17 might place you in some danger?

18     A    Correct.

19     Q    Okay.  And so then you approached the

20 passenger window of the small SUV.  And you said the

21 window was down; is that correct?

22     A    Correct.

23     Q    And then what observations did you make

24 next?

25     A    In speaking with the driver, we spoke

briefly about something that he was fumbling with.
And then when I asked him to hop out, I had already
detected the odor of marijuana, and I documented that
on to my body camera while speaking to it.

Q    When you say documented that on your body
cam by speaking to it, what do you mean exactly?

A    Like a form of narration.  It helps me later
on when writing my report.  So I will just lean down
and talk to my body camera.

Q    So you're documenting what you are doing for
your body camera to capture for later; is that
correct?

A    Correct.

Q    And so you did so in this case?

A    I did.

Q    And can you describe exactly what you -- did
you smell the odor of marijuana immediately upon
arriving at the passenger side window?

A    I did.

Q    Can you describe that odor?

A    With all the other windows up, the wind was
sucking it out of that one window.  So right when you
put your face down to that window to talk to the
occupants of it, that's all you get is the odor of the
car.  So it was very overwhelming.

1    Q    So you would classify it as an overwhelming
2    odor of marijuana?
3    A    Correct.
4    Q    And based on your training and experience
5    that you described, did you have a sense of whether --
6    did you have a sense of approximately how much
7    marijuana may be in that car, if it would be a small
8    amount or a large amount?  Did you have any idea at
9    that point?
10   A    Based on the smell alone, no, but everything
11   I was seeing in conjunction with the odor led me to
12   believe it was going to be a large amount.
13   Q    Okay.  And then what did you do next after
14   smelling the overwhelming odor of marijuana?
15   A    I invited the driver to hop out and speak
16   with me, to which he did.  He exited out the front of
17   the vehicle and I met him up there.
18   Q    Okay.  And did -- was that occupant of the
19   vehicle Mr. Alvarado?
20   A    It was.
21   Q    And did he exit the driver's side willingly
22   at your request?
23   A    He did.
24   Q    Was Mr. Alvarado cooperative with you?
25   A    He was.

1    Q    Okay.  And did you have your K9 partner with
2    you that day?
3    A    I did.
4    Q    And why did you not deploy your K9 partner
5    that day on that vehicle?
6    A    We already had the probable cause to search
7    the vehicle based upon the odor of marijuana.  So
8    there's no need to stack up and stack up and stack up
9    probable cause.
10   Q    Okay.  So if you smell it, you don't need
11   your dog to also smell it as well; is that a fair
12   statement?
13   A    Correct.
14   Q    Okay.  And just to be clear, you smelled the
15   odor of marijuana yourself, not just based on what
16   Officer Tanner told you; is that correct?
17   A    Correct.
18   Q    And then once Mr. Alvarado was out of the
19   vehicle, then what did you do next?
20   A    I stood with him at the front passenger side
21   of his vehicle, kind of off to the shoulder a little
22   bit while Officer Tanner came back up and spoke with
23   him.
24   Q    Okay.  And then did you and Officer Tanner
25   together speak with Mr. Alvarado roadside near his

SUV?

     A     We did.  It was mostly Officer Tanner

speaking.  I was present, but yes.

     Q     Okay.  And do you recall Officer Tanner

providing Mr. Alvarado his Miranda rights?

     A     I do.

     Q.     And do you recall what if anything

Mr. Alvarado said at that time to you and Officer

Tanner?

     A     In reference to the Miranda or just in

general?

     Q     After he -- let me ask you this then.

          After Officer Tanner provided his Miranda

rights, did -- based on your recollection, did

Mr. Alvarado agree to speak with the two of you?

     A     I believe so, yes.

     Q     Okay.  Do you recall what if any statements

he made at that time to you about the marijuana in the

vehicle?

     A     That there wasn't any marijuana in the

vehicle, and that he doesn't use marijuana.  We just

reiterated the fact that based on the odor, we

believed there to be marijuana in there and that we

would be searching.

     Q     Okay.  And so I am going to remind you again

1   to speak up a little bit.

2       A    Sorry.

3       Q    No problem.  Everybody requires a few

4   reminders.  Don't worry about it.

5            So he denied there was marijuana in the

6   vehicle and he denied that he smokes marijuana; is

7   that correct?

