IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

SOUTHERN DIVISION

_____
                               )
USA,                           )
                               )
            Plaintiff,         )
                               )
vs.                            ) Case No. 4:22-cr-00103-AMA-PK
                               )
ADRIAN JOSEPH ALVARADO,        )
                               )
            Defendant.         )
_____)


SUPPRESSION HEARING - DAY 4 OF 4

BEFORE THE HONORABLE

JUDGE PAUL KOHLER


MAY 28, 2024


Reported by:   Tasha A. Sisneros, RPR, CRC, CRR, CSR
United States Federal Court
206 West Tabernacle Street
St. George, Utah 84770
435-773-5115
Tasha_Sisneros@utd.uscourts.gov

```
 1                        APPEARANCES

 2    FOR THE PLAINTIFF:

 3    Angela Marie Reddish-Day
      US ATTORNEY'S OFFICE
 4    20 NORTH MAIN ST STE 208
      ST. GEORGE, UTAH 84770
 5    435-634-4265
      angela.reddish-day@usdoj.gov
 6
      Christopher Floyd Burton
 7    US ATTORNEY'S OFFICE
      20 NORTH MAIN ST STE 208
 8    ST. GEORGE, UTAH 84770
      435-634-4264
 9    christopher.burton4@usdoj.gov

10

11    FOR THE DEFENDANT:

12    Scott F. Garrett
      DENTONS, DURHAM, JONES & PINEGAR
13    192 E. 200 N. 3rd FLOOR
      ST. GEORGE, UTAH 84770
14    435-674-0400
      sgarrett@djplaw.com
15

16

17

18

19

20

21

22

23

24

25
```

<u>I N D E X</u>

| WITNESS | PAGE |
|---|---|
| Agent Nolan Tanner | |
| Cross-Examination by Mr. Garrett | 139 |
| Direct Examination  by Ms. Reddish-Day | 161 |
| Recross-Examination by Mr. Garrett | 173 |
| | |
| Adrian Alvarado | |
| Direct Examination  by Mr. Garrett | 175 |
| Cross-Examination  by Ms. Reddish-Day | 198 |

<u>E X H I B I T S</u>

| EXHIBIT NUMBER | PAGE |
|---|---|
| Defendant's Exhibit No. 4 | 69 |
| Defendant's Exhibit No. 5 | 73 |

P R O C E E D I N G S

* * *

**THE COURT:**  Thank you.  Be seated, please.  Good afternoon, everyone.  We are convened in the United States vs. Alvarado, case 4:22-cr-103.  Ms. Reddish-Day here for the United States.  Mr. Garrett for Mr. Alvarado.  We are convening today to finish our Rules hearing regarding Mr. Alvarado's Motion to Suppress.

Let me see if I can put some context on this and we will move forward.  We are down to the cross-examination of Officer Tanner.  We were in the middle of that the other day, and there was some more questions that the defense wanted to ask.

Officer Tanner, I am content to go forward with that, with anything that is appropriate under the rules.  I know there are some potential topics, cross-examinations that are somewhat controversial.  We could, kind of, take those as they come up.  But if there are some ways we can identify trains of thought or topics of questioning, it would be, I think, better for the record and for me to be able to discuss those not so much on the fly.

So, Mr. Garrett, why don't I start with you.  Are there -- if there are just, sort of, more routine, obvious trains of thought, you are welcome to go forward with those, but can you identify those that may be objected to.

1     **MR. GARRETT:**  Sure, Judge.  I think -- we have some

2     other investigations that Officer Tanner was involved with

3     where cases were dismissed because, you know, there was no

4     reasonable suspicion or probable cause for a stop.  We believe

5     that those instances are relevant to Mr. Alvarado's case.

6     Because Officer Tanner's credibility is going to be at issue in

7     this case, obviously, as you make decisions about various legal

8     issues.

9          And so anything that could impeach his credibility I

10    think is important for my client, Mr. Alvarado.  And so those

11    instances where, albeit they are other cases where Officer

12    Tanner was involved in and made stops, where those cases were

13    dismissed because of lack of probable cause.  We would like to

14    be able to probe that a little bit with Officer Tanner, and

15    impeach him with that material.

16         **THE COURT:**  And are there any -- if you can shed any

17    light, or maybe you need to allow Mr. Alvarado to do so, can

18    you shed some light for me on the source of information and the

19    specifics about what would be challenging to the officer's

20    credibility?

21         **MR. GARRETT:**  So they were both cases that were

22    handled in the state court system, Brett Jones and Eddye

23    Fonseca.  They both involved traffic stops with Officer Tanner.

24         **THE COURT:**  Those are the defendants' names in the

25    state court?

1      **MR. GARRETT:** Yeah. We're aware of those situations.
2 We are aware that the cases were dismissed, and/or reduced, and
3 Mark Leavitt -- so there's three, actually, Mark Leavitt as
4 well as the other defendants, where charges were dismissed
5 based upon a finding of lack of probable cause, you know, for
6 the stop. I mean, albeit, there wasn't an actual adjudication
7 of the facts, but we are aware of the circumstances, Your
8 Honor.
9      **THE COURT:** And how are you or Mr. Alvarado aware of
10 those circumstances?
11      **MR. GARRETT:** Mr. Alvarado has attained the police
12 reports. And in some instances, I think he has watched the
13 audio/video from the state court system; is that right?
14      (Counsel confers with client off the record.)
15      **MR. GARRETT:** He has watched the dash cam from the
16 Brett Jones case, and then he had some audio through the state
17 court system on the Mark Leavitt case.
18      **THE COURT:** And Mr. Alvarado attained the police
19 reports and the dash cam videos through acquaintances of his
20 that were defendants in the case? Has the Government been
21 allowed to see any of this? Where are we at with that?
22      **MR. GARRETT:** So it was a combination of a GRAMA
23 requests, and just the other defendants giving him materials
24 from their cases.
25      **THE COURT:** Okay. And what specifics do you think,

1    if presented as evidence, would diminish the credibility of

2    Officer Tanner?  In other words, what has he said or done that,

3    in contrast, would attack that credibility.

4         MR. GARRETT:  So what we believe, Judge, in those

5    instances, he stated a reason for the stop, which ended up not

6    being a valid reason for a stop, which resulted in a dismissal

7    of the charges.

8         THE COURT:  And can you be more specific than that?

9    Is it a windshield violation, or what --

10        MR. GARRETT:  I am sorry, Judge.

11        THE COURT:  Go ahead and talk to Mr. Alvarado.

12        (Counsel confers with client off the record.)

13        MR. GARRETT:  So in the Brett Jones case,

14   specifically, the alleged justification for the stop was a lane

15   violation.  The video from that case did not support that

16   violation, and the case was ultimately dismissed based upon

17   that.

18        THE COURT:  And the Fonseca case?

19        MR. GARRETT:  In the Fonseca case, the defendant

20   apparently stopped for not moving over for a maintenance

21   vehicle, and it turned out that the vehicle in question was not

22   a maintenance vehicle.  So our position is that -- a

23   reasonableness is presented that it wasn't accurate or legal

24   resulting in, again, a case where the charges weren't able to

25   be prosecuted as set forth.

1    **THE COURT:**  Okay.  Anything else you'd like to add

2    about those cases before I ask the Government for their

3    thoughts?

4         **MR. GARRETT:**  One moment, Judge.

5         (Counsel confers with client off the record.)

6         **MR. GARRETT:**  In the Mark Leavitt case, Judge, the

7    defendant, Mr. Leavitt, was stopped at a Maverick.

8         **THE COURT:**  And I am sorry, is this a third?

9         **MR. GARRETT:**  Yeah.  Mark Leavitt.  I am sorry.  He

10   was stopped at a Maverick and cited at the Maverick.  And in

11   this case, Officer Tanner testified that he could not stop

12   Mr. Alvarado at the Maverick because it was private property,

13   so we think there's some inconsistencies there that we'd like

14   to probe as well.

15        **THE COURT:**  Okay.  And anything else before I turn to

16   the Government to respond?

17        **MR. GARRETT:**  No.  Thank you.

18        **THE COURT:**  Okay.

19        Ms. Reddish-Day, your thoughts on this line of

20   questioning.

21        **MS. REDDISH-DAY:**  Your Honor, the proposed line of

22   questioning is improper under a number of legal reasons.  The

23   defendant is only allowed to ask questions that are probative

24   of the character, the truthfulness, or untruthfulness of the

25   witness.  There needs to be a good-faith based question, in

that, it must be relevant and probative to the officer's truthfulness and veracity, not simply a fishing expedition.

And also no extrinsic evidence is allowed pursuant to Federal Rules of Evidence 608. So we are only talking about questions that go to the officer's credibility and no extrinsic evidence is allowable. And impeachment on a collateral matter is also not allowed via intrinsic evidence, Your Honor.

Layering on top of the rules under Evidence Code 608, this line of questioning would be improper under those rules. But also what the defendant is trying to do is ask questions without any actual foundation, and based on hearsay, that the end result is something that he believes it to be: That Officer Tanner made reports, made stops in these three instances; those three instances, he alleges, Officer Tanner was untruthful; and he presupposes that simply based on the fact that the case was allegedly dismissed or adjudicated in some way that's unfavorable to the Government.

That's based on pure hearsay, Your Honor. The prosecutor has unlimited discretion to decide how to dispose of cases that are brought by law enforcement officers. So simply because a case is dismissed or a case is adjudicated for some lesser charge, by no means is it probative of the fact that an officer did or said something in reports that is untruthful.

So again, it is -- his accusations are based on hearsay, and what he has learned from other inmates. He has

received reports from other inmates through GRAMA requests.
They are all hearsay.  Officer Tanner has not been able to view
those reports to be able to answer why he did or didn't do
something in a particular case.  And there's just no foundation
for it, Your Honor, to prove that Officer Tanner has been
untruthful in this case.

And so we are going to be going down a road of
collateral matters on three separate incidents, where then the
Government would have to -- Officer Tanner would have to
respond to those three incidents, and have to remember those
incidents, first of all.  And then the Government would have to
have the opportunity to bring in additional evidence to prove
that Officer Tanner did not, in fact, lie on those occasions,
and perhaps those cases were dismissed or adjudicated for other
reasons.

Perhaps they weren't dismissed at all.  We are simply
going off what the defendant says to be true.  There's a
complete lack of foundation.  It's hearsay.  And it violates
the rules under 608 that information is also irrelevant to any
material issues in the case.  The defendant had requested all
of Officer Tanner's reports from two months prior to the arrest
to two months after the arrest.

The Court denied that request because those
documents, one, are not in the possession of the Government,
but also that those documents -- even assuming they were

discoverable -- would be immaterial in this case.  And so the
Court has already made that finding that these additional
arrests that Officer Tanner has made are immaterial to a
defense in this case, immaterial to this Motion to Suppress.

And so based on that, and that it doesn't fall
squarely within Rules of Evidence 608, and the reasons I
previously stated, we would strongly object to any line of
questioning along those lines.  We do have -- I mean, Brett
Jones pled to a felony in state court.  So there's a lot of
information that the defendant is just presenting based on what
he has been told that we would have to have an opportunity to
either corroborate, dispel, etc.

So we would be having like mini-trials as to these
three defendants, and I just give that one example as to Brett
Jones in particular.  And so, again, the prosecutor has -- if
the case was dismissed -- I am not even saying it was -- if the
case was dismissed, how does that equate to Officer Tanner did
something that was untruthful?  So I think we need to stick
within the confines of Rule 608, and what is material, and
there's no good-faith basis to proceed as proposed.  And I
would object, Your Honor.

**THE COURT:**  Thank you.  I appreciate those thoughts.
Let me, for clarity sake, if nothing else, do a couple of
things.  My impression, and tell me if I am wrong, Mr. Garrett,
is that you aren't looking to cross-examine under Rule 608, in

other words, a general character for truthfulness or untruthfulness.  Rather based on not the rule that has been stated, but you are just -- the verbiage, it sounds to me like you are looking to challenge Officer Tanner's credibility under Rule 607.  Can you speak to that at all?

MR. GARRETT:  Well, Judge, that's right.  We are here.  At the end of this hearing, you are going to have to make some decisions about whether or not you believe Officer Tanner.  Because the testimony that I have been able to gather from this hearing is that he -- the actual -- the following too close, that violation is not recorded.