8       A    Correct.

9       Q    Okay.  And at that point, what was your

10  intentions to do with regard to the SUV vehicle that

11  Mr. Alvarado was driving?

12      A    To assist him in a probable cause search of

13  it.

14      Q    And probable cause of what at that point?

15      A    At that point with the odor of marijuana

16  being in there, it is reasonable to believe that there

17  is marijuana in there.  So we were going to

18  investigate the crime of possession of marijuana.

19      Q    Okay.  Were you also investigating the crime

20  of potentially possession --

21           MR. BERARDI:  Objection.  Leading.

22           THE COURT:  Overruled.

23  BY MS. REDDISH-DAY:

24      Q    Were you also investigating the potential

25  that there was a large amount of marijuana in that

1   vehicle that would be beyond possession amount?

2       A    Yes.

3       Q    Okay.  And specifically what crime were you

4   investigating?

5       A    The possession with intent to distribute

6   marijuana.

7       Q    And you are a drug interdiction officer,

8   correct?

9       A    Correct.

10      Q    Okay.  Can you describe, just briefly for

11  the Court, what that is and what those duties are for

12  you?

13      A    So I am assigned locally at the county level

14  to our K9 unit, which is the criminal interdiction

15  specializing in narcotics smuggling.

16           And then also assigned to Department of

17  Homeland Security through HSI and ICE for the same

18  thing.  I work on the Federal Task Force part.

19      Q    Okay.  Thank you.  So you -- you and Officer

20  Tanner were going to engage in a search of the

21  vehicle; is that correct?

22      A    Correct.

23      Q    Okay.  And that was based on your probable

24  cause belief that there was marijuana in the vehicle?

25      A    Correct.

1      Q    And the Defendant indicated to you he didn't

2 smoke marijuana or there wasn't marijuana?

3      A    Correct.

4      Q    Okay.  So then what did you do next?  Did

5 you begin the search of the vehicle at that point?

6      A    We did.  I spoke with Mr. Alvarado for a

7 minute.  And then once he was off to the side, we

8 began the search.

9      Q    Okay.  And where specifically did you begin

10 the search?

11     A    I started at the rear of the vehicle, the

12 hatch.

13     Q    And why did you start there?

14     A    Previously I had mentioned that I saw those

15 boxes.  Those piqued my interest, along with the

16 marijuana.  So that's where I started -- I wanted to

17 see what was in the boxes.

18     Q    So did you open the back hatch of the

19 vehicle?

20     A    I did.

21     Q    And then what was your first observation

22 when you opened the back hatch of the vehicle?

23     A    I had seen the boxes earlier with the tape.

24 And I opened it and I confirmed that it was taped,

25 like heavily taped, which is pretty common when people

1    are transporting marijuana; they're trying to lock in

2    that odor so it can't be smelled.  So I leaned into

3    the largest of the boxes and cut it open.

4         Q    Okay.  That was the first thing you did?

5         A    I believe so, yes.

6         Q    And were there other bags and containers and

7    things like that in the trunk as well?

8         A    There were.

9         Q    And when you opened that first cardboard

10   box, what did you locate?

11        A    There's some sort of like a garment

12   covering.  I don't know if it was a towel or a shirt

13   or something.  On removing that, I could see the

14   vacuum-sealed packages of marijuana.

15        Q    Okay.  And when you say vacuum-sealed

16   packages of marijuana, how big were those

17   vacuum-sealed packages of marijuana in that first box;

18   do you recall?

19        A    Typically they are sealed as one pounds.

20   Sometimes you get flat ones that are like the size of

21   maybe a phone book and they're very pressed.  Other

22   times we get ones that are about the size of maybe a

23   football because they are rolled and rounded.  These

24   were fairly flat so they were a little bit bigger than

25   this screen I would say.

Q    The screen that's in front of you?

         A    Correct.  Maybe a little over a foot each

direction.

         Q    Okay.  And based on your training and

experience, did you have a sense of how much marijuana

was in each of those bags in the first cardboard box?

         A    Yes.

         Q    What was your estimate of how much marijuana

was in each of those bags?

         A    Maybe one pound each.

         Q    And was marijuana found -- did you -- after

you found marijuana in that first box, what did you do

next?

         A    I advised Officer Tanner that -- of what I

had found.

         Q    And how did you do that?