So if you find that my client was actually following too close, it will be based solely on the testimony of Officer Tanner.  So if he has a propensity, or he has a way of stopping vehicles without having justification, yes, we want to be able to attack his credibility in those instances.

And I think that a witness's credibility is always subject to impeachment, and we would be looking to do that under Rule 607.  I think it is relevant and I think it is appropriate under the circumstances.  And maybe he has information that he'll let us know that those cases weren't dismissed or, you know, who knows what he will say, but they are his cases.  He is aware of them.  He has personal knowledge of them.  He may have to refresh his memory, but he has involvement in those cases and maybe the ability for us to

probe that would be an appropriate impeachment method on

cross-examination.

**THE COURT:** Do you have information on the age of

these three cases?

**MR. GARRETT:** We believe that the Leavitt case is

about three months old. The Jones case may be a year, a year

and a little bit, and Fonseca maybe a year and a half.

**THE COURT:** Okay. Thank you. That's my sense,

virtually, is that -- I think I would agree, and I am still

under Rule 607, but I don't think Rule 608 is in play here. I

don't understand that any testimony is being offered as to a

general character of truthfulness or untruthfulness, rather

specific instances that may challenge the credibility of

Officer Tanner. Any thoughts on that?

**MS. REDDISH-DAY:** Well, Your Honor, the specific

instances are covered under Rule 608, which says that extrinsic

evidence is not admissible to prove specific instances of a

witness's conduct in order to attack or support a witness's

character for truthfulness, but the Court may on cross allow

them to be inquired if they are probative of the character for

truthfulness or untruthfulness of the witness.

My point is: This line of questioning is not

probative of the witness's truthfulness or untruthfulness, and

it would be just mere allegations without any foundation. I

don't expect Officer Tanner to even know what the outcome was

of those particular cases.  He was just simply -- have to be refreshed -- his memory would have to be refreshed on the particular arrests he made or particular stops he made, and then testify as to why he made the stops.  And then there would just simply be a lack of foundation for any further questioning with regard to that, Your Honor.

It is just not relevant.  I think the law is pretty clear that the cross-examination must actually be based on conduct that impugns the witness's character for truthfulness and be probative of truthfulness.  And that the Court has the duty to prevent harassment, prejudice, and confusion of the issues and interrogation is repetitive or only marginally relevant.

There may be marginal relevance in these allegations that are being made by the defense.  It is just marginally relevant, and I would submit it is not relevant at all.  But it is just going to confuse the issues, be undue consumption of time, and really not lead to any material that is going to lead the Court to be able to decide whether or not Officer Tanner has been truthful or untruthful in this particular case before the Court today.

So I just -- I think it is -- I think the law is really clear in this area that these specific acts of conduct should not be questioned about without any foundation.  It is just pure hearsay, Your Honor.

1          THE COURT:  Okay.  Thank you.  I appreciate that.

2          Any final thoughts, Mr. Garrett?

3          MR. GARRETT:  We just point out, Judge, we believe

4    that in questioning Officer Tanner, the prosecution did ask if

5    he always has a basis for a stop, and he testified that he did,

6    and so we think that kind of, you know, allows us to probe that

7    just a little bit.

8          THE COURT:  Okay.  I appreciate your thought.  To a

9    large degree, I think this general line of questioning falls

10   within the framework of my written ruling on discovery prepared

11   in prior police reports.  But the most important thread I think

12   there is that whether or not a stop is justified is an

13   objective finding that needs to be made based on the evidence

14   put forth -- by the Court, and not a subjective finding which I

15   think makes this line of questioning very collateral to the

16   issue at hand.

17         When I combine that with a relative lack of

18   foundation or notice to the prosecution, plus the State

19   prosecutor's discretion in dismissing a case could be for any

20   number of reasons, from officer -- an officer's inappropriate

21   actions all the way to resources, victims, all kind of things,

22   especially when these are unadjudicated and a foundation hasn't

23   been properly laid.

24         For all those reasons, I am going to deny the request

25   to cross-examine Officer Tanner on these specific cases that

Mr. Alvarado has requested.

Are there any other topics that we haven't addressed before bringing Officer Tanner in?

**MR. GARRETT:** My client would like a chance to address the Court, if that's okay, Judge.

**THE COURT:** Let me remind you, as always, Mr. Alvarado, you have the right to remain silent. Anything you say may be used against you. But if that's what you would like to do, I am happy to hear what you'd like to say.

**THE DEFENDANT:** So the only reason why I want to do this --

**THE COURT:** Mr. Garrett, if you wouldn't mind pushing that microphone, thank you, so I can hear you.

**THE DEFENDANT:** So one of the main reasons why I wanted to bring this up is because at the status hearing on the 2nd of this month, we came to a finding based off Ms. Reddish-Day's attempt to receive the ALPR records in their totality. And she attempted to receive them from Agent Tanner or was in communication with him pertaining to the two of them. And I believe her comment from him to her was, after reviewing these records, that they mysteriously erased two to three weeks later. And that answer to her was completely false.

I have information regarding how long these records actually still -- how long they are retained. And according to data, they came to retain these records for years. And so the

fact of the matter that these records still exist, and them being potentially part of discovery, and us still not having those records, it is apparent to me as to why those records were kind of prevented from us retrieving them.

When the Courts were misled by Agent Tanner to the prosecutor, and I was misled as to supposedly what the requirements are or how long they are retained for. And based off of that, I just feel like -- I don't know how the Court would address that right now.

Because you came to a finding that they were unfair treatment, was insufficient, and she just wasn't able to retrieve them based off the fact that Agent Tanner told her they no longer exist, and that's just not true.

**THE COURT:** This feels like kind of an additional topic. I understand. And if you'd like Mr. Garrett to ask Officer Tanner what he knows about how long ALPR records are kept, I will allow that questioning.

**THE DEFENDANT:** okay.

**THE COURT:** Are there any other topics that we think might be controversial or objected to that we can deal with now rather than, sort of on the fly, which we can do as well?

**MR. GARRETT:** Nothing that I foresee right now. Something may come up as we get into questioning, but I think we are good. Thank you for taking some time.

**THE COURT:** Very good. Why don't we have Officer

Tanner come in and we will get him back on the stand.

Officer Tanner, long time, no see. Come on up. Stand by the witness stand here, and we will swear you again.

AGENT NOLAN TANNER,

recalled as a witness for and on behalf of the Plaintiff, being first duly sworn, was examined and testified as follows:

**THE COURT:** Thank you. Please take the stand. I know this is a little unusual, but we have had you back multiple times, so thank you for your patience. The context is we are going to let Mr. Garrett pick off where he left off last week with cross-examination.

Any questions for me before we start?

**THE WITNESS:** No.

**THE COURT:** Mr. Garrett, when you are ready.

CROSS-EXAMINATION

BY MR. GARRETT:

**Q**   Good afternoon, Officer Tanner.

**A**   Good afternoon.

**Q**   I just wanted to start with some questions on some timeframes. So did you submit a search warrant affidavit in this case for a search warrant or somebody associated with the case?

**A**   For cell phone or what are we talking about?

**Q**   Anything.

**A**   I don't recall if I wrote the search warrant or one of the

1   detectives did.

2   **Q**    Okay.  But you do recall submitting an affidavit for a

3   search warrant?

4   **A**    I believe a search warrant was submitted on a cell phone.

5   That's a pretty standard practice.  I just don't recall.

6           **MR. GARRETT:**  Can I approach, Your Honor.

7   BY MR. GARRETT:

8   **Q**    I will just ask if you recognize this document I am

9   showing you.

10  **A**    Yes.

11  **Q**    What is it?

12  **A**    This would be a cell phone warrant involving this case

13  that I wrote.

14  **Q**    Okay.  So it is your affidavit?

15  **A**    Correct.

16  **Q**    All right.  And in this affidavit, here on page 2, do you

17  agree with me that you state that at approximately 20:42 hours

18  you were traveling north on I-15 at Mile Marker 11, that you

19  observed a black SUV with Utah license plate number, and then

20  you set forth -- do you agree that's what that says?

21  **A**    Yes.

22  **Q**    So 20:42 is the time you indicated on there?

23  **A**    Yeah, that's what is written on there.

24  **Q**    And in your police report, did you also state that the

25  time that you observed the vehicle was at 20:42?

1  **A**     Yes.  I believe that is copied from my police report.

2  **Q**     Okay.  What time did you actually stop the vehicle?

3  **A**     I don't know the exact time of the stop of the vehicle.

4  **Q**     Was your body cam -- was the time on your body cam, was it

5  accurate that night?

6  **A**     I believe it should be.

7  **Q**     Okay.  So if we reference the body cam, we should be able

8  to get the accurate time of the stop; is that right?

9  **A**     Yes.

10  **Q**     Can we just start that, his body cam, Nolan Tanner's body

11  cam.

12                          (Video Played.)

13  BY MR. GARRETT:

14  **Q**     Can you see that, Officer Tanner?

15  **A**     I can.

16  **Q**     What is the time?

17  **A**     20:34.

18  **Q**     And let's just let it run until you actually stop the

19  vehicle and get out.  It is just a short amount of time.

20                          (Video played.)

21  BY MR. GARRETT:

22  **Q**     So you are getting out, the vehicle has been stopped,

23  right?  What's the time?

24  **A**     20:34 and 59 seconds.

25  **Q**     Okay.  So your police report and affidavit were incorrect

1  as to the time that you first observed the vehicle, correct?

2  **A**    Correct.

3  **Q**    All right.  I want to ask you some additional questions

4  then about the ALPR.  Now, the other day in court, you

5  testified that you had ran the ALPR before you go to the

6  Maverick; is that right?

7  **A**    Correct.

8  **Q**    Didn't you testify at the first hearing in this case that

9  you ran the ALPR at the Maverick?

10  **A**    I ran the LPR twice.  So as I testified before, I used the

11  stakeout feature to the LPR.  It's essentially to determine

12  long distance travel in a short amount of time.  That would be

13  considered a query test, or -- like running a query,

14  essentially.  And then as he was at Maverick, I also ran an LPR

15  check a second time to confirm his travel.

16  **Q**    Okay.  So when did you run the stakeout feature?

17  **A**    A couple hours before he had reached my location.  The

18  timeframe before, I can't remember if it was an hour, hour and

19  a half, two hours, 30 minute.

20  **Q**    So you ran it, maybe, as soon as an hour before he got

21  into St. George, and then you ran it again at the Maverick?

22  **A**    Yeah.  Not the stakeout feature, though.  That's a tool

23  that Vigilant, which is the ALPR company that we use, in order

24  to -- it helps, essentially, articulate quick travel or

25  suspicious travel.  From there, it gives you a list of vehicles

that meet that criteria, whatever we put in for it. And it
gives you a printout, or a picture -- not a printout, but a
picture of each car that makes that travel. Once he has passed
me at Mile Marker 8 and exits, I then run his vehicle to
confirm that it is that vehicle in ALPR, and also to get a
better assessment of times on when exactly he tripped into
California and came out of California.

Q    This stakeout feature, it is part of the ALPR system; is
that right?

A    That's correct.

Q    Had you ran it before that even or was that the only time
you ran this vehicle on ALPR was just an hour before?

A    Are you talking about the stakeout or --

Q    Yeah. Anything. Just anything. Any part of the ALPR
system, did you run it before the two times you testified to?

A    No.

Q    As it relates to Mr. Alvarado's vehicle, I am narrowing it
down to that, obviously.

A    I don't recall if there was, like, one in between that or
if I ran it individually after that. What I do recall, is that
I used the stakeout. His vehicle -- or this vehicle --
obviously I don't know who is in this vehicle at the time.
That was where the vehicle first became something that I was
alerted to, and then me confirming his travel once he was at
the Maverick location.

1  **Q**    Okay.  So at this hearing back in November, you were asked
2  about running the license plate system.

3          **MR. GARRETT:**  can I approach?  It might be easier for
4  me.

5          **THE COURT:**  You may.

6  BY MR. GARRETT:

7  **Q**    So this was on redirect examination with the prosecutor
8  Ms. Reddish-Day.  I am showing you page 122 of the transcript
9  and I want to just start at line 4.