         A    We had a little silly code we do just called

bang-bang.  It lets us know -- it lets me and Officer

Tanner know that we know what is going on.  And it

keeps us from allowing the potential suspects at that

time to know that we know what is going on.

         Q    What is the reason for that?  Why don't you

want subjects to know that you found narcotics in

their vehicle?

         A    A lot of times it will initiate a fight or

flight.  I don't want to run after anybody and I don't
want to fight anybody so.

    Q    So those are the code words that you and
Tanner have come to, to indicate to each other that
narcotics have been found is bang-bang?

    A    Correct.

    Q    And you did so in this case?

    A    Yes.

    Q    And do you recall ultimately how much
marijuana was located in that vehicle?

         Well, first of all, let me ask you, did you
engage in a thorough search of the vehicle with
Officer Tanner?

    A    I did.

    Q    And the two of you searched that vehicle
together; is that correct?

    A    Correct.

    Q    Do you recall how much -- approximately how
much marijuana was located during the search?

    A    If I remember right, it was just over
20 pounds.  Maybe between 20 and 25 pounds.

    Q    Okay.  And were you wearing a body camera on
that evening?

    A    I was.

    Q    Are you always wearing a body camera when

1    you are on duty?

2         A    I am.

3         Q    And when do you activate your body camera

4    generally?

5         A    Whenever I conduct a traffic stop or have

6    dealings with the public in my official capacity.

7         Q    Okay.  So it is not on all the time while

8    you are driving around paroling; is that correct?

9         A    Correct.

10        Q    But you activate it prior to making any

11   contact with the suspect?

12        A    Correct.

13        Q    Or the vehicle?

14        A    Or the vehicle or just a general -- official

15   conversation with somebody as an officer instead of

16   just like a casual conversation.

17        Q    Okay.  So in this case, do you recall

18   activating your body camera?

19        A    I do.

20        Q    And when do you recall activating it?

21        A    As I was pulling up to the traffic stop.

22        Q    Okay.  So I am going to -- we are going to

23   play a portion of your body camera.  The entire body

24   camera is 33 minutes and 32 seconds and has been

25   admitted as Government's Exhibit 2.

1          We can pause it for a second.  So I am going

2    to -- just for your benefit, I am not sure how well

3    you can see the screen.  It is a little bit dark.

4          A    Yes.

5          Q    But what I am going to do is I am going to

6    play the first five minutes or so of this body camera

7    footage, and then I will ask you some follow-up

8    questions.

9          A    Okay.

10         Q    So if you want to just follow along while

11   we're playing it.

12         A    Sure.

13         Q    And then the Court will have an opportunity

14   to view the entire body camera footage, should it

15   choose to do so.

16              (Government's Exhibit No. 2, Video played)

17   BY MS. REDDISH-DAY:

18         Q    So we are pausing the video at about five

19   minutes.  So based on that, were you able to see most

20   of that or all of that?

21         A    Yes.

22         Q    Okay.  And at one point during the video, at

23   about 3:24, you say bang-bang.  Is that in reference

24   to what your testimony was earlier?

25         A    Yes.

1      Q    Okay.  And is that the point in time when

2   you first discovered the marijuana in the vehicle?

3      A    It is.

4      Q    Okay.  And was that the -- we can see you

5   opening a box.  Was that the box that had the first

6   marijuana that you located in that vehicle?

7      A    It is.

8      Q    Okay.  And then you indicated bang-bang to

9   Officer Tanner.  And then you began to walk towards

10  the Defendant, correct?

11     A    Correct.

12     Q    Okay.  And what was the purpose of that?

13     A    To place him under arrest.

14     Q    Okay.  So that you would be -- now, we can

15  see in the video that Officer Tanner is the one that

16  actually handcuffed the Defendant, correct?

17     A    Correct.

18     Q    Okay.  But you knew he was going to be

19  arrested?

20     A    Correct.

21     Q    And is that your practice to be present next

22  to your partner officer when making an arrest?

23     A    It is.

24     Q    Okay.  And why is that?

25     A    For safety, the person gets defiant or they

1    run.

2         Q    Okay.  And then we see you placing -- or on

3    the way to place the Defendant into a patrol vehicle,

4    correct?

5         A    Yes.

6         Q    And why was that done?

7         A    To secure him.  That way we can finish the

8    search of the vehicle.

9         Q    Okay.  So he remained handcuffed after you

10   placed him in the vehicle?