10         So Ms. Reddish-Day asks, and I will read the
11  question:  "Counsel asked you a few questions about the ALPR
12  and you running the license plate through that system,
13  correct?"

14         And your answer?

15  **A**    "Correct."

16  **Q**    "And just so we are clear, did you -- you did that while
17  you were at the Maverick gas station observing the defendant's
18  vehicle."

19         Your answer.

20  **A**    "Correct."

21  **Q**    I am sorry I talked over you.

22  **A**    "Correct."

23  **Q**    "Question:  Okay.  And is that a common practice that you
24  engage in as a drug interdiction officer?"

25         Your answer?

**A**     Right here?  Sorry.  Where are we at?

**Q**     Right here.  Line 14.

**A**     "This was prior, yes, prior to May of 2022 when you can run LPR for different reasons."

**Q**     Okay.  So during that exchange, you would have had the chance to talk about, you know, this stakeout feature of your ALPR system, but you chose not to; is that correct?

**A**     No, that's not correct, because nobody asked me anything to do with what -- ALPR has a whole bunch of different things you can do.  You can batch plates.  You can stakeout plates.  You can run off individual vehicles off of make/model.  So, no, I did not describe every single detail.  I ran a query on the plate and that's what I disclosed.

**Q**     But you disclosed you had done it at the Maverick, right?  You didn't disclose you had done it prior to that?

**A**     Yes.  That is one of the locations I had done it at was at Maverick.

**Q**     Now, as it relates to this windshield violation, just some questions on that.

        **MR. GARRETT:**  May I approach again, Your Honor?

        **THE COURT:**  Go ahead to go back and forth as necessary.

BY MR. GARRETT:

**Q**     I just want to show you Utah State Law 41-6a-1635, you are familiar with that?

**A**    Yes.

**Q**    I believe the relevant part here would be subsection (2)(a). "A person may not operate a motor vehicle with an object or device hanging or mounted in a manner that materially obstructs the operator's view."

Is that correct?

**A**    Correct.

**Q**    Is that the relevant portion of that statute that you were relying?

**A**    Yes.

**Q**    Okay.  So a violation then would be an object, either hanging or mounted, from the windshield, that materially obstructs the driver's view, correct?

**A**    Correct.

**Q**    Now, in trying to determine whether or not that was a material obstruction, did you ever get into the vehicle so that you had Mr. Alvarado's view out of the windshield to determine whether or not there was an obstruction that was material?

**A**    I did not sit in the driver's seat and look through it, no.

**Q**    So you wouldn't have known whether or not something was materially obstructing Mr. Alvarado's view based upon simply seeing something -- you didn't do anything further than just view it, from your standpoint, outside the vehicle?  You didn't do anything more to verify whether or not it would be a

1  material obstruction?

2  **A**    My reasonable suspicion lied under the items itself, how

3  large the item is, and multiple items, and where it was mounted

4  at, which was hanging dead center of the rear-view mirror.  And

5  that's what I was gaging it off of.

6  **Q**    Okay.  You also testified, right, that you don't typically

7  find a violation if the item is less than three inches wide?

8  **A**    That's just what I, myself, enforce is anything larger

9  than an air freshener.

10  **Q**    Anything larger than an air freshener.  Is a standard air

11  freshener three inches wide?

12  **A**    It's three inches by two inches.

13  **Q**    Three inches by two inches.  Okay.  So your standard

14  practice would be anything smaller than an air freshener you

15  would find to be a material obstruction?

16  **A**    Correct.

17  **Q**    Anything larger than that, you may find to be a material

18  obstruction?

19  **A**    Correct.

20  **Q**    Do you think that Utah statute that we have been

21  referencing, do you think that it's clear or do you think that

22  it is vague?

23          **MS. REDDISH-DAY:**  Objection.  Calls for a legal

24  conclusion.

25          **THE COURT:**  I will allow it.

1    **THE WITNESS:**  Do I think that it is vague or clear?

2    **Q    (By Mr. Garrett)** Uh-huh, (affirmative).

3    **A**    I believe that it is clear, in my mind, because it's

4    stating that anything that can materially obstruct their view.

5    I would say any items that seem large or multiple items would

6    be reasonable to believe that would obstruct their view.

7        Vehicles are set up for a reason, AS-1 lines on each

8    side where the rear-view mirror is, that nothing should go

9    below that.  It needs to be above it.  So in my mind, it is

10   clear.  It doesn't have a specific thing saying it needs to be

11   larger than this or that.  That's where I think the officer's

12   interpretation and reasonable suspicion will come from.

13   **Q**    So your interpretation anything bigger than a

14   two-by-three, or three-by-two object, would materially

15   obstruct -- that's just your own, kind of, reasoning and

16   analysis?

17   **A**    I believe it could be articulated based off that officer.

18   If they believe a single air freshener can reasonably obstruct

19   their view, I believe that officer can articulate that.  For

20   myself, I'm not able to articulate that small of an item, so I

21   gage that as the threshold of anything larger than this is a

22   possible concern for their visual.

23   **Q**    And I guess my point is, though, that the statute doesn't

24   really spell that out, correct?  It's left to, kind of, your

25   interpretation of what material obstruction might be?

1    **A**    Sure.

2    **Q**    I mean, that three by two that you go by, that's nowhere

3    in the statute, right?

4    **A**    No.  That's just based off trainings.

5    **Q**    Okay.  And then I want to just shift to the following too

6    close briefly.  So was it your testimony at the last hearing

7    back in November, not last week, but back in November, that you

8    used a guardrail or fixed object, right, to start the pacing to

9    determine how far behind Mr. Alvarado was to the car in front

10   of him, correct?

11   **A**    I believe it was a guardrail, yes.

12   **Q**    And did you at that time state that it was the last

13   guardrail that you -- on that stretch of highway, the last

14   guardrail that you identified as your fixed object?

15   **A**    I don't recall the last one, or -- I don't recall the

16   exact guardrail it was.

17   **Q**    I am just going to show you the transcript from the last

18   hearing.  Page 45.  I will just read from it starting on line

19   19.  Okay.

20        "Question:  So then in this case, you observed the

21   subject vehicle traveling behind a white vehicle and you

22   engaged in that same process; is that right?"

23        You say:  "That's correct."

24        "Question:  And what did you use as your fixed point

25   to do your counting?

1          Answer:  It is the last post on the guardrail that I

2     used.  There's a metal guardrail on the left shoulder of the

3     inside lane.  We're in the number one lane, so we are driving

4     close to that guardrail, so it is easy for me to see taillights

5     as they pass it, so that's what I am using as my fixed object."

6          Correct?

7     **A**    Correct.

8     **Q**    So you state that it was the last post on the guardrail;

9     is that right?

10    **A**    Correct.

11    **Q**    And then you went on to testify that you ran the test

12    multiple times?

13    **A**    Correct.

14    **Q**    So how would you run the test multiple times if your fixed

15    object was the last guardrail, and once that's gone, it is

16    gone?

17    **A**    So during the process, I am behind him.  There's a semi on

18    the right.  There's -- I believe it was a white passenger

19    vehicle.  There's your defendant's vehicle and then there's a

20    pickup truck.  There's about three to four miles that we are

21    traveling that this test is being conducted.

22         That one right there was off that guardrail.  I can't

23    recall where the second one was, but I was using multiple fixed

24    objects as I was going on I-15 and counting them off.  And that

25    is also testified to.

1    There's a time where me and Deputy Montgomery are on
2 a phone conversation, and I am not really real reactive to his
3 conversation because I am constantly counting as we are passing
4 fixed objects.

5 **Q**    You agree that your testimony just identified the one
6 fixed object, correct?

7 **A**    Correct.

8 **Q**    Have you ever fabricated a reason to justify a stop on a
9 traffic search?

10 **A**    Fabricated a reason, like?

11 **Q**    A justification?

12 **A**    Made up a stop?

13 **Q**    Uh-huh, like fabricated a reasonable suspicion or probable
14 cause to stop a vehicle?

15 **A**    No.

16 **Q**    All right.  Thank you for your patience, Officer.  We are
17 getting close here.  I want to just take you back to the
18 Maverick real quick for a few questions there.  So did you see
19 whether or not Adrian Alvarado, the defendant, went into the
20 Maverick store during the stop?

21 **A**    No.  By the time I located his vehicle, he was either
22 sitting in his car or putting fuel in his car.

23 **Q**    So your testimony is he did not go into the Maverick?

24 **A**    I don't know if he went in or not.

25 **Q**    Could he have gone in and you not have seen it?

**A**     Yes.

**Q**     So he could have gone in?

**A**     Yes.

**Q**     And did he, in fact, have a drink from the Maverick as you stopped him?  Did you notice that?

**A**     I don't recall that.

**Q**     But it is possible?

**A**     Yes, it is possible, because I didn't see whether he went in or not.

**Q**     So your testimony is not that he didn't go in, it is just that you didn't see him go in?

**A**     Correct.

          **MR. GARRETT:**  One moment.

          (Counsel confers with client off the record.)

**Q**     **(By Mr. Garrett)** So did -- we talked a little bit about this the other day.  Just for clarification, but you believe that your body cam was on the entire time that you were interacting with Mr. Alvarado, correct?

**A**     So during the investigation, a body camera until the end of my investigation is done.  I don't recall if I transported Mr. Alvarado or somebody else transported Mr. Alvarado to Purgatory.  It is definitely possible that at some point he was placed in my car after he was done doing interviews with HSI and DEA.  If he was in my car, there may have been conversation not related to anything specific of where the drugs were going

1  to or coming from, but I don't recall that conversation.  So it

2  is possible that we had a conversation, but nothing to do with

3  any incriminating information on this case.

4  **Q**    Okay.  And I did ask the other day about whether you had a

5  conversation with him about showing him that you used the ALPR

6  system to, kind of, catch him, so to speak?

7  **A**    Yeah, I just -- I don't recall that at all.  That's what I

8  testified to as well.  I know it is a common tool when doing

9  debriefs with individuals that we use, HSI, DEA, things like

10 that.  If he was told they knew his travel, or whatever it be,

11 and he asked me if it was used, then I am sure while driving or

12 whatever I could have said yes, you know, I use them, but I

13 don't recall any specifics or showing him anything I was

14 looking at unless he happened to see my laptop.  I don't know

15 is the answer.

16 **Q**    Okay.  But would it be policy for you -- if you did have

17 that conversation, should you have had your body cam on?

18 **A**    About, like, LPR stuff?

19 **Q**    Uh-huh, (affirmative).

20 **A**    I honestly don't know a whole lot about what our policy

21 says.  I know if we are making traffic stops and responding to

22 calls, we are required to have our body camera on.  But as far

23 as like transportation, we have never been told to have our

24 body camera on.  Our policy says exactly on it, but I haven't

25 viewed our policy for over three years when we first got our

body camera.  I know it is not standard with our officers.  If we left our body camera on for a three-hour investigation, it would be dead halfway through our shift.  Unless it is a female, then we are required to have a body camera on.

**Q**    Okay.  Thank you for that answer.

**MR. GARRETT:**  Judge, we are just trying to find a time slot.

**THE COURT:**  That's all right.  Go ahead.

BY MR. GARRETT:

**Q**    We are just going to play this clip of this video, Officer Tanner.  I think it depicts you interacting with Mr. Alvarado.  Let's just play it and see if that's what it is.  This is your body camera -- or the dash cam on your car; correct?

**A**    Correct.

(Video played.)

BY MR. GARRETT:

**Q**    Do you know if your body cam is off at this point?

**A**    I don't know.  I don't know.

**Q**    I believe that it is, but I wanted to know if you can confirm that or not.  So there on the right of the screen, Mr. Alvarado comes into view.  He is with an officer.  And then who is that, the officer that has a drink in the vehicle and is bringing it down?

**A**    That would be Deputy Montgomery and I am standing next to Alvarado.

**Q**   All right.  You can stop it right there.  So Montgomery got him a drink from the vehicle?

**A**   Correct.

**Q**   And both of you were interacting with Mr. Alvarado at this point, correct?

**A**   Correct.

**Q**   And there's no evidence of that on the body cam, would you agree with that?

**A**   I agree.

**Q**   Wouldn't that have been an interaction that would have required your body cam to be running?

**A**   I -- I don't know what the policy or the state statute at this point reads for our interaction.  I do know at this point he has already done his interviews with these agents, and I am standing there off to the side while they are making phone calls to further this investigation up north.  I don't know what our conversation was, what the context was.  But from the looking at it and viewing it, I don't know how much we were talking.  I think I am just more there for officer safety standing with him while they continue.