11        A    He did.

12        Q    Okay.  And then what was your purpose in

13   that, what were you going to be doing next?

14        A    To continue the search of the vehicle.  Make

15   sure to search it in its entirety.

16        Q    And did you do so?

17        A    We did.

18             MS. REDDISH-DAY:  If we can hit play again.

19             (Video played)

20   MS. REDDISH-DAY:

21        Q    So the box that we see in that video that

22   was just pulled out of the vehicle just prior to being

23   paused, is that the box that contained that first

24   amount of marijuana that you located?

25        A    The larger box that Officer Tanner pulled,

yes.

Q    Can we rewind that, thank you, and freeze it there.  Now we can -- that's good, thank you.

And that's at -- what minute is that?  5:18.  I don't have a time stamp on my screen, unfortunately.

So can you see a box in that video?

A    I can.

Q    Screen shot?

A    Yes.

Q    Can you describe what that is?

A    It is a brown cardboard box with tape on each side and a white garment on top and the marijuana packages below that.

Q    Okay.  And that's the box that you were testifying to earlier, correct, where you found the first amount of marijuana?

A    It is.

Q    And then was there additional marijuana found in other places in this cargo area?

A    There was.

Q    And do you recall where?

A    I believe the chip box had it in it.  The smaller cardboard box that I had removed just prior to this still shot, and then I believe there's also a duffel bag that had some marijuana in it.

1    Q    Okay.  And in looking at this screen shot,

2    it is a little bit dark, but do you recall the setup

3    of this SUV vehicle?  Was the cargo area open to the

4    passenger and driver compartment of the vehicle?

5    A    It's got a row of seating that blocks it,

6    but over the top is open.

7    Q    Okay.  So air can flow through from the

8    cargo area to the driver's area of the vehicle; is

9    that correct?

10    A    Correct.

11    Q    There's no barrier like there would be in a

12    trunk, for example?

13    A    Right.  There's no partition.

14    Q    Okay.  So anything that's in the back cargo

15    area, if there was smells coming from the back cargo

16    area, it is possible the smells would go into the

17    passenger compartment of the vehicle as well; is that

18    fair to say?

19    A    Correct.

20    Q    Just based on the setup?

21    A    Yes.

22        MS. REDDISH-DAY:  So if we can hit play

23    again, Ms. Fano.  I am going to ask Ms. Fano to stop

24    it there and rewind it back to 5:05, the time on the

25    bottom of that screen, and then play from there.

```
 1              (Video played)

 2              MS. REDDISH-DAY:  You can go ahead and pause

 3    it there, if you want.  Thank you.  I have nothing

 4    further of this witness at this time, Your Honor.

 5              THE COURT:  Very good.  Cross-examination?

 6              MR. BERARDI:  Yes, Your Honor.

 7                   CROSS-EXAMINATION

 8    BY MR. BERARDI:

 9         Q    Officer Montgomery, when you arrive at a

10    scene, do you call dispatch to let them know you are

11    there?

12         A    Typically, yes.

13         Q    Do all officers have to do that?

14         A    It's a safety concern if we don't, but I

15    can't say that everybody does.

16         Q    Is what?

17         A    I can't say that everybody does; but you

18    should, yes.

19         Q    And did you do that in this case?

20         A    I believe so.

21         Q    And how about Officer Tanner; do you know?

22         A    If he --

23         Q    Did he call in that he was making a stop?

24         A    Yes.

25         Q    Okay.  And I have what is marked Defense
```

1   Exhibit 1, and it is part of the Cad log.

2           On the very bottom there, is that -- one of

3   those numbers your call sign?  The bottom three.

4       A    Yes.

5       Q    Okay.  Would you speak up a little bit.

6       A    Yes.

7       Q    How -- now, this shows that all three of you

8   arrived at the same time.  How is that?

9       A    So on-site call means that's when the call

10  is actually generated.  So we were on scene prior to

11  that.  That's just when dispatch created a call.

12  Because traffic stops are not created as an incident.

13      Q    So traffic stops are not created as an

14  incident.  And this is -- what is this time

15  indicating?

16      A    The time that an incident was created.  So

17  when Officer Tanner radioed to dispatch for what you

18  said, having said 35, which is the ten code for drugs,

19  dispatch then creates the call and attaches all of us

20  to it.  That's why it shows, the succession time

21  stamp.