          **MR. GARRETT:**  Thank you.  One moment, Judge.

          (Counsel confers with client off the record.)

BY MR. GARRETT:

**Q**   All right.  Back to the following too close quickly.  Were you able to determine whether or not Mr. Alvarado was

1    accelerating during that following too close, decelerating, or

2    otherwise?

3    **A**    I believe he was just traveling.  I don't know that he was

4    accelerating or -- I don't recall brake lights or him

5    getting -- I don't think he could accelerate very much more.

6    He probably would have rear-ended that car.

7    **Q**    What if he had put his brakes on?  Would he have created a

8    situation behind him that would be unsafe, with that car

9    traveling behind him?

10   **A**    If he would have braked?

11   **Q**    Uh-huh (affirmative).

12   **A**    I don't recall.  I am not sure.  It is always possible if

13   that car doesn't stop as well, they can rear end them.  Same

14   goes for the vehicle in front of Alvarado.

15   **Q**    Mr. Alvarado, he didn't create this situation on the

16   freeway, would you agree with that?  Where we -- kind of this

17   log jam?  Isn't it true to say that the white vehicle was

18   traveling below the posted speed limit at that time?

19   **A**    I believe the vehicle was traveling below the posted speed

20   limit, but I disagree that he didn't create that following too

21   closely.  If he would have gradually slowed down, and caused

22   the distance between the two, that violation wouldn't have

23   occurred.

24   **Q**    And that was in the number one lane; is that correct?

25   **A**    Correct.

**Q**   And the number one lane, just so we all understand, is considered the fast lane or the left lane?

**A**   Correct.

**Q**   And the number two lane is the right lane?

**A**   Yes.

**Q**   And, eventually, the traffic went around the white vehicle; is that correct?

**A**   I believe that once the white vehicle had passed the semi-truck, it had signaled over and then all the vehicles began to do the same from what I recall.

**Q**   Okay.

(Counsel confers with client off the record.)

BY MR. GARRETT:

**Q**   So after you conducted your test, in your mind, of calculating how far behind the white vehicle Mr. Alvarado was, did you do it again or do you know?  Can you say -- can you say with any degree of certainty how long he followed him at that point, after he conducted the test?

**A**   So the test were conducted multiple times during that timeframe.  So are you asking me like the length -- I am sorry.

**Q**   Just how long after you conducted the test did this situation continue?

**A**   I'd say another mile or two, however long the distance was from the vehicle in front of him finally getting over and then the number one lane clearing out, so I'd say a mile or two-mile

timeframe.

**Q**    Okay.  And that whole time, were you calculating in your mind this distance between the vehicles?

**A**    Yes.  I had done it several times.  As I pulled my car on the shoulder, using the guardrail, 1-1,000, 2-1,000, seeing if the Alvarado vehicle had passed that within that two seconds.  Restarted using another one, 1-1,000, 2-1,000.  And at that time, I believe traffic began to open up, and that's when the traffic stop was going to be conducted.

**Q**    All right.  Can we watch the dash cam of him following too close.

        **THE COURT:**  That's fine.  Let me interject, Mr. Alvarado, and just to let you know that the dash cam and the body cam have been entered into evidence, and so Mr. Garrett can later make references to that evidence in his brief.  There may be some things you want to specifically ask Officer Tanner, and that's fine -- but I guess what I am getting at is there's arguments that can be made as to these things without specifically doing it here in court, if that makes sense.

        **THE DEFENDANT:**  Yeah.  I understand, Your Honor.  I just feel there's a lot to cover with all the variables of this case, and he just made a statement that that white car moved over, and that was a false statement, so I wanted to put on the record --

1    **THE COURT:** I am not trying to stop you here. I just
2    want to make sure you know the context.
3         **MR. GARRETT:** We will just pick it up here and watch
4    the, kind of, take off on the body cam after they get on I-15,
5    and just watch it unfold.
6    BY MR. GARRETT:
7    **Q**   Is this you following the vehicles, Officer Tanner?
8    **A**   Yes, sir.
9    **Q**   Okay.
10                        (video played.)
11   BY MR. GARRETT:
12   **Q**   Where is Mr. Alvarado's vehicle at this point, do you
13   know? Is it the one that just changed lanes? Signaled and
14   changed lanes to the fast lane?
15   **A**   I believe so, but we are going to need to watch it a
16   little bit further to say for certainty. So that would be
17   Mr. Alvarado's car.
18   **Q**   Yeah. So there's a pickup truck that pulled in between
19   you and Mr. Alvarado's car, correct?
20   **A**   Correct.
21   **Q**   Do you assert at this point that he is following too close
22   or not yet?
23   **A**   It is more of when I start moving my car over from what I
24   can recall.
25   **Q**   So in your mind, you haven't seen a violation yet?

**A**   Front windshield violation.

**Q**   I mean, I am sorry, a following too close violation?

**A**   Yeah.  I believe that -- I began starting to count and monitor it at this point, but it isn't until the guardrail starts or ends --

**Q**   You -- let me know when you are starting to count or you see something that triggers that action from you.

**A**   I believe it is at this point that I am using the guardrail to count, that we just passed, and that's one of the two that I recall from that.

**Q**   So the violation has occurred then at this point in your mind?

**A**   Yes, it has.

**Q**   And has Mr. Alvarado's car moved over?

**A**   Yes, it has.

**Q**   Did it move over right after it passed the diesel, do you know?  Did you see?

**A**   I didn't recall that.

**Q**   But that white car is below the speed limit, you would estimate, right there?

**A**   Yes.

**Q**   And impeding traffic, correct?

**A**   Correct.

        **MR. GARRETT:**  Okay.  You can stop that.

///

BY MR. GARRETT:

**Q**   And so we saw the one guardrail, is that the guardrail you were referencing that he passed?

**A**   Yes.

**Q**   Was there a second guardrail there or just the one?

**A**   There was a second guardrail, but that was the one that I used as a reference point, and at that point, I was using the post as well.

**Q**   So there was one guardrail, and then you used posts --

**A**   Yes.

**Q**   -- for your fixed object.  All right.

       (Counsel confers with client off the record.)

       **MR. GARRETT:**  All right.  Thank you, Officer Tanner. That's it for now.

       **THE COURT:**  Very good.

       Ms. Reddish-Day, anything else from your side?

                  DIRECT EXAMINATION (continued)

BY MS. REDDISH-DAY:

**Q**   Good afternoon, Officer Tanner.

**A**   Good afternoon.

**Q**   So you've been asked a lot of detailed questions over the last -- well, last Thursday afternoon, this afternoon, and then also back on November 8th of 2023.  Do you recall your testimony on all those days, as best you can?

**A**   As best I can.

**Q**   I just want to clarify just a few details.  This won't take long.  I will start with the following too close violation.  That is partially captured on the dash camera footage we just went over.  So it is your testimony that you did your calculation 1-1,000, 2-1,000, based on fixed objects, correct?

**A**   Correct.

**Q**   And you did that multiple times as you were traveling Northbound I-15 behind Mr. Alvarado?

**A**   Correct.

**Q**   And you have done -- based on your best recollection, you have tried to describe to the Court at what points during that travel that you were making those calculations; is that correct?

**A**   Correct.

**Q**   And does the -- is it fair to say that the body camera does not -- or the dash camera footage does not capture exactly what your eyesight was able to see that evening?

**A**   That's correct.

**Q**   Okay.  And you have made stops as an interdiction officer for this exact type of violation multiple times before; is that correct?

**A**   That's correct.

**Q**   Is it fair to say you have extensive experience on how to determine whether or not there is a following too close

1   violation pursuant to the Utah State Code?

2   **A**    Yes.

3   **Q**    And you testified earlier, I think back in November, about

4   how you -- and then I think you also testified a little bit

5   about it during cross-examination, about how you moved your

6   vehicle over slightly on to the shoulder so that you could

7   observe the cars traveling in front of you a little bit better;

8   is that right?

9   **A**    That's correct.

10  **Q**    And the dash camera also is not -- is located in the

11  center of your patrol vehicle; is that correct?

12  **A**    That's correct.

13  **Q**    So the vision of the dash camera is not exactly the same

14  as where your eyes would be looking if you are watching a

15  violation in front of you; is that correct?

16  **A**    Yes.

17  **Q**    Okay.  And then also your trained eye -- let me ask you

18  this:  Have you reviewed several dash cam videos in other cases

19  that you have made arrests or traffic stops in?

20  **A**    Yes.

21  **Q**    And is it your experience that the dash camera doesn't

22  always show exactly what you were actually able to see with

23  your trained law enforcement eye?

24  **A**    That's correct.

25  **Q**    Okay.  And would you say that was true in this case as

1    well, Officer Tanner?

2    **A**    Yes.

3    **Q**    And the white vehicle that is in front of Mr. Alvarado is

4    traveling too slowly; is that correct?

5    **A**    That's correct.

6    **Q**    And so you have testified, more than once, that that

7    vehicle appeared to be impeding traffic, is that correct?

8    **A**    Correct.

9    **Q**    And that Mr. Alvarado was following too close to that

10   vehicle?

11   **A**    Yes.

12   **Q**    And the fact that that white vehicle was impeding traffic,

13   isn't it true that it is common to then see the cars that are

14   following them also follow too close?

15   **A**    Correct.

16   **Q**    But those cars that are following a vehicle impeding

17   traffic, that's not lawful to follow too closely, simply

18   because they are impeding traffic; is that correct?

19   **A**    No.  Two wrongs don't make a right.

20   **Q**    Okay.  So in that situation, according to the Utah Traffic

21   Code, if a vehicle is impeding traffic, such as the white

22   vehicle was, the vehicles following still must follow at a safe

23   distance; is that correct?

24   **A**    Correct.

25   **Q**    And they must follow at a distance of at least two seconds

1  behind the vehicle that's impeding traffic; is that correct?

2  **A**    Correct.

3  **Q**    Okay.  And with regard to the -- let me ask you a few

4  questions about the observations of the material obstruction in

5  the windshield.  You testified -- do you recall testifying back

6  in November that you observed that obstruction in the

7  windshield while you were parked at the Maverick observing the

8  defendant's vehicle?

9  **A**    I do.

10  **Q**    And that you were approximately 20 to 25 feet away from

11  the vehicle when you were making those observations?

12  **A**    That's correct.

13  **Q**    Can you describe how you were faced with your vehicle in

14  relation to the defendant's vehicle's windshield?

15  **A**    Yes.  So my patrol vehicle would have been facing

16  southbound.  My -- I could see through my window to my right,

17  and Mr. Alvarado's car is positioned level with my vehicle.  So

18  as I am looking out my passenger window, I could see directly

19  through his driver and out his passenger window as well.

20  **Q**    So you are looking through the driver's side window, not

21  the front windshield, when you are making that observation?

22  **A**    Correct.  So I am looking level with it so I can see

23  the -- all the way through and through, as well as everything

24  that's in front.

25  **Q**    Okay.  So from that angle, from about 20 to 25 feet away,

1 you were able to see the material obstruction in the

2 windshield?

3 **A**    Correct.

4 **Q**    And was the Maverick lit on that evening?

5 **A**    It was.

6 **Q**    Did you feel like you had a clear line of sight to that

7 obstruction in the defendant's windshield?

8 **A**    I did.

9 **Q**    And are you firm in your belief, in your suspicion, that

10 that object or objects that were hanging from the rear-view

11 mirror were in violation of Utah Code?

12 **A**    I did.

13 **Q**    Okay.  And then after you stopped the vehicle, further up

14 I-15, you also were able to observe those objects from a closer

15 vantage point, is that fair to say?

16 **A**    That is fair.

17 **Q**    And at that point, did you then confirm your already --

18 the suspicion that you already had that those objects

19 materially obstructed that windshield?

20 **A**    I did.

21 **Q**    Okay.  So you did not change your assessment of when you

22 were able to actually see it up close after you made the stop;

23 is that correct?

24 **A**    That's correct.