22      Q    What does the "arrive" mean then?

23      A    It means that the call was created and we

24  arrive to it.

25      Q    So at this time all three of you are there?

1    A    Yes.

2    Q    Okay.  So how is it that you are -- how are

3  you all there -- what time did you first arrive at the

4  scene then?  Was it different than this time?

5    A    Yes.

6    Q    Okay.  So what time was that?

7    A    I would have to look at the body camera on

8  my radio logs.  I couldn't tell you for sure.

9    Q    Do you have your log up there?

10    A    I don't.

11    Q    Let's see.  Can we play that video back to

12  the beginning when he arrives.

13         (Video played)

14    Q    So is that 20:37 about?

15    A    I can't see it on my screen.  I'm sorry.

16    Q    It was on the upper right corner of my

17  screen.

18    A    My screen is shifted.  I can see the lower

19  left-hand portion of the video.

20         THE COURT:  I will note at this point the

21  screen does say 20:37:34.

22  BY MR. BERARDI:

23    Q    Okay.  And when you examined that first bag

24  of marijuana that was in the box, were those bags,

25  were they flat and air sealed?

1        A    Relatively flat and air sealed, yes.

2        Q    Okay.  And but they were still emitting a

3   smell, correct, is that, according to your testimony?

4        A    I'm sorry?

5        Q    They were still emitting a smell?

6        A    Correct.

7             MR. BERARDI:  Thank you.  Nothing further.

8             THE COURT:  Any redirect?

9             MS. REDDISH-DAY:  No, Your Honor.  Thank

10  you.

11            THE COURT:  Okay.  Thank you, Deputy

12  Montgomery.  Thank you for being here today.  You are

13  excused.

14            THE WITNESS:  Thank you, Your Honor.

15                  (Witness excused.)

16            THE DEFENDANT:  Your Honor -- Your Honor, I

17  want to file a motion to remove Counsel from my case.

18            I feel that I am -- it is receiving

19  ineffective counsel right now.  And I don't really

20  want to proceed with this hearing until I can --

21            THE COURT:  I am happy to hear what you

22  would like to tell me.

23            THE DEFENDANT:  Okay.

24            THE COURT:  Here is what I'd like to do in

25  that regard.  A couple of concerns I have.  One is

1   that we have witnesses out here.

2           But let's take a five-minute recess.  If

3   you'd like to talk in private with Mr. Berardi, I

4   will give you that opportunity.  But you don't have

5   to, that's up to you.

6           But I want to take a five-minute recess

7   here to give you that chance, and to give

8   Ms. Reddish-Day also a chance to collect thoughts

9   here if there is a motion pending.  Does that make

10  sense to you?

11          THE DEFENDANT:  It does.  I just don't feel

12  like we are completely ready for this hearing.

13          THE COURT:  Okay.  I understand.  I want you

14  to take just that five minutes, think about it for a

15  minute.  I am going to let you stay here in the

16  courtroom if you would like so that you can chat

17  comfortably with Mr. Berardi.

18          The deputies will stay here.  But if anybody

19  else needs to leave for that open conversation, then

20  the Deputy has the authority to just kind of clear the

21  courtroom.  I will give you five or ten minutes just

22  to think, chat about that for a minute, and give the

23  other side a moment to do that as well.

24          THE DEFENDANT:  Thank you, Your Honor.

25               (Recess taken.)

1          THE COURT:  Thank you.  Be seated.  Okay.
2     We are back on the record.
3          A few moments ago, Mr. Alvarado indicated
4     that he may be in a position where he is looking to
5     change attorneys or at least not move forward with
6     Mr. Berardi.
7          Let me just give a chance to flesh this out
8     on the record a little bit.  I will start with
9     Mr. Berardi.
10         Is there anything that you'd like to put on
11    the record or advice you have for Mr. Alvarado that
12    you'd like to at least known advice was given or not,
13    anything you'd like to put on the record basically.
14         MR. BERARDI:  No, Your Honor.  After
15    speaking with Mr. Alvarado, I understand his concerns.
16         I think there's a couple of impasses that we
17    have, so I think he is right if he wants to get new
18    counsel.
19         THE COURT:  Okay.  Very good.  Mr. Alvarado,
20    I will give you a chance to flesh this out in a
21    minute, if need be.
22         But one of my concerns is that you end up
23    saying something on the record that you wish you
24    hadn't.  But I will give you a chance here in a minute
25    if you'd like.