25 **Q**    And the objects that were hanging from the rear-view

mirror were not translucent, I think your testimony was?

**A**    Correct.

**Q**    And that would be what you would be considering in your assessment as to whether or not an object is obstructing the windshield?

**A**    Correct.

**Q**    Okay.  And with regard to -- you were asked a lot of questions about the license plate reader system.  I just want to clarify a couple of points on that.  So your testimony is that there was at least two interactions with the LPR system that you engaged in on that evening?

**A**    Correct.

**Q**    And one of them is the stakeout mode, where you are simply receiving information about cars that have made quick trips in and out of California; is that correct?

**A**    Correct.

**Q**    Okay.  And the defendant's vehicle during that stakeout mode of LPR was identified as one of several vehicles that had traveled in and out of California in a designated short time period; is that correct?

**A**    Correct.

**Q**    And then when you observed the defendant's vehicle come into Utah, or when you were at Mile Marker 8, you observed his vehicle pass you, correct?

**A**    Correct.

**Q**    And then you observed him pull off of the freeway and into the Maverick station, just off I-15 and highway -- at Exit 8?

**A**    Yes.  I observed him at Exit 8 and make a left-hand turn from there.  I did not have a visual of him pulling into Maverick at that time because I had to catch up and relocate the vehicle, but I later did locate him at the Maverick off the exit.

**Q**    So it was at the Maverick, then, that you got his actual license plate off his vehicle and ran it through the LPR system, specifically to his license plate, correct?

**A**    At the Maverick -- I had already confirmed the plate.  I observed it.  And at that point, I ran the second inquiry, that's correct.

**Q**    Okay.  And that secondary query is specific to his license plate, correct?

**A**    Correct.

**Q**    As opposed to stakeout mode which is identifying multiple vehicles that have traveled in and out of California in a short timeframe?

**A**    Correct.

**Q**    And so when you ran that second inquiry at the Maverick, then that also confirmed that that vehicle had traveled in and out of California in a short timeframe; is that correct?

**A**    Correct.

**Q**    And when you are running LPR in the stakeout mode is that

1   because you are doing a generalized investigation as an

2   interdiction officer on the freeway?

3   **A**    That's correct.

4   **Q**    Okay.  And that's routine for you to do so, at least back

5   in August of 2022?

6   **A**    That's correct.

7   **Q**    Okay.  And -- but you weren't conducting any

8   investigations specific --

9          **MR. GARRETT:**  Objection, Judge.  This is just a line

10  of leading questions that -- they ought to be open ended.

11         **THE COURT:**  Sustained.

12  BY MS. REDDISH-DAY:

13  **Q**    So you were not -- when you were using the stakeout mode

14  of LPR at that time, were you conducting an investigation

15  specifically about Mr. Alvarado?

16  **A**    No.

17  **Q**    When you were using stakeout mode?

18  **A**    When I use the stakeout mode, it is a general

19  investigation on possible vehicles that may be traveling

20  through our area, possibly involved in criminal episodes.

21  **Q**    Okay.  And then when you are running a specific plate,

22  then does that become a more specific investigation at that

23  time?

24  **A**    Yes.

25  **Q**    Okay.  And you -- did you stop Mr. Alvarado's vehicle

1  based solely on the fact that he had made a quick trip in and

2  out of California?

3  **A**    No, I did not.

4  **Q**    And the information you received from the LPR about the

5  quick trip, did that factor into your investigation at all?

6  **A**    No.

7  **Q**    Why not?

8  **A**    The investigation was very quick.  From the time of the

9  traffic stop, the odor of marijuana was present in the vehicle.

10  That kicked off the search of the vehicle and the location of

11  the narcotics.  It wasn't used to build reasonable suspicion

12  during the interview, to detain him for longer, or to extend

13  the stop by any means, due to the odor being present so

14  quickly.

15  **Q**    Okay.  So it is information that you had -- that you

16  really had no further use for once you made the traffic stop

17  for the two traffic code violations; is that correct?

18  **A**    That's correct.

19  **Q**    Counsel asked you about your understanding of Utah Code

20  Section 41-6a-1635 which deals with the window obstruction that

21  you testified to --

22  **A**    Correct.

23  **Q**    -- correct?  And you testified that your understanding of

24  that vehicle code section allows for officer discretion to

25  decide whether or not there's a material obstruction in the

1  windshield; is that correct?

2  **A**   Correct.

3  **Q**   Okay.  And is it true there's also a second provision in

4  that section that deals with items that are below four inches

5  from the top inch of the windshield or beyond the AS-1 line?

6  **A**   That's correct.

7  **Q**   And did you find that to also be the -- did you believe

8  that the items that were hanging from the rear-view mirror also

9  were more than four inches from the top edge of the windshield

10  and beyond the AS-1 line?

11  **A**   I knew they were based off of where the rear-view mirror

12  is mounted.  It will be level with the AS-1 line.  And the

13  objects were hanging below it, so I knew those objects were

14  below that.

15  **Q**   Okay.  So there's, essentially, two different provisions

16  of the Utah Code section that you had suspicion were being

17  violated by Mr. Alvarado when he left the Maverick?

18  **A**   Correct.

19          **MR. GARRETT:**  Objection, Judge.  Leading.

20          **THE COURT:**   Sustained.

21  BY MS. REDDISH-DAY:

22  **Q**   Did you believe that there was more than one violation of

23  that particular traffic code section with regard to the window

24  obstruction?

25  **A**   Did I believe that he violated two separate --

1  **Q**    Yes.  That's my question.

2  **A**    based off of the code and what I read, I believed he was

3  in violation, just based off of my training and experience on

4  objects and things like that.  As far as specific on how many

5  of these he had violated, I didn't know an exact number.

6  **Q**    Okay.  And that's a common -- is that a common vehicle

7  code violation for you -- or traffic code violation for you to

8  stop vehicles for?

9  **A**    Yes.

10 **Q**    And the conversation that we viewed on the side of the

11 road in the dash cam, where you appear to be interacting with

12 Mr. Alvarado and Deputy Montgomery, what do you believe the

13 context of that was?

14 **A**    I believe he asked for a drink, and Deputy Montgomery

15 went -- or asked him, probably, where the drink was at, or knew

16 where it was at, and brought him a drink.  As far as context

17 goes, I believe that's the level of it.  It was -- I don't know

18 if we communicated too much to be honest, but, essentially, we

19 are just standing there.  There's small talk.  There may be

20 small talk, but it isn't anything investigation wise.

21 **Q**    Okay.  You were at that scene for quite some time; is that

22 fair to say?

23 **A**    Yes.

24      **MS. REDDISH-DAY:**  Your Honor, if you can just give me

25 a moment to check my notes.  I don't think I have anything

further.

          **THE COURT:**  Sure.

          **MS. REDDISH-DAY:**  If I can just have one moment.

          Your Honor, I have nothing further.  Thank you.

          **THE COURT:**  Very good.  A little unusual to do a recross, but given how chopped up the hearing has been, I will give you a short window here.

          **MR. GARRETT:**  Thank you, Judge.  It won't be long.

RECROSS-EXAMINATION

BY MR. GARRETT:

**Q**   You testified that today, just barely with Ms. Reddish-Day, that you ran the LPR the second time at the Maverick, correct?

**A**   I ran it at least one more at the Maverick that I can recall, correct.

**Q**   The other day, didn't you testify that you ran the plate before -- just as it was getting off the freeway after it passed you, through the LPR system?

**A**   Correct.  So whether I was at Maverick or in that short window, I don't recall exactly where it was.  I just know that it was in that short timeframe.

**Q**   Okay.  And you didn't cite my client for any of the following too close, or the obstruction of the windshield, correct?

**A**   I believe it was charged on his arrest booking, but a

1 written citation was not issued, no.

2 **Q**    And you did not make -- initiate any contact with my

3 client at the Maverick, correct?

4 **A**    No, I did not.

5 **Q**    All right.  So you didn't approach him, right?  Because I

6 think you testified that you couldn't do anything about him

7 being on private property -- or couldn't cite him on private

8 property, is that accurate?

9 **A**    I could not conduct a traffic stop on his vehicle on

10 private property for the front windshield violation, that's

11 correct.

12 **Q**    So you let him leave before you conducted the stop?

13 **A**    Correct.

14         **MR. GARRETT:**  Okay.  All right.  I have nothing

15 further.  Thank you, Judge.

16         **THE COURT:**  Okay.  Very good.

17         Ms. Reddish-Day, any final questions?

18         **MS. REDDISH-DAY:**  Nothing further, Your Honor.  Thank

19 you.

20         **THE COURT:**  Very good.  Officer Tanner, thank you for

21 your patience with us.  You are free to go as you choose.

22         Okay, Mr. Garrett, anything else from your side.

23         **MR. GARRETT:**  Judge, maybe we can just take a break

24 and let me consult one last time with my client.  He may want

25 to testify.  We need to kind of make that decision.

1       **THE COURT:**  Okay.  We will take a short recess.

2  Thank you.

3                    (Court in recess.)

4       **THE COURT:**  Mr. Barrett, your thoughts?

5       **MR. GARRETT:**  Yes, Judge, if the State has rested --

6  or the Government, we are prepared to call Mr. Alvarado to the

7  stand.

8       **THE COURT:**  Okay.  Very good.  You may do that now.

9       Mr. Alvarado, if you can come toward the witness

10  stand here.  Raise your right hand the best you can.

11                    ADRIAN ALVARADO,

12   called as a witness for and on behalf of the Defendant,

13  being first duly sworn, was examined and testified as follows:

14       **THE COURT:**  Okay.  Very good.  Have a seat up here.

15  just make sure that mic is close to pick you up.  Very good.

16                    DIRECT EXAMINATION

17  BY MR. GARRETT:

18  **Q**    Good afternoon, Mr. Alvarado.

19  **A**    Good afternoon.

20  **Q**    Can you state your name for the record.

21  **A**    Adrian Alvarado.

22  **Q**    Spell your last name?

23  **A**    A-L-V-A-R-A-D-O.

24  **Q**    You are the defendant in this case?

25  **A**    Yes, sir.

1   **Q**    How old are you?

2   **A**    45.

3   **Q**    All right.  Where do you live?  Where did you come from?

4   Where did you live before you were incarcerated?

5   **A**    Ogden, Utah.

6   **Q**    Okay.  How long have you been in Utah?

7   **A**    Probably since I was 13 or 14.

8   **Q**    Okay.  So I want to take you back to the day that you were

9   pulled over, and, ultimately, arrested in this case.  Do you

10  remember that day?

11  **A**    Yes, sir.

12  **Q**    Okay.  Were you traveling northbound on I-15?

13  **A**    Yes.

14  **Q**    Okay.  Were you coming through the St. George area?

15  **A**    Yes.

16  **Q**    All right.  And did you have occasion to pull off the

17  freeway at Exit 8?

18  **A**    Yes, sir.

19  **Q**    Okay.  And from there, did you go to the Maverick?

20  **A**    Yes.

21  **Q**    Now, when you pulled off the freeway, did you see Officer

22  Tanner's vehicle or Officer Tanner sitting in the median there?

23  **A**    No.

24  **Q**    Did you have any idea that he was around you?

25  **A**    No.

**Q**    Why did you pull off?

**A**    I needed gas, and wanted to use the restroom, and buy a drink, and get snacks.

**Q**    So were you familiar that that Maverick was there on the Boulevard?

**A**    Yes.

**Q**    You had been there before?

**A**    Yes, sir.

**Q**    Is that why you chose that location?

**A**    Yes.

**Q**    So when you got to the Maverick, do you remember about what time it was?

**A**    I can't say exactly what time it was.

**Q**    Almost dark?

**A**    It was getting dark.

**Q**    Okay.  And so tell us, what did you do when you go to the Maverick there?

**A**    So upon getting off the freeway, I got to the light.  I had my blinker on to go left to go towards the direction of the Maverick, so I go through that light.  At the next light, it is red, and that's the first time I actually observed Agent Tanner as he pulls up next to me.

**Q**    Okay.  And so you were still -- you weren't at the Maverick yet?

**A**    No.

**Q**   Still headed towards the Maverick?

**A**   Yes, sir.

**Q**   What happened next?

**A**   So he is facing me.  We go through the next light.  I turn into the Maverick, and I observe him hit his brakes, and go into a turning lane, so that -- I was assuming he was going to flip around, so I just pulled into the Maverick, pulled up to the gas station, the gas pumps, and got out, and went inside to use the restroom, and do what I was going to do.