1      Let me see if the Government has initial

2 thoughts on that.

3      MS. REDDISH-DAY:  Well, Your Honor, I wasn't

4 anticipating this; but I was trying to look through

5 the file to see when Mr. Berardi came on the case.  He

6 is retained counsel.

7      The Federal Public Defenders were previously

8 appointed to Mr. Alvarado.  And then at some point,

9 which I haven't located that date yet, it is in the

10 docket, Mr. Alvarado made the choice to retain

11 Mr. Berardi.

12      Mr. Berardi and I have been in pretty

13 regular contact since that time with regard to the

14 issues in this case, discovery, and this particular

15 motion to suppress.  But he is a retained attorney so

16 he certainly has the right to make a choice as to who

17 he wants to retain on the case.

18      I just -- he has already been appointed the

19 Federal Public Defender so that would likely no longer

20 be an option for the Defendant.  So I just wanted to

21 make the Court aware of that, that this is now his

22 second attorney.

23      And I would just submit to the Court's

24 discretion, we've made it many hours through a motion

25 hearing and have had witnesses here in the courthouse

1    for many hours and come back today to finish the

2    motion hearing.

3           So the Government has an interest in

4    finishing the hearing and putting on the remaining

5    evidence in this hearing or to create a complete

6    record.

7           But I will leave that to the discretion of

8    the Court whether that's advisable to do so if the

9    Defendant is now essentially letting his attorney go.

10          THE COURT:  Okay.  Thank you, I appreciate

11   those thoughts.

12          Mr. Alvarado, let me note a couple of

13   things.  I don't know what my decision would be

14   regarding this hearing moving forward.

15          What I mean by that is -- and I will first

16   say if you want to hire another attorney, I'm going to

17   let you do that, okay.  But coming along with that, I

18   don't know whether my decision would be to insist that

19   a new lawyer simply pick up this hearing where we left

20   off; or whether I would allow them to go back and

21   cross-examine Officer Tanner and Deputy Montgomery or

22   something like that.

23          I don't know, and I don't want to make that

24   decision off the cuff.  But I want you to know that's

25   a possibility that I would simply insist that the

hearing be picked up where it's left off and not go
back.

It is conceivable, too, that I decide this
is unlikely; but again, I don't want to make decisions
off the cuff, but that I would decide this was the
time to examine those witnesses and I am not going to
make them come back again.

It is unlikely, but I just want you to know
there is a little uncertainty in how this decision
would be made moving forward.  Additionally, it is
conceivable if a new lawyer came in, they would
attempt to negotiate a deal with the United States
sort of from scratch and see what kind of plea
agreement they could work.  That would certainly be a
possibility, but I can't speak for the United States
on whether they would be willing to entertain that as
if this hearing wasn't begun or not.

Does all that kind of make sense to you?

THE DEFENDANT:  It does, Your Honor.

THE COURT:  Okay.  So let me just ask you
again, I don't want you to say much here on the
record.

But is it still your intent to fire
Mr. Berardi as your lawyer?

THE DEFENDANT:  It is.

1          THE COURT:  Okay.  Let me ask you a couple

2     other questions just generally about your finances.

3          And when I ask you these, I mean you

4     particularly, not necessarily your family or friends

5     or anybody else.

6          Do you believe you can afford to hire

7     another lawyer at this point?

8          THE DEFENDANT:  No, I don't.

9          THE COURT:  Okay.  I understand.  In my mind

10    that makes you -- there would be a little paperwork,

11    but that would make you eligible for me to appoint a

12    lawyer at no cost to you moving forward.

13         It could be the same lawyer, or we could

14    talk about that a little bit.  So that's a possibility

15    for you.

16         Alternatively, of course, family and friends

17    and everybody can help you out.  But would it be your

18    initial plan to have me appoint a lawyer for you or

19    would you be willing to hire another lawyer with help

20    of other --

21         THE DEFENDANT:  Initially by appointment.

22         THE COURT:  Okay.  And then just see what

23    you can do?

24         THE DEFENDANT:  The last lawyer I had, he

25    lied to me multiple times.  He -- I don't know if I

can say this on record, but him and Angela came to the

jail one time.