**Q**   Did you get gas and then go into the Maverick or did you just go in?

**A**   No.  I had to pay for it first.  But I had to use the restroom, so I went inside and used the restroom.  I got a drink and some snacks.  I bought some snacks and then I came out.  At the time, they give you the ticket.  You had to actually type in the code to -- once you got to the pump after you paid, and so I had to go in and pay for that.  And once I paid, I came out, put my drinks in the car.

**Q**   Did you see Officer Tanner at this time?

**A**   At this time, when I was walking in -- when I was walking in the Maverick, I actually seen two officers right there.  But as I was walking, I watched him leave.  And so when I came out, there was only one officer there.

**Q**   Do you know which officer was there?

**A**   I believe it was the St. George, Joe Watson.

1 **Q** So Officer Tanner was not there when you came back out?

2 **A** No.

3 **Q** All right. Do you know where he went?

4 **A** I don't.

5 **Q** Okay. So what happened next?

6 **A** So I finished pumping gas. I arranged my drinks, and got

7 in the car after I got done pumping gas.

8 **Q** How much gas did you pump? Do you remember? Was it

9 empty? Were you empty?

10 **A** I was like half a tank, so like $27. I can't remember the

11 gas prices then, it was kind of high, but $30, around there.

12 **Q** Okay. Then what did you do?

13 **A** So I got in my car, put my seatbelt on, and I commenced to

14 head back towards the freeway.

15 **Q** Did you notice whether or not an officer followed you at

16 that point?

17 **A** I did notice it.

18 **Q** And right behind you?

19 **A** Yeah. He immediately started following me.

20 **Q** Do you know who that was?

21 **A** I now know it was Joe Watson.

22 **Q** Okay.

23 **A** But I didn't know who it was at the time.

24 **Q** Just one officer following you?

25 **A** Yes.

**Q**   What happened next?

**A**   I -- right there when you leave Maverick at that street, it is kind of congested right there, so I know from prior experience that you have to move over fast in order to get into the turning lane.  And so I checked to make sure that the traffic was -- it was safe to do so, and that's what I did. And he did the exact same thing too, so he was right behind me at the light ready to turn left.

**Q**   Did he follow you out on the freeway?

**A**   Yes, sir.

**Q**   Then what happened?

**A**   So I just head -- I merged on to the freeway.  I am driving, and I just -- yeah.  I am just driving.  I know that he is following me.

**Q**   Is he right behind you?

**A**   Yes.

**Q**   For how long?

**A**   I believe he got off at Exit 10 when I watched him leave.

**Q**   Okay.  So Officer Watson just pulled off the freeway at Exit 10?

**A**   Yes, sir.

**Q**   Then what happened?

**A**   Well, it is kind of congested, so I see cars coming, so I try to move over so these cars that are coming on to the freeway could merge on to the freeway, so I switched lanes, and

1  I think -- I believe I got into the fast lane so I could
2  continue on my way.
3  **Q**    Did you at some point notice another officer behind you?
4  **A**    Well, at this time when I'm merging on to the freeway, I
5  know I have to move over to the fast lane so I can pass this
6  diesel in front of me.  So I hit my blinker, and then in the
7  process of doing that, I looked in my rear-view mirror to check
8  and see if there's any oncoming cars.
9        I looked through my thing to see if there's any cars
10  in the blind spot.  And I looked at the side-view mirror.  I
11  see Agent Tanner there -- well, his patrol car.  And I am not
12  knowing -- normally in a situation like that, when you see an
13  officer in the fast lane, they are either coming real fast or
14  they have an agenda, so I didn't know what he was doing at the
15  time.  And so I kind of waited quickly to see what he was going
16  to do.  I determined he was going to stay back there so I just
17  continued on my business.  I switched lanes and continued to
18  move forward.
19  **Q**    Okay.  And what happened next?
20  **A**    I remember a car that was in the fast lane.  As I am
21  accelerating, I see that it is kind of far in the distance,
22  probably five or six cars in front of me.  So as I am going, I
23  know it's the fast lane, so I am accelerating.  Once I see that
24  three or four cars ahead of me, and it is not accelerating, I
25  start to decelerate.

**Q**   And what was the car in front of you?

**A**   A white passenger vehicle.

**Q**   Okay.  What happened next?

**A**   Well, I know that -- just because I drive like a grandma, and you can tell from the way I was driving, that's how I have always driven.  So I just know that I have to keep a certain distance from this car, and I am judging it off the -- I am like, at least, three or four cars behind it, so I kept that safe pace the whole way.

**Q**   And did you get any closer than that to that white vehicle?

**A**   Maybe like three cars.

**Q**   Okay.  Did you make an estimation how many seconds behind that car you were?

**A**   Well, based off three cars, that would be about three seconds.

**Q**   In your mind, you are at least three seconds behind the white car?

**A**   Yes.

**Q**   All right.  And how long did you stay behind that white car?

**A**   All the way until I was able to remove myself from that situation.

**Q**   How did that happen?  Tell us how you were able to remove yourself from that situation.

1  **A**    We are passing the semi, and I think we passed like two

2  other vehicles.  His car is not moving out of the way, so I am

3  just carrying on and staying at that pace that I was driving.

4  **Q**    Do you know what the speed was at that time, do you

5  remember?

6  **A**    I believe 70.

7  **Q**    Was it in a -- in a posted speed limit area of 80, do you

8  know?

9  **A**    No, not yet.

10  **Q**    Okay.

11  **A**    No, it usually --

12         **THE COURT REPORTER:**  I'm sorry.  I didn't hear that.

13         **THE WITNESS:**  That usually starts where the road

14  starts inclining.  That's about Exit 16 somewhere in there.

15  BY MR. GARRETT:

16  **Q**    Okay.  And were you within the speed limit?

17  **A**    I was driving below the speed limit after that.

18  **Q**    Because of the car in front of you?

19  **A**    Yes, sir.

20  **Q**    Okay.  And once you were able to -- how did you navigate

21  around that white car?  How did that finally happen?

22  **A**    I had to wait until we passed the semi in order to do

23  that.  So I just continued on my path.  And as soon as I was

24  able to, as soon as I seen that it was safe, then I switched

25  lanes and got back into the slow lane.  I just removed myself

1  from that situation.

2  **Q**   Okay.  And would it be helpful to watch the dash cam of

3  this encounter with you and Officer Tanner?

4  **A**   Yes.

5      **MR. GARRETT:**  All right.  Can we watch the dash cam.

6  BY MR. GARRETT:

7  **Q**   I think we can pick it up at Mile Marker 10, would that be

8  all right?

9  **A**   Yes, sir.

10 **Q**   Move forward a little bit.

11      (Video plays.)

12      THE WITNESS:  That's --

13      **THE COURT REPORTER:**  Sir, I can't hear you over the

14  audio.

15      **THE WITNESS:**  That's me.

16  BY MR. GARRETT:

17 **Q**   Is this okay right here?

18 **A**   No.  It is going to go back a little bit, probably when I

19  switched lanes to the fast lane.

20 **Q**   Okay.  Right here.  So is that -- are you directly in

21  front of Officer Tanner right now?

22 **A**   No.

23 **Q**   Where are you?

24 **A**   There on the left.

25 **Q**   You are in the fast lane?

1   **A**     Yes.  And that white car is in front of me at that time.

2   **Q**     And then a truck pulls over between you and Officer

3   Tanner; correct?

4   **A**     If you back up just a little bit, you can see there's a

5   great distance between me and the white car.

6   **Q**     We need to go back?

7   **A**     Yes, sir.

8   **Q**     Okay.  Tell us where to stop.

9   **A**     Right there.  Okay.

10  **Q**     Stop right there.  Is that what you are talking about?

11  **A**     Yes, sir.

12  **Q**     So that distance right there, that white car is directly

13  in front of you in the fast lane right now, correct?

14  **A**     Yes.

15  **Q**     And you estimate yourself to be three seconds behind that

16  white car right there?

17  **A**     At least three vehicles, yes.

18  **Q**     Did you stay that distance the entire time?

19  **A**     Yes, sir.

20  **Q**     Did you get any closer?

21  **A**     No.

22  **Q**     Was the white car accelerating, decelerating, what was

23  happening?

24  **A**     I would say staying the same pace.  It wasn't

25  accelerating.

**Q**    Okay.  But that same distance that we are looking at right

now, we are, basically, locked in at -- as far as the dash cam

shows, it looks like it is 3:00 -- 15:30:27.  That same

distance reflected there is the same distance you had between

you and the white car?

**A**    Yes.

**Q**    The entire time?

**A**    Yes, sir.

**Q**    Which you estimate to be about three seconds?

**A**    Yes, sir.

          **MR. GARRETT:**  Go ahead and play it.

                              (Video plays.)

BY MR. GARRETT:

**Q**    So that truck pulls in behind you, right, and that's the

last we can really see of the dash cam video of the three

vehicles, right?

**A**    Yes, sir.

**Q**    And you couldn't get over because of the semi-diesel right

there in the slow lane?

**A**    Yes.  I couldn't -- no.  And I know you've got to have at

least like a car or -- two cars coming -- two or three cars

distance before you can move over to create the space in

between car.

**Q**    You had to get a certain distance past the semi --

**A**    Correct.

**Q**    -- before you could switch lanes?

**A**    Yes, sir.

**Q**    Does the video show when you switch lanes?

**A**    I believe it kind of captures it.  You can see once I am in the lane.

**Q**    Do you know if you switched lanes yet?

**A**    I don't believe I have.  I think I am still waiting for that distance, the safe distance.  Right here --

**Q**    That --

**A**    No. I'm --

**Q**    Oh.  So you had to pass that --

**A**    Yes, sir.

**Q**    -- that --

**A**    That's why I didn't --

       **THE COURT REPORTER:**  Counsel, can I get you to speak one at a time, please.

       **THE WITNESS:**  Oh, sorry.

       I believe I moved over right there.

BY MR. GARRETT:

**Q**    Okay.  Yeah.  I think --

**A**    You can see --

**Q**    You can see you car there now, right?

**A**    Yes.

**Q**    I think that's good.  Is that good?

**A**    Yes.

**Q**     All right.  So you were stopped shortly after that, correct?

**A**     Yes, sir.

**Q**     All right.  And was it Officer Tanner that stopped your vehicle?

**A**     Yes.

**Q**     And when he stopped you, what was he telling you was the purpose of the stop?

**A**     He was telling me -- he told me specifically that in the State of Utah something -- or anything can't be hanging from the rear-view mirror, three to four inches, and that was an obstruction of the windshield.  So he never mentioned anything about obstruction of my view.  He said it was a windshield obstruction.

**Q**     Did he ask you to remove it?

**A**     Yes, he did.

**Q**     Did you remove it at that time?

**A**     I attempted to, but it got stuck on the -- whatever the little knobs are back there -- and there was a pin that kind of held the mask kind of the way it was wrapped around the rosary. I poked myself trying to take it off, but the rosary ended up breaking, and then I was never able to get it off there. Montgomery ends up walking up after that, and advising me to get out of the car, so I was never able to completely take it off the rear-view mirror.

1  **Q**   So describe exactly what it was that was hanging from the

2  mirror there?

3  **A**   So it was a rosary, and then it was a cloth mask that was

4  wrapped around the rosary.  It was a picture of my grandmother.

5  My cousin, she had that -- she is real religious so she kind of

6  kept that for sentimental reasons for my grandma to be with her

7  at all times, so that's why it was there.  It was her car, so

8  that's why she had it up there.

9  **Q**   And did you ever see that -- the rosary and the mask again

10 after the stop?

11 **A**   What do you mean?

12 **Q**   Did you ever -- did you keep it?  Did you have it?

13 **A**   It was still in the vehicle when my cousin came to pick up

14 her vehicle.

15 **Q**   Okay.  And have you photographed that since that time?

16 **A**   She has, not me.  I am incarcerated.

17       **MR. GARRETT:**  Can I approach and grab an exhibit,

18 Your Honor?

19       **THE COURT:**  You may.