THE COURT: I am going to stop you. It is

not that I don't want to hear you, and we can go into

this if we need to. I just, I'm a little concerned.

THE DEFENDANT: That's the reason why I

fired him.

THE COURT: And tell me who was that initial

lawyer?

THE DEFENDANT: Rob Hunt.

THE COURT: Okay. And so without making you

say anything more, the reason you hired Mr. Berardi in

the first place was you were unsatisfied with

Mr. Hunt?

THE DEFENDANT: Correct.

THE COURT: For whatever reason; is that

correct?

THE DEFENDANT: Correct.

THE COURT: I understand.

Ms. Reddish-Day or Mr. Berardi, if you know,

can you tell me the degree of work knowledge, that

kind of commitment that Mr. Hunt put into the case?

Or was Mr. Berardi hired pretty early on? In other

words, is there any economies of having Mr. Hunt back

in versus another lawyer?

1    MS. REDDISH-DAY:  Well, Your Honor, it

2 sounds as if it would be counter-productive to have

3 Mr. Hunt back on the case because his relationship

4 with Mr. Alvarado broke down for the reasons that only

5 Mr. Alvarado fully knows.

6    There was a fair amount of work that

7 Mr. Hunt put in the case.  Mr. Hunt was actually

8 advocating very strongly for Mr. Alvarado.  And we did

9 discuss this actual motion to suppress many, many

10 times.  And I was ready to proceed with a motion to

11 suppress, but we also talked about the consequences

12 potentially of doing so and going to trial versus the

13 plea deal that I was willing to provide Mr. Alvarado.

14    So there was quite a bit of work that was

15 done by Mr. Hunt prior to Mr. Alvarado making the

16 decision to hire Mr. Berardi.  But it's been some time

17 Mr. Berardi has been on the case.  He can probably

18 speak to exactly when he was retained.  I don't seem

19 to have that here in my files.

20    I feel like the Government spent about equal

21 time on the case with Mr. Hunt, then we started all

22 over with Mr. Berardi.  And so now it appears as if

23 we'll have to start all over again with a new

24 attorney.

25    THE COURT:  I guess that's my question, is

1     it doesn't appear to you that based on the

2     relationship between Mr. Hunt and Mr. Alvarado, those

3     kind of things, it doesn't appear that it would be

4     particularly efficient to simply bring Mr. Hunt back

5     in on the case; is that correct?

6                MS. REDDISH-DAY:  Well, it would be

7     efficient in that he knows the case very, very well.

8     But if there's --

9                THE COURT:  But that relationship may water

10    down that efficiency.

11               MS. REDDISH-DAY:  Exactly.  There could be

12    another Federal Public Defender perhaps who could wall

13    themselves off from Mr. Hunt if Mr. Alvarado needed

14    that to happen.

15               But it might be safer to have a different

16    attorney outside of the Federal Public Defenders

17    office.  But we don't get into the business of

18    advising the Court on who to appoint specifically.

19               THE COURT:  Sure.  I was just saying since

20    Mr. Hunt wasn't here, I was wondering how much we

21    are -- in terms of historical or institutional

22    knowledge of the case.

23               MS. REDDISH-DAY:  Well, Your Honor, this

24    case is from August of 2022.  And we've -- yeah.

25               THE COURT:  Let me do a couple of other

```
 1   things.

 2           So, Mr. Alvarado, I am willing to appoint

 3   another attorney for you.  You can go forward with

 4   that attorney toward the end of the case.  Or, as you

 5   have said, if you decide to hire another attorney, you

 6   can do that with your family.

 7           But I'm convinced that you can't afford an

 8   attorney on your own right now so I will appoint one.

 9   I am going to appoint one outside the Public

10   Defender's Office.  Meaning it won't be Rob Hunt or

11   Paul Riddle, his colleague.

12           I can't tell you off the cuff who that will

13   be, it is kind of a random draw.  But I want you to

14   know it is very unlikely I will appoint another lawyer

15   after this one.  Does that make sense to you?

16           THE DEFENDANT:  Yes, it does.

17           THE COURT:  Okay.  Because they are

18   qualified, they all have to have a certain level of

19   experience, and I am comfortable and confident with

20   their work.

21           So you will probably be -- if you are

22   looking for a free lawyer, you will probably be stuck

23   with whoever I appoint next.  Do you understand that?

24           THE DEFENDANT:  Yes.

25           THE COURT:  Okay.  The other thing I want to
```

make sure you understand is while a motion to suppress
is pending or while a new lawyer is getting up to
speed, then I am going to pause the speedy trial
calculation.