20 BY MR. GARRETT:

21 **Q**   Showing you what's been marked as Defendant's Exhibit

22 No. 4, and ask if you recognize that.

23 **A**   Yeah.  That's the mask that was hanging from the rear-view

24 mirror and the rosary.

25 **Q**   Is it substantially in the same condition it was at the

```
1   time that it was hanging from the mirror?

2   A    Yes.

3         MR. GARRETT:  All right.  And I move -- I admit --

4   Defendant's Exhibit 4 -- or offer Defendant's Exhibit 4, Your

5   Honor?

6         THE COURT:  Ms. Reddish-Day.

7         MS. REDDISH-DAY:  No objection.

8         THE COURT:  Okay.  Defendant's Exhibit 4 is admitted.

9     (Defendant's Exhibit No. 4 was received into evidence.)

10  BY MR. GARRETT:

11  Q    All right.  And it looks like there's a ruler up next to

12  the mask and the rosary; is that right?

13  A    Yes.

14  Q    It's got it under -- less than three inches wide; is that

15  right?

16  A    Yes, I believe it is like two and a quarter.

17  Q    Two and a quarter inches wide.  Okay.  And that is the

18  same rosary you had up on the windshield there, correct?

19  A    The exact same rosary and mask.

20  Q    Okay.  All right.  So you were asked to step from the

21  vehicle; is that right?

22  A    Yes.

23  Q    After the stop?  And officers searched your car, correct?

24  A    Yes.

25  Q    And they found drugs in the car, correct?
```

**A**   Yes.

**Q**   All right.  And at some point, you spoke with both Agent Tanner and Deputy Montgomery?

**A**   During the first part of when they put me out, I was talking briefly with them.  But then after that, after the drugs were found, they put me in Tanner's vehicle.

**Q**   Okay.  And how long were you in Officer Tanner's vehicle?

**A**   Probably throughout the whole search, so like 20, 30 minutes.

**Q**   Okay.  And during that time, did you talk to any of the officers?

**A**   At that time, no.  I was waiting for them to -- I was still in the back of the car while they did the search.  But after that, they came back and Agent Tanner talked to me about possibly talking to the DEA, and Homeland Security about possibly taking the load to where the destination was supposed to be.

**Q**   Okay.  Before we -- I do want to follow up with that, but before we do that, I want to go back and ask you some questions about the rosary and the mask.  It was hanging from the mirror; is that right?

**A**   Yes, sir.

**Q**   Rear-view mirror.  Did it obstruct your view so that you couldn't see out the windshield?

**A**   No.

**Q**    Were you able to see everything in front of you just fine?

**A**    Yes, sir.

**Q**    It didn't cause you to not be able to see the road or things that were happening around you?

**A**    No.

**Q**    You were able to see just fine?

**A**    Yes, sir.

**Q**    Why is that?  Is it because it wasn't in your way?  It wasn't a material obstruction?  Why were you able to see things just fine?

**A**    It just wasn't in my line of view.

**Q**    Was it below your line of view?

**A**    It wasn't in my line of view.  It was off to the side, so I could see everything in front of me.

**Q**    Okay.  Now, back to some of your discussions with Agent -- or Officer Tanner, so you talked about delivering the load. Did that happen?

**A**    No.

**Q**    All right.  And did you have any other conversations with Officer Tanner while you were there in the vehicle?

**A**    Well, while I was in the vehicle, when the DEA and the Homeland Security showed up, they put me in their car for -- I am not sure for how long -- maybe 20 to 30 minutes.  I had a brief interview with them.  And after that, after they were done with me, they were going to do their phone calls or --

contact whoever it was they needed to contact in order to
arrange the drop off.

        And so after that, that's when they were getting
ready me to put me back in Tanner's vehicle, and I asked for a
drink of the soda that I had in my car.  And so they pulled me
off to the side.  They got it.  They came and gave me a drink.
They walked me back to Tanner's vehicle.  They took off the
cuffs and put them in front of me, and then they put me --
Tanner put me in his front seat, and gave me my drink.

**Q**    Is that the drink you had purchased at the Maverick?

**A**    Yes, sir.

        **MR. GARRETT:**  Before we go any further with that, I
just want to mark another exhibit and show it to you.

BY MR. GARRETT:

**Q**    I am showing you what has been marked as Defendant's
Exhibit 5, do you recognize this?

**A**    I recognize what it is, yes.

**Q**    What is it?

**A**    It's a tree air freshener.

**Q**    Okay.  And is it any particular air freshener, or just
generally an --

**A**    just a general one.

**Q**    And just -- used to depict the width of an air freshener;
is that right?

**A**    Yes.

**Q** Does it fairly and accurately depict the air freshener that is shown in the picture?

**A** It says almost three inches.

    **MR. GARRETT:** Okay. I offer Exhibit 5, Your Honor, Defense Exhibit 5.

    **THE COURT:** Any objection?

    **MS. REDDISH-DAY:** I am going to object to lack of foundation. I don't know if this was an air freshener that was in the defendant's vehicle, or he is just testifying as to air fresheners in general. Objection. Lack of foundation.

    **THE COURT:** I think he did say that it is just an exemplary air freshener; is that correct?

    **THE WITNESS:** Yes, sir.

    **THE COURT:** Let me ask one more question, is it -- do you know who took the picture?

    **THE WITNESS:** My cousin.

    **THE COURT:** Mr. Garrett, any follow-up questions?

    **MR. GARRETT:** No.

    **THE COURT:** Ms. Reddish-Day?

    **MS. REDDISH-DAY:** Your Honor, I would just object to that exhibit. I don't think it has anything to do with this case whatsoever. If it wasn't found in his vehicle, I don't see the relevance of that particular exhibit.

    **THE COURT:** Overruled. I will admit Defense Exhibit No. 5.

(Defendant's Exhibit No. 5 was received into evidence.)

**MR. GARRETT:** Thank you.

BY MR. GARRETT:

**Q** And then we will finish up with your conversation with Tanner there -- Officer Tanner there in the vehicle, what happened after you -- he came back to the vehicle and you guys had another discussion? What was that about?

**A** After he put me in the vehicle, he came back and sat next to me. Basically described to me that we are going to have to sit there and wait for the DEA and Homeland Security to see if they are going to be able to put together the drop, and see if they have enough man power up north. They basically had to make calls, so we were going to sit there for a minute.

He was kind of adamant -- or kind of excited about the fact that he was going to be involved in this drop off of the drugs, so on and so forth. And he starts to tell me that he is going to possibly have to call his wife to inform her that he is not coming home on time like he is supposed to.

And then -- I think at the time he is trying to butter me up to actually do the drop off. So he starts by telling me, "I shouldn't be showing you this because you can go and tell other people what I am using to pull people over, but this is why I really pulled you over."

And he turns the screen towards me, and I am looking -- I don't really know what I am looking at. I wasn't

familiar with AFPL at the time.

He goes, "This vehicle traveled to California two times in the last three months."

And he goes, "Are you the one that took the vehicle the other time?"

And I was like, "No, I believe my cousin at the time had to go pick up her mom because one of my other cousins started drinking again, and so she had to go ruin her vacation, and pick her up, and bring her home to take care of my cousin."

And so he tells me that, and then he goes into a whole another story about some individual -- I don't know who this individual was -- that this individual supposedly made it to its destination somewhere in Colorado, and he was kind of -- not upset about it, but telling me that it made it to its destination. And he was okay with that, because at that moment he knew the vehicle was on its way back, and then he told me he was going to take that vehicle's money -- or that individual's money, because he knew that vehicle was on its way back with the proceeds from whatever drugs, he was assuming that --

**MS. REDDISH-DAY:** Your Honor, I am going to object. This is all hearsay. I am making a motion to strike. He is making allegations against Office Tanner that is completely hearsay.

**MR. GARRETT:** Judge, I am probably okay if you strike the part about the vehicle coming back, and taking the money,

but I think the other part is relevant.  Because when I asked

Officer Tanner about that conversation, he said he didn't

remember that it happened, about the ALPR, showing Mr. Alvarado

the screen, you know, that he used this ALPR system to stop

him.  I think that's relevant.  The other part, I don't know

that I disagree with.

**THE COURT:**  In terms of hearsay though?

**MR. GARRETT:**  It would be used to kind of -- as

impeachment material, Your Honor.  Just to -- because he wasn't

able to recall the conversation, so we're -- and it could be a

lack of recollection or it could be just a denial.  In any

event, we are demonstrating that this conversation took place,

even though his testimony was that he couldn't recall.

**MS. REDDISH-DAY:**  Your Honor, Officer Tanner's

testimony of, "I do not recall," would not be proper

impeachment for the defendant to testify to hearsay to counter

that.  He simply didn't recall the conversation.  This is

not -- the defendant's testimony, to whatever Officer Tanner --

whatever he is going to testify to that Officer Tanner said

does not impeach Officer Tanner if Officer Tanner simply did

not recall the substance of the conversation.

**THE COURT:**  It appears to me that it is being offered

for a reason other than its truthfulness, that the conversation

happened, rather than the substance of the conversation.  I

think it would probably fall under the present sense impression

exception anyway, so I am going to overrule the objection.

            But I will, Mr. Garrett, just ask you to try to help
Mr. Alvarado not to testify in long narratives so we can rule
as necessary.

            **MR. GARRETT:**  Thank you, Judge.

            **MS. REDDISH-DAY:**  Your Honor, I would renew my motion
to strike the allegations that are made without foundation or
basis against Officer Tanner that are pure hearsay.

            **THE COURT:**  Overruled.

            **MR. GARRETT:**  I don't have anything further at this
time, Judge.  Thank you.

            **THE COURT:**  Thank you.

            Ms. Reddish-Day.

                            CROSS-EXAMINATION
BY MS. REDDISH-DAY:

**Q**    Good afternoon, Mr. Alvarado.

**A**    Good afternoon.

**Q**    You made some strong allegations against Officer Tanner
here today; isn't that correct?

**A**    I wouldn't consider them allegations.  I was just stating
facts.

**Q**    And you are facing -- you are facing very serious federal
charges for trafficking narcotics in this case, correct?

**A**    Correct.

**Q**    And based on that, you have every motivation in the world

1  to lodge accusations against Officer Tanner; isn't that

2  correct?

3  **A**    I wouldn't say motivation to lodge these accusations.

4  From the very beginning, I have been seeking just the truth.

5  **Q**    And you realize that you face a potential prison term in

6  this case; is that correct?

7  **A**    Yes.

8  **Q**    And isn't it fair to say you will do anything in your

9  power to avoid that outcome; is that correct?

10  **A**    No.

11  **Q**    No?  And you don't have any way of knowing what Officer

12  Tanner actually observed that even before he pulled you over;

13  isn't that correct?

14  **A**    Just what he told me.

15  **Q**    But you don't know what he actually observed; isn't that

16  correct?

17  **A**    No, I don't.

18  **Q**    And just like he doesn't know what you observed; isn't

19  that correct?

20  **A**    Correct.

21  **Q**    You don't know what he observed?

22  **A**    Correct.

23  **Q**    And isn't it true that you were also -- you knew that

24  Officer Tanner was following you at some point as you traveled

25  northbound on I-15, correct?

**A**     Yes, I observed him --

        **THE COURT REPORTER:**  I didn't hear that.

        **THE WITNESS:**  Yes, I observed him.

BY MS. REDDISH-DAY:

**Q**     And prior to that, you observed another officer following you briefly; isn't that correct?

**A**     Yes.

**Q**     And so you were nervous as these two different officers were following you northbound on I-15; isn't that correct?

**A**     No.  Not nervous.

**Q**     You weren't nervous?

**A**     No.

**Q**     Even though you had a car full of multiple amounts and types of narcotics?

**A**     I knew I wasn't committing any traffic violations so I had no reason to be nervous.

**Q**     So you weren't committing any traffic violations.  That's your testimony.

**A**     Yes.

**Q**     But you were committing violations of federal law; isn't that correct?

**A**     Yes.

**Q**     And you had a large amount of -- you had about 27 pounds of marijuana in your vehicle; isn't that correct?

**A**     I believe it is somewhere near that.

1 **Q**   Okay.  And you had fentanyl pills in your car, correct?

2 **A**   I believe they were there, yes.

3 **Q**   I can't hear you.

4 **A**   I believe they were in there, yes.