Okay. Meaning that whatever trial date, if
you ever had one in this case, there's no time working
against having that trial while we are paused because
of a new attorney or because of your motion.

Do you understand that?

THE DEFENDANT: I do.

THE COURT: Okay. Particularly important
for me to know you understand that since you are in
custody at this time. I don't want it to drag out
unless you are part of that decision. Does that make
sense?

THE DEFENDANT: Yes.

THE COURT: Okay. Here is what I am going
to do then. I am going to appoint a new lawyer to
represent you. I am going to put your case on for a
status conference on Monday, okay, just a few days
from now, to make sure that that lawyer has been
named, has reached out to you, you know who it is and
I am satisfied by that on Monday.

And then we will talk about the calendar
from Monday moving forward in terms of timing, how

```
 1  long you need with that lawyer to assess this motion,

 2  what you want to do with it, things like that.

 3          Does all that make sense to you?

 4          THE DEFENDANT:  Yes.

 5          THE COURT:  Okay.  Mr. Berardi, anything you

 6  would like to add?

 7          MR. BERARDI:  No, Your Honor.

 8          THE COURT:  Okay.  What I am going to do, I

 9  am going to release Mr. Berardi from the case as soon

10  as that new lawyer is appointed.

11          So, in other words, if you had a question

12  this afternoon and you were just panicked about it or

13  something and you wanted to talk to Mr. Berardi, I am

14  going to make him stay on the hook until that happens

15  no later than Monday.  Okay.

16          THE DEFENDANT:  I am mainly concerned with

17  being able to address Agent Tanner again.  My attorney

18  was under the impression he was going to go second, so

19  that's why he released him yesterday.

20          THE COURT:  That's a possibility.  You can

21  challenge that lawyer about whether Agent Tanner needs

22  to be recalled or something like that.  So I want you

23  to chat with the lawyer, sir, privately about that,

24  maybe with Ms. Reddish-Day before I make a final

25  decision on that.
```

1          THE DEFENDANT:  Thank you.

2          THE COURT:  Anything else we haven't put on

3     the record at this point?  Other than I am tolling the

4     speedy trial between now and -- is there a trial date

5     pending or has that been taken off?

6          MS. REDDISH-DAY:  There is, Your Honor.  I

7     was digging for that while you were talking.  And we

8     do have a two-day jury trial set for January 16th.

9          So I understand the statute absolutely

10    allows for the speedy trial to be tolled while the

11    motion is pending, but I would ask that that date

12    actually be continued or we can do so on Monday when

13    the new attorney is appointed.

14         THE COURT:  Okay.  I think that is likely

15    that a new lawyer will need some time to get up to

16    speed for this motion before the trial.

17         But let's talk about that on Monday, maybe

18    we can compare notes and calendars with the new

19    lawyer; but certainly the speedy trial calendar

20    continues to be tolled pending while this motion to

21    suppress is pending.

22         I am not dismissing the motion until we sort

23    this out.  So it is still pending and the time is

24    tolled between now and Monday.

25         Anything else for the record from either

1    side?

2         MS. REDDISH-DAY:  No, Your Honor, thank you.

3         THE COURT:  Okay.  Thank you.  That

4    concludes this hearing for today.  We will pick things

5    back up on Monday.  We are adjourned.

6      (Proceedings adjourned for the day at 12:13 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                 C E R T I F I C A T E

 2   STATE OF UTAH                    )

 3                                    )   ss.

 4   COUNTY OF WASHINGTON             )

 5

 6        This is to certify that the proceedings in the

 7   foregoing matter were reported by me, Tasha Sisneros,

 8   RPR, CRR, CSR, CRC, in stenotype and thereafter

 9   transcribed into written form;

10        That said proceedings were taken at the time and

11   place herein named;

12        I further certify that I am not of kin or

13   otherwise associated with any of the parties of said

14   cause of action and that I am not interested in the

15   event thereof.

16        In witness whereof I have subscribed my name this

17   15 day of December 2023.

18

19                              _Tasha Sisneros_

20        _____

21        Tasha Sisneros, RPR, CRR, CRC, CSR

22

23

24

25
</pre>