5 **Q**   And you also had cocaine in your vehicle, is that correct,

6 a large amount of cocaine?

7 **A**   Yes, I think there was some.

8 **Q**   And you also had 19 pounds of methamphetamine in your

9 vehicle; isn't that correct?

10 **A**   Correct.

11 **Q**   And none of that made you nervous as you had two different

12 officers following you up I-15 northbound?

13 **A**   I just figured if I don't commit traffic violations,

14 there's nothing to be nervous about.

15 **Q**   So you testified that you were following behind a white

16 vehicle that was traveling slowly, correct?

17 **A**   Yes.

18 **Q**   And as you were traveling behind that white vehicle, there

19 was -- you were in the fast lane; is that correct?

20 **A**   Yes.

21 **Q**   And there was a semi-truck in the lane just to the right

22 of you, correct?

23 **A**   I believe so.

24 **Q**   As the white vehicle and yourself were attempting to pass

25 that semi-truck, correct?

1    **A**    Yes.

2    **Q**    Okay.  And that vehicle was proceeding slowly in your

3    estimation; is that correct?

4    **A**    It was driving below the speed limit.

5    **Q**    Okay.  And you were traveling northbound on I-15?

6    **A**    Correct.

7    **Q**    And you're traveling side by side with the semi as there's

8    a vehicle in front of you impeding traffic; is that correct?

9    **A**    Yes.

10   **Q**    Okay.  And you didn't come -- your testimony is that you

11   didn't come within three vehicles of that car at any point,

12   correct?

13   **A**    Correct.

14   **Q**    Through that entire many mile stretch that we observed on

15   the body -- the dash cam, correct?

16   **A**    Correct.

17   **Q**    You never came close to that vehicle, even though it was

18   traveling too slowly next to a semi?

19   **A**    No.

20   **Q**    Okay.  So if Officer Tanner perceived that then that would

21   be untrue; is that correct?

22   **A**    Yes.

23   **Q**    Okay.  And at your first opportunity to navigate around

24   that car, you did so?

25   **A**    I removed myself from the situation that we were

1  addressing.

2  **Q**   So after -- you were following the white car alongside the

3  semi, correct?

4  **A**   Yes.

5  **Q**   And then there was another vehicle in front of the semi,

6  correct, that you also had to get past?

7  **A**   Yes.

8  **Q**   And this following occurred for several miles, is that

9  fair to say, correct?

10  **A**   I think, like, two miles.

11  **Q**   Okay.  And during none of that period, you believe you

12  were following the white vehicle too closely?

13  **A**   No.

14  **Q**   Okay.  And that's because you were carrying a lot of

15  narcotics in your vehicle, and you wanted to be sure that you

16  would not be stopped; is that correct?

17  **A**   I don't know how me carrying had anything to do with the

18  distance between the vehicles.

19  **Q**   Well, you testified you wouldn't get pulled over if you

20  didn't commit traffic code violations, correct?

21  **A**   True.

22  **Q**   Okay.  And -- but you were distracted because there was an

23  officer in back of you, and you knew that, correct?

24  **A**   I wasn't distracted, no.

25  **Q**   You weren't distracted by an officer following you up the

```
 1   freeway?

 2   A    No.

 3   Q    Okay.  And then you ultimately passed the semi, correct?

 4   A    Yes.

 5   Q    And you were able to move into the right-hand lane,

 6   correct?

 7   A    Yes.  Once it was safe to do so.

 8   Q    And with regard to the object that was hanging in your --

 9   hanging on your rear-view mirror, your testimony is that did

10   not obstruct your view; is that correct?

11   A    Correct.

12   Q    But you don't know what Officer Tanner's view was of that

13   object hanging from your rear-view mirror, correct?

14   A    I don't even know if he can see it, to be honest with the

15   fact, with the tinted windows and stuff like that.

16   Q    And so that object is hanging down many inches below the

17   rear-view mirror, correct?

18   A    A couple inches, yes.

19   Q    Only a couple inches?

20   A    Well, I didn't measure it, so I couldn't tell you.

21             MS. REDDISH-DAY:  Well -- can I approach, Your Honor?

22             THE COURT:  You may.

23   BY MS. REDDISH-DAY:

24   Q    So I am showing you -- let's talk about Defense Exhibit 4.

25   You maintain that that's the mask and rosary that was hanging
```

1  from your rear-view mirror, correct?

2  **A**    Correct.

3  **Q**    That's certainly more than two inches in length, correct?

4  **A**    Yes.

5  **Q**    Okay.  And so if you are in the driver's seat of the

6  vehicle, as you were, and you are looking to the right, that

7  would be in your line of sight, correct?

8  **A**    Yes.

9  **Q**    Yeah, it would be.  And that photograph was taken after

10  your car was released to who?

11  **A**    To my cousin.

12  **Q**    Okay.  And your cousin took that picture?

13  **A**    Yes.

14  **Q**    And how are you certain that that's the object that was

15  hanging from that rear-view mirror?

16  **A**    Because it was in the car when I borrowed the car.

17  **Q**    But you were incarcerated when that picture was taken; is

18  that correct?

19  **A**    Yes.

20  **Q**    You didn't actually take it?

21  **A**    No.

22  **Q**    Okay.  You did, in fact, make a short trip to California

23  just prior to being pulled over; is that correct?

24  **A**    I was there for three days.

25  **Q**    Okay.  And so it didn't surprise you when you learned as

1  you testified that Officer Tanner told you that your vehicle

2  had traveled to and from California recently, because that was

3  true, correct?

4  **A**    Yes.

5  **Q**    Okay.  And you had gone to California to pick up

6  narcotics; is that correct?

7  **A**    To pick up my tools too, yes.

8  **Q**    But also narcotics?

9  **A**    Yes.

10  **Q**    Okay.  And so this isn't the first time you have done

11  that, isn't that correct?

12        **MR. GARRETT:**  Objection, Your Honor.

13        **THE COURT:**  Based on what?

14        **MR. GARRETT:**  Well, I mean -- I understand he has

15  taken the stand in this case, and shed some of his protections,

16  but I don't want him admitting to other crimes, and here on the

17  stand that may -- I don't know what his answer would be.  I

18  just don't want to subject him to self-incrimination at

19  this point on something that is unrelated to the charges in

20  this case.  It is beyond the scope.

21        **THE COURT:**  The theory of asking, Ms. Reddish-Day?

22        **MS. REDDISH-DAY:**  Well, Your Honor, he is testifying

23  that he is not nervous when he is transporting narcotics with

24  two officers following him.  I just wanted to inquire as to how

25  many times he has done this to cause him to have no anxiety or

nervousness about traveling up the 15 with a car full of narcotics.

        **THE COURT:**  I am going to overrule the objection.

BY MS. REDDISH-DAY:

**Q**    So this isn't the first time you have done this; isn't that correct?

**A**    No.

**Q**    How many times have you done this before?

**A**    Once --

        **MR. GARRETT:**  Objection, Judge.  I really think this is subjecting him to incrimination beyond the scope of these proceedings and beyond the scope of my direct examination.  I am worried about where this is headed.

        **THE COURT:**  I understand.  If you want to consult with Mr. Alvarado about his Fifth Amendments rights, you can, but I think this does fall under a theory that Ms. Reddish-Day is articulated about his demeanor, and it's not being offered to show conformity with these actions, and so I think that they are appropriate at this time.

        Do you need a moment with Mr. Alvarado?

        **MR. GARRETT:**  Yeah.  Maybe a moment, Judge, if that's okay?

        **THE COURT:**  Go ahead.  Come on up.

        (Counsel confers with client off the record.)

///

BY MS. REDDISH-DAY:

**Q**   So how many times have you engaged in this drug
trafficking activity?

**A**   Once before.

**Q**   What?

**A**   Once before.

**Q**   Once before.  Okay.  So this was your second time?

**A**   Yes.

**Q**   And you weren't nervous at all about two cops following
you up the 15?

**A**   No.

        **MS. REDDISH-DAY:**   I am just going to cue up the
video.  I am just going to play -- I am playing Officer
Tanner's body cam starting at --

        Can you go to that?

        Starting at 13:40 on the bottom meter, not the top of
the body cam.  It is actually 20:47.

                       (Video plays.)

BY MS. REDDISH-DAY:

**Q**   So do you see this view?  Can you see that on your screen
there?

**A**   Yes, ma'am.

**Q**   And it is your testimony that the items depicted in
Defense Exhibit 4 are the same items that are hanging from that
rear-view mirror in that vehicle that day?

```
1    A    Yes, ma'am.

2            MS. REDDISH-DAY:  Nothing further, Your Honor.

3            THE COURT:  Very good.

4            Mr. Garrett, any redirect?

5            MR. GARRETT:  No, thank you, Judge.

6            THE COURT:  Very good.

7            You may go back to counsel table, Mr. Alvarado.

8            Take a moment, if you need it, Mr. Garrett.

9            MR. GARRETT:  Thank you.

10           (Counsel confers with client off the record.)

11           MR. GARRETT:  Thank you, Judge.  We rest as well.  I

12   just want to make sure we have the exhibits offered and

13   received.  I think we do.

14           THE COURT:  I think we have Defense Exhibit 1 through

15   5.

16           MR. GARRETT:  Received?  Is that your list?  Okay.

17           THE COURT:  They have been received.

18           Ms. Reddish-Day, any sort of housekeeping things

19   before we wrap up?

20           MS. REDDISH-DAY:  No.  I think all the Government's

21   Exhibits were received as well on Thursday or on the previous

22   hearing in November.

23           THE COURT:  Okay.

24           MS. REDDISH-DAY:  I don't believe there's any

25   exhibits that are outstanding that have not been received.
```

```
 1        THE COURT:  That's my recollection as well.  That
 2   concludes, then, the evidentiary receipt portion of this
 3   motion.  Let's talk about scheduling a little bit.
 4        Mr. Garrett, how long would you like to have after
 5   you receive the transcript for your brief to be due?
 6        MR. GARRETT:  I am glad you said after I receive the
 7   transcript.  Would 30 days be okay after I receive the
 8   transcript?
 9        THE COURT:  I think that's reasonable.
10        Ms. Reddish-Day, I intend to give the Government to
11   same 30 days.  Any objection to that?
12        MS. REDDISH-DAY:  No, Your Honor.
13        THE COURT:  And then if needed, I will give you a
14   14-day reply, but let me know -- Mr. Garrett, if you don't need
15   that, let us know.
16        MR. GARRETT:  Okay.
17        THE COURT:  We'll go forward.  At that point, I will,
18   obviously, take the memorandum, look at them, and decide.  In
19   terms of oral argument, my initial reaction would be to go
20   ahead and have oral argument shortly thereafter, if needed, but
21   we can address that at a later time.
22        Anything else we need to do on the record today?
23        MS. REDDISH-DAY:  Your Honor, just while we are here,
24   with regard to the transcript, and ordering of that, the
25   Government ordered the transcript for the November 8th and
```

1 | 9th hearing at some expense to the Government.  And I have been

2 | asked that that expense be incurred by defense going forward.

3 | it is a defense motion, so that should come out of CJA funds as

4 | far as ordering that transcript, and then, of course, we have

5 | to pay for a copy, I believe.

6 | **THE COURT:**  I think that's reasonable.

7 | Mr. Garrett, let me know if you run into a log jam

8 | with that and we will work that out.

9 | **MR. GARRETT:**  Okay.

10 | **THE COURT:**  Anything else?

11 | **MR. GARRETT:**  No.  Thank you, Judge.

12 | **THE COURT:**  That concludes the hearing and court for

13 | today.  We are adjourned.

14 | (Proceedings adjourned at 3:28 p.m.)

C E R T I F I C A T E

STATE OF UTAH          )

                       )     ss.

COUNTY OF WASHINGTON )


        This is to certify that the proceedings in the foregoing matter were reported by me, Tasha Sisneros, RPR, CRR, CSR, CRC, in stenotype and thereafter transcribed into written form;

        That said proceedings were taken at the time and place herein named;

        I further certify that I am not of kin or otherwise associated with any of the parties of said cause of action and that I am not interested in the event thereof.

        In witness whereof I have subscribed my name this 4th day of August, 2024.



_____
        Tasha Sisneros, RPR, CRR, CSR